1    **Sean M. Sherlock (CA 161627)**
     **SNELL & WILMER L.L.P.**
2    **600 Anton Blvd., Suite 1400**
     **Costa Mesa, California 92626**
3    **Telephone: (714) 427-7000**
     **Facsimile: (714) 427-7799**
4    **ssherlock@swlaw.com**

5    **Attorneys for Defendant Syntellect, Inc.**

6

7

8               **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

**FILED**

**08 MAY 28 PM 3:35**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

**'08 CV 0941 BEN NLS**

10    SOUTHERN CALIFORNIA GAS
     COMPANY, a California corporation,

11               Plaintiff,

12    v.

13    SYNTELLECT, INC., a Delaware
14    corporation,

15               Defendant.

16

Case No.

**NOTICE OF REMOVAL UNDER
28 U.S.C. § 1446**

17         Defendant Syntellect, Inc. hereby files this Notice of Removal to this Court

18   of a case pending in the Superior Court of the State of California for the County of San

19   Diego captioned: *Southern California Gas Company, a California corporation, Plaintiff,*

20   *v. Syntellect, Inc., a Delaware corporation, Defendant*; Case No. 37-2008-00082356-CU.

21         On April 28, 2008, Syntellect was served with the Summons and Complaint

22   in this matter. A copy of the Summons and Complaint in the state court case is attached

23   hereto as Exhibit A. A copy of the court's Notice of Case Assignment in the state court

24   case is attached hereto as Exhibit B.

25         This Court has jurisdiction under 28 U.S.C. § 1332 in that at the time of the

26   filing of the Complaint in the California state court and at the time of the filing of this

27   Notice of Removal, the case involves a civil action between citizens of different states

28   where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest

-1-                NOTICE OF REMOVAL

**Snell & Wilmer**
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1    and costs.  More specifically, the plaintiff, Southern California Gas Company, is a citizen

2    of the state of California in which it has been incorporated and defendant, Syntellect, Inc.,

3    is a corporation organized under the laws of the State of Delaware, having its principal

4    place of business in the State of Arizona.  The Complaint states a cause of action for

5    breach of contract for alleged failure to defend and indemnify the plaintiff for claims of

6    patent infringement made against the plaintiff in a case captioned:  *Ronald A. Katz*

7    *Technology Licensing, L.P., Plaintiff, v. Avon Products, Inc., et al*, Case No. CV 07 3672

8    CAF (CTx), filed in the United States District Court for the Central District of California.

9            Plaintiff Southern California Gas Company alleges that defendant Syntellect

10   must indemnify the plaintiff for any settlement payment or judgment arising out of the

11   patent infringement suit against it and that Syntellect is contractually obligated to

12   reimburse the plaintiff for its attorney fees and costs incurred in defending that suit.

13           Based upon the allegations made in the Complaint filed in state court,

14   Syntellect believes that the plaintiff's claims for payment of any settlement or judgment

15   and reimbursement of plaintiff's attorney fees exceeds the sum or value of $75,000,

16   exclusive of interest and costs, satisfying the amount in controversy requirement of 28

17   U.S.C. § 1332.

18           Submitted herewith are copies of all process and pleadings that have been

19   served upon Syntellect in the state court action.

20

21   DATED:  May 28, 2008.

22                                        SNELL & WILMER L.L.P.

23

24                              By: _____

25                                        Sean M. Sherlock
                                          Attorneys for Defendant
26                                        Syntellect, Inc.

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

- 2 –                                   NOTICE OF REMOVAL

**EXHIBIT A**

04/21/2008  11:59    2139559250    ~        WILLENKEN LOH ET AL ~                    PAGE 02/14

SUM-100

## SUMMONS
### (CITACION JUDICIAL)

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br>SYNTELLECT, INC., a Delaware corporation,<br><br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br>SOUTHERN CALIFORNIA GAS COMPANY, a California corporation, | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)* |

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.  A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.  There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no le protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>San Diego Superior Court -Central Division<br>220 W. Broadway<br>San Diego, CA 92101 | CASE NUMBER:<br>*(Número del Caso):* 37-2108-00082356-CU |

**VIA-FAX**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jason H. Wilson -Willenken Wilson Loh & Lieb LLP  213-955-9240
707 Wilshire Blvd., Ste. 3850, Los Angeles, CA 92101

| | | | |
|---|---|---|---|
| DATE:          APR 2 · 2008<br>*(Fecha)* | Clerk, by     S. Haro        , Deputy<br>*(Secretario)*        *(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. January 1, 2004] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 425<br>American LegalNet, Inc. | www.USCourtForms.com |

3

1  WILLENKEN WILSON LOH & LIEB LLP
2  Jason H. Wilson (Bar No. 140269)
   William A. Delgado (Bar No. 222666)
3  707 Wilshire Blvd., Suite 3850
   Los Angeles, CA 90017
4  Tel: (213) 955-9240
   Fax: (213) 955-9250
5
6  Attorneys for Plaintiff
   Southern California Gas Company
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF SAN DIEGO

10                                                      **VIA-FAX**

11 SOUTHERN CALIFORNIA GAS          Case No.: 37-2008-000 82356-Ch
   COMPANY, a California corporation,
12                                   **COMPLAINT FOR:**
                  Plaintiff,
13                                   1. **Breach of Contract (Failure to Defend)**
14 v.                               2. **Breach of Contract (Contractual**
                                        **Indemnity)**
15                                   3. **Declaratory Relief**
   SYNTELLECT, INC., a Delaware
16 corporation,                      **DEMAND FOR JURY TRIAL**

17                Defendant.

18

19

20

21

22

23

24

25

26

27

28

                              -1-
                           COMPLAINT

Plaintiff Southern California Gas Company hereby alleges as follows:

1.    Defendant Syntellect, Inc. agreed to give Plaintiff Southern California Gas Company ("SoCal Gas") a broad indemnity for any patent infringement claim that has some connection with an interactive voice response system.  In 2007, Ronald A. Katz Technology Licensing, L.P. ("RAKTL") sued SoCal Gas for patent infringement and targeted Syntellect's interactive voice response system.  SoCal Gas made a demand for contractual indemnity and Syntellect refused to provide it.

## THE PARTIES

2.    Plaintiff, SoCal Gas, is a corporation organized and existing under the laws of the State of California, with its principal place of business at 555 West Fifth Street, Los Angeles, California.  SoCal Gas is the nation's largest natural gas distribution utility in the nation.   SoCal Gas serves about 20 million customers in California.

3 .    Plaintiff is informed and believes, and thereon alleges, that Defendant, Syntellect, Inc. ("Syntellect") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 16610 N. Black Canyon Hwy., Suite 100, Phoenix, AZ, and doing business in the state of California.

## JURISDICTION AND VENUE

4.    This Court has personal jurisdiction over the Defendants because Defendants' activities or contacts in California give rise to this Action and the parties have agreed to the exclusive jurisdiction of this court.

5.    Venue is proper in this Court because, *inter alia*, the alleged breaches of contract took place in this county and the parties have agreed to submit disputes related thereto to this venue.

-2-
COMPLAINT

5

# FACTUAL BACKGROUND

## Interactive Telephone Response and Customer Service Calls

6.   Like any company providing a utility distribution service, SoCal Gas has to respond to calls from its customers.  Customers, of course, call for a wide variety of reasons, including: to connect gas service to their home; to question a bill; to report a potential leak.  Not surprisingly, utilities have long handled these inquiries with telephone customer service representatives.

7.   Before the advent of computers, customer service calls that were received when customer service representatives were not available would simply be placed  on hold pending the availability of a customer service representative.  Once the  service representative answered the call, he or she would have had to write down information.

8.   Computers have revolutionized the way that customer service calls are handled.  A company can now use an "IVR" system to automatically route, sort and handle customer calls.  The term "IVR" stands for interactive voice response.  IVR is a telephone technology that allows a caller to interact with a database and/or voice prompts by, for example, pushing the buttons on a touch-tone telephone or responding to voice prompts, to acquire or enter information.  For example, a customer for SoCal Gas can push  "1" to report a gas leak, "2" to deal with billing issues, "3" to start or stop or transfer service, etc.

9.   An IVR system does not necessarily require customers to have any human interaction with a customer service representative.  Some transactions can be done entirely by using the IVR system.  An IVR system can also gather information on the caller and then connect the caller with a live customer service representative.  After the IVR system connects the caller to a live customer service representative, it can provide the representative with information about the caller.

10.   An IVR system enables a company using it to have fewer live operators because some of the calls are handled with self-service interactions on the IVR system.  And even if a

1   live operator is used, the operator has more information about the caller when he or she

2   answers the call and the transaction can be handled more quickly and efficiently.

3

4   **Syntellect Is A Self-Proclaimed Early Pioneer in IVR Systems and Vista Is One of Its**

5   **IVR Products**

6       11.   Syntellect has proclaimed itself to be an early pioneer of IVR systems.  For

7   example, in its 10-K report for 2000, Syntellect said of itself:  "We were founded in 1984, and

8   became an early pioneer in the Interactive Voice Response industry.  By 1995 we had become

9   the fourth largest provider of IVR technology IVR systems . . ."   See Exhibit 1 hereto,

10  Syntellect's 2000 10K report at page 6.

11      12.   In 1998, Syntellect introduced VocalPoint Interactive Services Transaction

12  Architecture ("Vista").  Exhibit 1, page 7.  Vista, which Syntellect has described as having

13  "call center technologies," includes an IVR component.  Id. at page 7 & 12.   Syntellect

14  claims that its "Vista IVR automates customer self-service inquiries and is sometimes

15  considered the 'voice' of an automated customer contact center."  Id. at 12.

16

17  **Syntellect and the Morganstein Patents**

18      13.   Plaintiff is informed and believes that Syntellect is the assignee of a set of

19  patents that were issued to Sanford J. Morganstein.  Plaintiff is informed and believes that Mr.

20  Morganstein is an expert in interactive voice response technology.  Plaintiff is informed and

21  believes that the portfolio of Morganstein patents that Syntellect holds as assignee includes

22  patents that concern automated call processes that are relevant to call centers.

23      14.   Plaintiff is informed and believes that Syntellect began to enforce its

24  Morganstein patents in 1997 by filing a series of patent infringement lawsuits against a

25  number of different companies.   In these suits, Plaintiff is informed and believes that

26  Syntellect accused the defendants of making products that infringed the Morganstein patents.

27

28

<div align="center">

-4-

COMPLAINT

</div>

**The Katz Patents Claim To Cover Interactive Voice Response Systems**

15.    Plaintiff is informed and believes that Ronald A. Katz is the inventor of a large portfolio of patents.  Plaintiff is further informed and believes that Mr. Katz and his licensing company, RAKTL assert that Mr. Katz's patents cover any automated interactive voice response system like Syntellect's Vista system.  Indeed, the Judicial Panel on Multidistrict Federal Litigation has referred to the Katz patents as patents involving "interactive voice response."  Plaintiff is informed and believes that Syntellect's Vista system is an interactive voice response system as well.

16.    Plaintiff is informed and believes that the Katz patents build upon the earlier innovations in the Morganstein patents.  Plaintiff is informed and believes that Katz's patents have cited the Morganstein patents as prior art at least five times.  "Prior art" is a patent term that means that the earlier patent was a precursor to the innovation found the in the current patent.

**Syntellect Stops Enforcing Its Morganstein Patents After Morganstein Testifies As Katz's Markman Expert in 1999**

17.    RAKTL sued AT&T in the late 1990s, claiming that AT&T had infringed his patents.  In a federal patent litigation case, the district court holds a "Markman" hearing to determine how the words in a patent claim should be interpreted.  In Katz's case against AT&T, Katz hired Mr. Morganstein, the same Mr. Morganstein that invented Syntellect's patent portfolio, as its Markman expert.   Plaintiff is informed and believes that Mr. Morganstein's Markman testimony was based upon his expertise in interactive voice response technology.  Mr Morganstein testified as Katz's Markman expert in 1999.

18.    On information and belief, Plaintiff alleges that Syntellect stopped enforcing the Morganstein patents around the time that Mr. Morganstein became Katz's Markman expert. Around that time, Syntellect dropped the various patent enforcement actions it had brought. Plaintiff is informed and believes that Syntellect dropped its patent enforcement actions to

1  avoid any litigation with Katz—litigation that Syntellect could likely lose given that the

2  inventor of its portfolio had decided to serve as Katz's expert witness.

3

4  **Syntellect Discloses the Risk of Patent Infringement to its Investors in March 2001**

5       19.    Not surprisingly, after Mr. Morganstein testified for Katz, Syntellect changed

6  its 10K report (filed on March 31, 2001) to reflect that its products might infringe someone

7  else's patents.   In the 10K report for 2000, Syntellect noted:

8       "Also, even though we hold patents and other proprietary rights of others, including

9       the patent rights of others, the development and sale of our products could violate the

10      proprietary rights of others, including the patent rights of others."

11 Exhibit 1 at 44.

12

13 **A Few Months Later, In June 2001, Syntellect Sells SoCal Gas An Interactive Voice**

14 **Response System**

15      20.    On or about June 19, 2001, SoCal Gas and Syntellect entered into a

16 Hardware/Software System Agreement ("Agreement"), attached hereto as Exhibit 2.

17      21.    Pursuant to the Agreement, Defendant agreed to "design, develop, manufacture,

18 sell, deliver, install and warranty...the Vista Interactive Voice Response System [('System')],

19 including equipment hardware, software and Services" for SoCal Gas.  Exhibit 2 at page 1.

20 The Vista Interactive Voice Response System was deployed at the call center for SoCal Gas.

21      22.    Syntellect  further promised to:

22      "provide all design, engineering, System and applications operational database

23      development (including in-depth user interviews to determine most effective designs

24      and features/applications profiles, configurations, class-of-service, etc.) and input all

25      system and application database into appropriate Systems components necessary for

26      System performance in the matter contemplated by this Agreement."

27 Exhibit 2 at page 1

28      23.    Pursuant to Section 20.2 of the Agreement, Defendant also agreed to indemnify

-6-
COMPLAINT

1  Plaintiff against patent infringement claims as follows:

2         [Syntellect] shall indemnify, defend and hold [SoCal Gas],

3         and its present and future direct or indirect parent

4         company(ies), subsidiaries, and affiliates and their directors,

5         officers, shareholders, employees, agent and representatives

6         harmless from and against **any and all claims**, actions, suits,

7         proceedings, losses, liabilities, penalties, damages costs or

8         expenses (including attorneys' fees and disbursements) **of any**

9         **kind whatsoever** arising from (1) **actual or alleged**

10        **infringement** or misappropriation by [Syntellect] or any

11        subcontractor of any **patent**, copyright, trade secret,

12        trademark, service mark, trade name, or other intellectual

13        property right **in connection with the System**, including

14        without limitation, **any** deliverable… (Emphasis added).

15     24.    Section 20.3 of the Agreement provides that "if any claim is brought against"

16 SoCal Gas, Defendant can either assume the defense of that claim or reimburse SoCal Gas on

17 a monthly basis for its defense through separate counsel of SoCal Gas's choice.

18     25.    On or about June 6, 2007, RAKTL filed a lawsuit against SoCal Gas, alleging

19 that its call center, of which the Vista Interactive Voice Response System is the primary

20 component, infringes twenty-five (25) different U.S. patents issued to Ronald A. Katz. (See

21 RAKTL Complaint at Exhibit 3).

22     26.    On August 21, 2007, SoCal Gas notified Syntellect of RAKTL's claim and

23 requested defense and indemnification pursuant to Sections 20.2 and 20.3 of the Agreement.

24 (See Letter to Syntellect, Exhibit 4).

25     27.    On October 1, 2007, Syntellect informed SoCal Gas that it would neither

26 assume the defense of this action nor provide any requested indemnification. (See Letter to

27 Jason Wilson, Exhibit 5).  Syntellect made this refusal even though its Vista product was an

28 IVR system and RATKL's patents claim to cover IVR products like Syntellect's Vista IVR.

1  Syntellect refused to provide an indemnity even though it holds (and tried to enforce) a set of

2  call center patents that were invented in part by Morganstein, who served as Katz's Markman

3  expert and claimed expertise in interactive voice response.

4      28.    As a result of Syntellect's failure to provide a defense or provide indemnity,

5  SoCal Gas has had to pay attorneys' fees and costs on its own and face the prospect of bearing

6  any settlement payment or judgment alone without Syntellect's contractually promised

7  assistance.

8

9                              **FIRST CAUSE OF ACTION**

10                            Breach of Contract–Failure to Defend

11

12      29.    Plaintiffs refer to and incorporate herein paragraphs 1 through 28, inclusive,

13  hereinabove, as if fully set forth herein.

14      30.    Pursuant to Sections 20.2 and 20.3 of the Agreement between the parties,

15  Defendant has a duty to defend SoCal Gas against claims of patent infringement in connection

16  with the Vista Interactive Voice Response System.

17      31.    RAKTL has made a claim of patent infringement against SoCal Gas in

18  connection with the Vista Interactive Voice Response System.

19      32.    Plaintiff has performed all conditions, covenants, and promises required to be

20  performed accordance with the terms and conditions of the Agreement, and is excused from

21  nonperformance of any conditions, covenants, and promises which it has not performed.

22      33.    Defendant breached the Agreement by failing to defend SoCal Gas in the action

23  asserted by RAKTL despite the latter's request.

24      34.    As a proximate result of Defendant's breach of the contract, Plaintiff has been

25  injured and damaged as alleged herein.

26

27

28                              **SECOND CLAIM**

-8-
COMPLAINT

1                    Breach of Contract—Contractual Indemnity

2         35.     Plaintiff refers to and incorporates herein paragraphs 1 through 34, inclusive,

3 hereinabove, as if fully set forth herein.

4         36.     Pursuant to Sections 20.2 and 20.3 of the Agreement between the parties,

5 Defendant has a duty to indemnify and hold harmless SoCal Gas against claims of patent

6 infringement in connection with the Vista Interactive Voice Response System.

7         37.     RAKTL has made a claim of patent infringement against SoCal Gas in

8 connection with the Vista Interactive Voice Response System.

9         38.     Plaintiff has performed all conditions, covenants, and promises required to be

10 performed accordance with the terms and conditions of the Agreement, and is excused from

11 nonperformance of any conditions, covenants, and promises which it has not performed.

12         39.     Defendant breached the Agreement by failing to participate in the RAKTL

13 action and/or indemnify SoCal Gas despite the latter's request.

14         40.     As a proximate result of Defendant's breach of the contract, Plaintiff has been

15 injured and damaged as alleged herein.

16

17                        **THIRD CLAIM**

18                        Declaratory Relief

19

20         41.     Plaintiff refers to and incorporate herein paragraphs 1 through 40, inclusive,

21 hereinabove, as if fully set forth herein.

22         42.     An actual and ongoing controversy now exists between SoCal Gas and the

23 Syntellect. SoCal Gas contends that Syntellect must provide SoCal Gas with a defense and

24 fully indemnity SoCal Gas for its attorneys' fees and any settlement payment or judgment that

25 may arise from RAKTL patent infringement action in connection with the Vista Interactive

26 Voice Response System. Syntellect has denied that it has any such obligation.

27         43.     SoCal Gas seeks a judicial determination that Syntellect has a contractual duty

28 to provide a defense and to provide full indemnity to SoCal Gas with respect to RAKTL's

1 | patent infringement action.

2

3 | <center>**PRAYER**</center>

4

5 |    WHEREFORE, Plaintiff prays for judgment as follows:

6 |    1.    For actual damages according to proof;

7 |    2.    For interest thereon and loss of use thereof according to proof;

8 |    3.    For costs of suit incurred herein, including attorneys' fees pursuant to the

9 | Agreement;

10 |    4.    For a declaration requiring Syntellect to provide SoCal Gas with a defense in its

11 | action against RATKL and to provide SoCal Gas with a full indemnity for its attorneys' fees,

12 | any settlement payment, and any judgment.

13 |    5.    For such other and further relief as to the Court seems just and proper.

14

15 | Dated: April 21, 2008            WILLENKEN WILSON LOH & LIEB, LLP

16

17

18 |                    Jason H. Wilson
                    Attorney for Plaintiff
19 |                    Southern California Gas Company

20

21

22

23

24

25

26

27

28

-10-
COMPLAINT

13

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury of all issues so triable.

Dated:  April 21, 2008                              WILLENKEN WILSON LOH & LIEB, LLP

                                                    _____
                                                    Jason H. Wilson
                                                    Attorney for Plaintiff
                                                    Southern California Gas Company

-11-
COMPLAINT

**EXHIBIT 1**

*SEC Info*   Home   Search   My Interests   Help   User Info   *Jason Wilson*

# Syntellect Inc · 10-K · For 12/31/00

### Filed On 3/30/01 6:23pm ET · SEC File 0-18323 · Accession Number 950153-1-500190

| Find | | in this filing. | Show docs searched and every "hit". |

Help... **Wildcards:** ? (any letter), * (many). *Logic:* for Docs: & (and), | (or); for Text: | (anywhere), "(&)" (near).

| As Of | Filer | Filing | As/For/On | Docs:Pgs |
|-------|-------|--------|-----------|----------|
| 4/02/01 | Syntellect Inc | 10-K | 12/31/00 | 11:124 |

---

### Annual Report · Form 10-K
### Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|------------------|-------------|-------|------|
| 1: 10-K | Annual Report | 47 | 284K |
| 2: EX-3.II | Articles of Incorporation/Organization or By-Laws | 10 | 54K |
| 3: EX-10.I | Material Contract | 11 | 53K |
| 4: EX-10.II | Material Contract | 9 | 46K |
| 5: EX-10.III | Material Contract | 11 | 62K |
| 6: EX-10.IV | Material Contract | 6 | 33K |
| 7: EX-10.V | Material Contract | 6 | 37K |
| 8: EX-10.VI | Material Contract | 21 | 108K |
| 9: EX-11 | Statement re: Computation of Earnings Per Share | 1 | 7K |
| 10: EX-21 | Subsidiaries of the Registrant | 1 | 5K |
| 11: EX-23 | Consent of Experts or Counsel | 1 | 8K |

---

### 10-K · Annual Report
### Document Table of Contents

| *Page* | (sequential) | (alphabetic) | Top |
|--------|--------------|--------------|-----|
| 1 | 1st Page | • Alternative Formats (RTF, XML, et al.) | |
| 3 | Item 1. Business | • Business | |
| 13 | Item 2 -- . Properties | • Certain Relationships and Related Transactions | |
| " | Item 3 -- . Legal Proceedings | • Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | |
| " | Item 4 -- . Submission of Matters to A Vote of Security Holders | • Directors and Executive Officers of the Registrant | |
| " | Item 5. Market for the Registrant's Common Equity and Related Stockholder Matters | • Executive Compensation | |
| 14 | Item 6 -- . Selected Financial Data | • Exhibits, Financial Statement Schedules, and Reports on Form 8-K | |
| 15 | Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | | |

EXHIBIT 1

16  Net income (loss)
18  Operating Business Segments
19  Item 7a. -- . Quantitative and Qualitative
    Disclosure About Market Risk
24  Item 8. Financial Statements and
    Supplementary Data
30  Notes to Consolidated Financial Statements
43  Item 9 -- . Changes in and Disagreements
    With Accountants on Accounting and
    Financial Disclosure
"   Item 10. Directors and Executive Officers of
    the Registrant
"   Item 11. Executive Compensation
"   Item 12. Security Ownership of Certain
    Beneficial Owners and Management
"   Item 13 -- . Certain Relationships and Related
    Transactions
"   Item 14. Exhibits, Financial Statement
    Schedules, and Reports on Form 8-K

- Financial Statements and Supplementary
  Data
- Legal Proceedings
- Management's Discussion and Analysis of
  Financial Condition and Results of
  Operations
- Market for the Registrant's Common
  Equity and Related Stockholder Matters
- Net income (loss)
- Notes to Consolidated Financial
  Statements
- Operating Business Segments
- Properties
- Quantitative and Qualitative Disclosure
  About Market Risk
- Security Ownership of Certain Beneficial
  Owners and Management
- Selected Financial Data
- Submission of Matters to A Vote of
  Security Holders

| 10-K | 1st Page of 47 | TOC | Top | Previous | Next | Bottom | Just 1st |

### SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549
### FORM 10-K

(Mark One)

[x]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934

           For the fiscal year ended December 31, 2000

                           OR

[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934

           For the transition period from _____to _____

                 Commission file number: 0-18323

                       SYNTELLECT(R) INC.
           (Exact name of Registrant as specified in its charter)

                                                      [Download Table]

           DELAWARE                          86-0486871
     (State or other jurisdiction of    (IRS Employer Identification No.)
      incorporation or organization)

     16610 North Black Canyon Highway
              Suite 100,
             Phoenix, AZ                        85053
   (Address of principal executive offices)   (Zip Code)

                 (602) 789-2800
        (Registrant's telephone number, including area code)

    Securities Registered Pursuant to Section 12(b) of the Act: None
     Securities Registered Pursuant to Section 12(g) of the Act:

                 Common Stock, $.01 par value
                      (Title of Class)

     Indicate by check mark whether the Registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes [X] No [ ]

     Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the
best of Registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [ ]

     The aggregate market value of common stock held by non-affiliates of the
Registrant, computed by reference to the closing price at which the Common Stock
was sold as of March 20, 2001, was $23,649,031.

**(APPLICABLE ONLY TO CORPORATE REGISTRANTS)**

Indicate the number of shares outstanding of each of <u>the Registrant</u>'s classes of common stock as of the latest practicable date:

11,204,546 shares of Common Stock outstanding as of <u>March 20, 2001</u>.

<u>DOCUMENTS INCORPORATED BY REFERENCE</u>

Materials from <u>the Registrant</u>'s Proxy Statement relating to its 2001 Annual Meeting of Stockholders (the *"Proxy Statement"*) have been incorporated by reference into Part III, Items 10, 11, 12 and 13.

| 10-K | **2nd Page of 47** | TOC | 1st | Previous | Next | Bottom | Just 2nd |

<u>TABLE OF CONTENTS</u>

[<u>Enlarge/Download Table</u>]

**PAGE**
----

**PART I**

ITEM 1.   <u>BUSINESS</u>............................................................................... 1
          General
          Historical Development of the Company
          Industry and Market Background
          Products
          Sales and Marketing
          Product Development
          Manufacturing and Suppliers
          Backlog
          Proprietary Rights and Intellectual Property
          Employees
          Executive Officers of the Registrant
ITEM 2.   PROPERTIES............................................................................. 11
ITEM 3.   LEGAL PROCEEDINGS...................................................................... 11
ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.................................... 11

**PART II**

ITEM 5.   MARKET FOR THE REGISTRANT'S COMMON EQUITY AND RELATED
          STOCKHOLDER MATTERS.................................................................... 11
ITEM 6.   SELECTED FINANCIAL DATA............................................................... 12
ITEM 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
          AND RESULTS OF OPERATIONS............................................................. 13
ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK........................... 17
          Interest Rate Risk
          Foreign Currency Exchange Rate Risk
          Additional Cautionary Factors That May Affect Future Results
ITEM 8.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA............................................ 22
ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON
          ACCOUNTING AND FINANCIAL DISCLOSURE................................................... 41

**PART III**

ITEM 10.  DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.................................... 41
ITEM 11.  EXECUTIVE COMPENSATION................................................................ 41
ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND
          MANAGEMENT............................................................................ 41
ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS......................................... 41

**PART IV**

ITEM 14.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON
          FORM 8-K.............................................................................. 41

| 10-K | 3rd Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 3rd |

## PART I

## ITEM 1 -- BUSINESS

### GENERAL

Syntellect Inc. (together with its subsidiaries, collectively, the *"Company,"* which may also be referred to as the *"Registrant," "we," "us,"* or *"our"*) develops, markets and implements voice, Internet and call processing software and services to large and mid-sized commercial, industrial and government entities through a worldwide direct and indirect distribution network. Through our flagship product, Vista, a client-server, open, standards-based, NT-Java software platform, we offer customizable software applications including Interactive Voice Response (*"IVR"*), Automatic Speech Recognition (*"ASR"*), Vocalpoint Interactive Web Response(R) (*"IWR"*), and Computer Telephony Integration (*"CTI"*). With the foundation of these products and capabilities, collectively known as Vista Interactive Media Response (*"IMR"*), we create enterprise-wide voice portals. These voice portals harness the power of the Internet as well as of wired and wireless telephones, using natural language voice commands, for unassisted, self-service access to applications, information, and transactions between an enterprise and its customers, employees, suppliers, partners and investors.

We also own and operate an interactive transaction-based Hosted Services center for our customers who prefer to outsource their voice processing or web transaction-based applications or in conjunction with their premises-based installation. Our Hosted Services include, for example, cable and satellite pay-per-view orders, employee benefits enrollment, and utility outage applications. This combination of hosted and on-premises voice portals, built upon a single software platform, gives us a unique market position. We also provide a single source for system implementation and on-going system lifecycle support through our professional services organization including consulting services in the areas of speech recognition, speech application design, analysis and development, as well as installation, integration, and after-sale support. As of February 28, 2001, we employed a total of 294 individuals. In addition to our primary office facilities in Phoenix, we maintain five sales and support offices in the United States and one each in London, Amsterdam and Stockholm.

### HISTORICAL DEVELOPMENT OF THE COMPANY

We were founded in 1984, and became an early pioneer in the Interactive Voice Response industry. By 1995 we had become the fourth largest provider of IVR technologies in North America and the largest IVR provider in Europe. Virtually all of our growth during this period was attributable to our proprietary IVR systems (known as Infobot(R) and Premier). In the early 1990's, the IVR industry experienced a major shift in product demand as the market began to move from proprietary hardware and software applications to advanced, open architecture products. These products increased functionality with a wider range of options for self-service including telephones using speech recognition, personal computers linked to the Internet, faxes, pagers and mobile phones. In 1993, we introduced our first open architecture product, the VocalPoint(R) IVR, and announced the phase-out of our older proprietary systems.

On March 14, 1996, we acquired Pinnacle Investment Associates Inc. (*"Pinnacle"*) in a transaction accounted for as a pooling of interests transaction. Pinnacle subsequently merged into its wholly-owned subsidiary, Telecorp Systems, Inc. (*"Telecorp"*). Telecorp developed and distributed inbound

and outbound call center systems worldwide, primarily in the cable television, newspaper and healthcare industries. Telecorp also operated a transaction-based hosted application center designed primarily to process pay-per-view orders for the cable television industry. Subsequent to the merger, we assumed all of Telecorp's systems functions in Syntellect Inc. and consolidated all hosted application center functions into Syntellect Interactive Services, Inc. ("SIS"), Telecorp's wholly-owned subsidiary. Telecorp was dissolved as of December 27, 2000, and SIS became Syntellect Inc.'s wholly-owned subsidiary.

In 1998, we introduced our VocalPoint Interactive Services Transaction Architecture ("*Vista*"). Vista combines call center technologies with a distributed client-server architecture, powerful open standards components, a web-based management system and a graphical application development tool. This combination provides customers with flexibility, scalability, efficiency, redundancy, and excellent processing performance. With the

1

| 10-K | **4th Page of 47** | TOC | 1st | Previous | Next | Bottom | Just 4th |

introduction of Vista, we implemented our strategy of moving from a hardware-based company to a software-based company.

We sold our predictive dialer product line to Nobel Systems Corporation in 1999. In 1999 and 2000, we significantly enhanced our Vista product line by adding new functionality to the core product and integrating advanced, natural language speech recognition and text-to-speech capabilities. We continue to expand the Java application framework contained in Vista as well as its application development and management tools. Additionally, we continue to enhance Vista for our international markets with new telephony protocols and languages.

### INDUSTRY AND MARKET BACKGROUND

### IVR VALUE PROPOSITION STRONG AND GROWING

The Interactive Voice Response market continued to grow during 2000 at a compounded annual growth rate of approximately 13%, according to the Gartner Group, an industry analyst. Also, according to the Gartner Group, the average cost of an IVR-completed call is $.45, compared to $7.60 for a call handled by a call center agent.

IVR systems first gained market acceptance through customer reaction to reduced hold times, cost savings resulting from automating low value-added customer interactions, and freeing contact center agents to concentrate on high value-added customer interactions. Much of the value of IVRs comes from our enabling the Computer Telephony Integration of our customer's systems and back-offices. Information about a caller or customer can be retrieved from a company's PBX or automatic call distributor ("ACD") or from a caller personally entering account information. In either case, the information is instantly available on an agent's screen. According to Datamonitor, another industry analyst, CTI-enabled IVR systems decrease the length of a call by 18%, on average, further enhancing cost savings and service improvements. Datamonitor research has also shown that when IVR platforms are available, customers also use Internet technology more frequently to access back-end information and existing databases. Our Interactive Web Response technology also enhances contact center customer management by linking the speed and convenience of Internet access to call center agents.

Datamonitor estimates the size of the IVR market at $761 million for the year ended 1999 and expects this market to grow to $1.3 billion by the end of 2004, representing an 11.1% compounded annual growth rate. Datamonitor also expects market growth to be highest outside of North America with rates of growth approaching 15% per annum. Our major markets in Europe, one of the markets where growth rates are expected to be highest, include the United Kingdom, France, the Netherlands, Germany, Italy and Spain.

### SPEECH RECOGNITION WILL ENABLE IVR GROWTH AND MARKET EXPANSION

Touchtone telephone, Automatic Speech Recognition ("ASR") and Text-to-Speech ("TTS") applications are replacing touchtone input and pre-recorded speech output for IVR applications. Speech recognition is more popular with customers than is touchtone, and ASR allows more sophisticated interactions to be automated, thereby creating more potential applications. Speech recognition is emerging as a critical technology for new IVR development. Industry experts expect speech recognition to revolutionize the way individuals interact with machines whether from home, in the car, on the street or at the

office. The Internet can now be accessed by personal computers, mobile telephones, interactive television, and traditional telephones.

We believe that voice access to the World Wide Web can potentially add two billion new points of access, in addition to the more than 250 million personal computers which can access the Internet today. We also anticipate that voice access will be particularly important in regions with lower personal computer penetration such as Asia, the Middle East and Africa, Eastern Europe and Latin America. We further believe that new classes of portable, wireless devices (Personal Digital Assistants ("PDA") and handhelds) with multiple input and output methods will play a major role and become standard Internet terminals.

Datamonitor expects telephony-based speech recognition revenue to grow rapidly at a projected compounded annual rate of 57.9% from $133 million in 1999 to $1.9 billion by the end of 2004. We expect improved speech recognition

2

| 10-K | **5th Page of 47** | TOC | 1st | Previous | Next | Bottom | Just 5th |

technology will drive this growth with enhanced comprehension of natural language and increased reliability. These improvements will lower costs through shortened calls, increase customer acceptance of automation and self-service, and stimulate demand for information access around the clock, independent of location or device.

### SPEECH RECOGNITION CREATES A NEW CLASS OF VOICE PORTAL PRODUCTS AND SERVICES

Other developments in the industry, including voice portals and voice-enabled websites, may offer even greater promise. A voice portal uses advanced speech recognition technology to access information available on websites or in other databases. Although Interactive Voice Response platforms and voice portals use the same underlying technology, they are distinguished by usage rather than technology. IVR platforms are associated with database applications and consist of a closed coupling between a few database servers with hierarchical menus that may use speech recognition, but more frequently touchtone input, for access. Voice portals generally rely on speech recognition, use wide-ranging flat menus, and focus on Internet-based information access and protocols. Voice portals also support a broad range of applications in addition to simple database information access. These voice portals include broad-based Internet information, messaging access and collaborative applications such as calendars. The distinction is blurred when IVR platforms add VoiceXML, an emerging standard which enables voice applications to communicate in a vendor-independent way, or add other gateway functionality, and access information and applications across the Internet. In that case, the system becomes a hybrid IVR/voice portal. In this context, we believe that we are uniquely positioned to aggressively pursue the voice portal products and services markets.

A voice portal used in an enterprise setting is referred to as an Enterprise Voice Portal ("EVP"). An EVP permits convenient increased access to company-wide information for customers, suppliers, partners and employees, increasing operating effectiveness for each. EVP companies will need to design their voice portals so that all methods of enterprise access flow through a single server strategy. The primary benefit for such companies will likely come as the applications and web servers supporting graphical access are also able to support access devices such as the telephone. Not only will security and reliability be central to the success of any EVP strategy, but the EVP's ability to integrate with existing applications and call centers will prove to be the most important component, especially if access to call center agents is available.

The most probable EVP applications will be speech-enabled telephone access to company applications such as sales force, customer relationship management, and logistics and supply chain management, according to a report by Dain Rauscher Wessels, a securities firm. Also according to that report, the ability to voice-enable an e-commerce website to make it voice accessible may stimulate a new class of Business to Business and Business to Consumer transactions. The market for EVP platforms is predicted to materialize in 2002.

### COMPETITION IS STRONG AND INCREASING

The voice processing industry is highly competitive, and we believe competition will continue to intensify in the future. The industry is characterized by rapid technological advances; frequent introductions of new products, options and features; constant improvement in the performance of IVR products; and downward pressure on prices. We believe the principal competitive

factors which affect the voice processing industry are price, functionality, service and industry reputation. In this regard, we also believe our years of experience in the IVR industry provide an excellent foundation with which to meet competition. Our capabilities and operating assets include our installed base of customers, proven product functionality, existing distribution networks, contact center brand, and skill at designing and implementing speech-enabled IVR applications which compete effectively in the voice technology and contact center marketplace, as well as our ongoing professional services to customers.

Our principal competitors for IVR and web products include Periphonics Corporation (a division of Nortel Networks Corporation); Avaya Inc. (a spin-off of Lucent Technologies Inc.); InterVoice-Brite, Inc.; Edify Corporation, and IBM Corporation. Many of these and other competitors have more extensive engineering, manufacturing, and marketing capabilities than we do, in addition to their substantially greater financial, technological and personnel resources. We also expect new entities to enter our markets to compete with us.

3

| **10-K** | **6th Page of 47** | TOC | 1st | Previous | Next | Bottom | Just 6th |

## PRODUCTS

Our products are divided into three business segments: Licenses and Hardware, Services and Hosted Services. See Item 7, *"Management's Discussion and Analysis of Financial Condition and Results of Operations - Operating Business Segments,"* for another description of these business segments.

## LICENSES AND HARDWARE

In 1998, <u>the Company</u> introduced its third generation software platform, Vista, which uses a Windows NT operating system and Java programming language for customer application development. Vista comprises a broad suite of communications features designed for automating customer transactions. It provides a multitude of applications on one platform including, for example, Interactive Voice Response, Interactive Web Response, Computer Telephony Integration, fax on demand, and advanced speech recognition. With this software platform, transactions can be processed from callers using almost any communication device including wired and wireless telephones, web browsers, fax machines, pagers and PDAs.

Vista is built on an open, scalable, standards-based framework forming an integrated foundation for various customer transactions. It allows our customers to deliver powerful new capabilities to their contact centers using their existing telecommunications and information technology infrastructure. Vista supports inbound and outbound telephone (whether touchtone, voice, or fax), hosted, and web transactions. It also interfaces with other technologies, supports a range of reporting options, and incorporates a standard set of application development, administration and management tools. Vista also accommodates an extensive range of object-orientated applications for specific business needs related to multimedia contact centers.

We can configure Vista for virtually every company, from small, single-premises contact centers to multi-site global enterprise networks. Because of Vista's open, standards-based design, our customers receive the information technology ("IT") flexibility necessary to adapt quickly to changing business and technological requirements. While this flexibility is important to virtually any company, it is particularly important to those without dedicated in-house developers who must rely on local and regional systems integrators or independent applications developers for their IT support.

The standards used in the Vista framework include: Windows NT operating system, Java application development language, Intel Dialogic voice boards, Sybase relational database, and Intel-based computer hardware. The Vista components themselves are sold as software-centric products. We provide the base software along with connections to a customer's PBX or ACD host environment. We have also established partnerships with third party suppliers who provide high quality, cost effective, industry standard platform components for Vista customers.

Vista's components include Interactive Voice Response (*"IVR"*), Interactive Web Response (*"IWR"*), Advanced Speech Recognition, Proactive Outbound Notification, a Speech Enabled Directory (*"SPEED"*), Fax Server, Computer Telephony Integration (*"CTI"*), and Vista Tools.

Vista IVR automates customer self-service inquiries and is sometimes considered the *"voice"* of an automated customer contact center. As part of the Vista software architecture, Vista IVR is designed to be highly scalable and to

be integrated into existing telecommunication and data processing environments. The same software and hardware components are utilized for all system or networked configurations, facilitating modular growth. Vista is also designed to be particularly effective in environments supporting multiple applications.

Vista IWR allows companies to take advantage of the Internet with self-service options designed exclusively for the World Wide Web. Just as IVR allows a customer to conduct self-service transactions by telephone, IWR makes the same options available to customers through the Internet. Rather than providing voice prompts, IWR presents visual instructions on the customer's computer screen. The Vista IWR component incorporates all the features a customer needs to perform transaction processing on the Internet including scalability, performance, security, access to enterprise data, and an ability to integrate with other Vista features.

Our Advanced Speech Recognition and speaker authentication components provide the recognition accuracy, scalability, and robustness required to make successful natural language and large vocabulary speech applications

4

| 10-K | 7th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 7th |
|------|----------------|-----|-----|----------|------|--------|----------|

available. We have partnered with Nuance Communications to create those applications by utilizing Nuance's SpeechObjects along with Vista's Java application framework.

Our Vista Proactive Outbound Notification component is used to create, configure, and manage completely automated outbound calling campaigns and generate operational progress reports. Proactive Outbound Notification applications can range from simple campaigns that deliver straightforward messages to more complex, self-service applications that involve questions to and answers from respondents.

In January 2000, we announced SPEED. SPEED automates call routing tasks by allowing callers to speak the name of a specific individual or department they wish to reach rather than speaking to an operator or entering an extension number through the touchtone keypad. SPEED relies on advanced speech recognition algorithms to recognize a spoken name as well as advanced voice-processing capabilities to transfer the call appropriately. When multiple employees have the same name, SPEED prompts the caller for additional information, such as the individual's department, and then makes the appropriate routing decision. SPEED can be configured as a stand-alone product residing on the Vista platform, or it can be configured as part of a Vista IVR application.

The Vista Fax Server component receives fax requests from IVR and IWR applications. Customers are able to use our Fax Server to obtain a facsimile of the information they want using a Vista system. Data from a host screen or database that callers access during a transaction can be programmed to also merge with forms, graphics, or logos stored on the IVR system before being faxed to the caller. Callers can then efficiently retrieve pre-defined documents such as product brochures, catalog information, or stock reports.

Our Vista Computer Telephony Integration ("CTI") component optimizes contact center agents' productivity by allowing them to handle telephone calls more intelligently and efficiently. For example, by using CTI technology, customer data collected by the IVR at the initiation of a customer contact session can be delivered to an agent's workstation at the same time as the telephone connection is transferred to that agent's telephone. The simultaneous transfer of a caller's voice and account data results in increased agent productivity, greater effectiveness in resolving customer inquiries, and efficiencies in providing what consumers perceive to be personalized, integrated support.

The Vista Tools component includes both our VistaView(TM) and VistaGen(R) Application Generator. VistaView allows users to monitor their Vista servers and applications. Using VistaView, system administrators can examine all aspects of their functioning system, whether the data resides on a single platform or at numerous locations. VistaView can also act as a single point of access for both consolidated and itemized system information. It also supports all Vista system components. VistaGen Application Generator is an object-oriented application development tool for Vista, which simplifies the customer's process of building simple IVR applications into a sophisticated application that integrates natural language speech recognition, IWR and CTI technologies.

We believe the market is poised for a renaissance of IVR spurred by the need for Enterprise Voice Portals. In preparation, we introduced a new level of functionality we call IMR, Interactive Media Response. IMR consists of current and evolving interactive, data access, and communication technologies that

provide the functionalities necessary to support rapidly evolving Enterprise Voice Portal requirements. Our Vista platform offers a number of IMR elements today and plans are in place to enhance its functionality over the next 18 months through two additional phases of development.

The Vista software platform incorporates the following four key components to our new IMR functionality and to the successful deployment of an Enterprise Voice Portal:

1.  Separate the request medium from the response medium.

    The Vista platform allows callers to choose how they want to receive the information they have requested. For example, the system may prompt a caller requesting an account statement to request that it be delivered by fax or email. Being able to independently structure the front-end (request) media from the back-end (response) media is critical to the flexibility required to meet users' demands.

5

| 10-K | **8th Page of 47** | TOC | 1st | Previous | Next | Bottom | Just 8th |
| --- | --- | --- | --- | --- | --- | --- | --- |

2. Use Java, the software language of the Internet.

> As the volume of Internet data continues to grow exponentially year after year, it becomes imperative to write applications, integrate third-party components, call third-party services, and absorb third-party software objects using the software language of the World Wide Web, Java. By using Java, we eliminate the need to write artificial bridges from proprietary IVR environments to open third-party applications and data sources.

3. Enable customers to access existing data, application, and transaction services from anywhere.

> Even though web-hosted data is exploding in size, existing non-web systems still hold a large percentage of corporate data. Nevertheless, corporate servers, databases, and non-web-enabled applications all contain data that companies may want to access through voice commands. The Vista IMR platform is designed to make that access possible.

4. Connect instantly to a live agent during a telephone call or Web interaction.

> The experience of early e-commerce sites established the absolute necessity of live agent access during a telephone call or web interaction. Moving a caller from unassisted interactions to a live agent is complex. Our IMR is capable of connecting the telephone user to a live agent who has been informed of the caller's identity, what the caller has done or was attempting to do, and who has the appropriate application screen open to provide help immediately.

We believe IMR is beneficial to more than the call center. It also serves as a powerful tool for supporting other users such as business prospects, employees, suppliers, partners and investors. Our IMR platform is designed to help our customers be responsive to their customers and does this by providing access to the information and services they want, when and how they want it, whether the platform is located on the customer's premises or at our Hosted Services centers.

Our IMR platform was designed to permit flexible transfer of work loads between applications located on a customer's premises and those located at our Hosted Service center or at other locations. For example, our IMR platform permits the caller's contact to begin on our customer's premises (whether via telephone or Internet), flow seamlessly to our hosted facility for a particular purpose, move to a third-party data source for additional processing, and return to the originating customer's premises for completion. Not only does this flexibility improve the caller's experience in contacting our customer, it permits our customer to marshal its resources in the most cost-effective way. We expect that new opportunities for the flexibility of the IMR platform will surface as powerful new products are introduced to the market, such as Hewlett Packard's network product called eSpeak.

**SERVICES**

We support our customers with consulting and education services, help line

warranty and maintenance, regular adjustments in their system data bases such as for moves, adds and changes, scripting and voice file production, and database maintenance services. We focus particularly on developing improved consulting services in the areas of design analysis, specification development, project management, application development, installation and integration as each is related to speech recognition. Our services are generally sold as part of the initial sale of a system. In some cases, however, they are added after installation.

Creating a robust, yet user-friendly, speech recognition application requires experience in software design, telephony, networking, client-server systems, databases, linguistics, human factors, and speech recognition technology. We have years of experience in designing voice user interfaces from dialog design to grammar development and the intricacies of data base access. We have assembled and continue to expand a dedicated speech recognition implementation team to address this significant opportunity. The individuals comprising that team have been specifically trained and have experience from many successful speech recognition implementations of varying degrees of complexity. We believe our speech recognition expertise, built on our IVR history, is a critical skill necessary to bring effective speech-enabled IVR, voice portal and voice-enabled websites to market. We also believe our skill is highly valued in the market and provides us with a competitive advantage.

6

| 10-K | *9th Page of 47* | TOC | 1st | Previous | Next | Bottom | Just 9th |
|------|------------------|-----|-----|----------|------|--------|----------|

We provide warranties on our products for periods ranging from three to six months commencing with the installation of each system. After the initial warranty period ends, our hardware and software maintenance services are available on both a contract basis and on an on-demand, time and materials, basis. Domestically and internationally, hardware and software maintenance and support provided to customers are performed on-site by us or under contractual arrangements with independent third party service providers.

## HOSTED SERVICES

Our wholly-owned subsidiary, Syntellect Interactive Services, Inc. ("*SIS*"), operates our Hosted Services transaction center in Roswell and Atlanta, Georgia. Our Hosted Services center has IVR, database, and web server capacity to handle over 5,000 telephone and Internet transactions simultaneously. It offers contract-based telephony and Internet automated transaction services and is designed with full system redundancy and fault-tolerant power protection for 24-hours a day, 7-days a week operation. We believe we are the only provider of speech-enabled technology that offers our customers both on-premises capability and outsourced Hosted Services using a consistent, internally-developed software platform.

Companies focusing on their core business, rather than on managing their infrastructures, capitalize on hosted service offerings. Hosted Services offers benefits such as reduced time to market, limited capital expenditure, and less exposure to technology obsolescence. Hosted Services is also ideal for enterprises having limited IT or inadequate in-house expertise to handle complex applications.

We utilize our own Vista platform for speech recognition and voice portal applications in our Hosted Services transaction center. This allows our customers to select the option best suited to their needs and provides them with the ability to seamlessly move an application between their premises and our Hosted Services facility. Many customers begin by using our Hosted Services and migrate to bringing their own capability in-house, while continuing to use our capacity to support them in overtime settings. Others use our services in overflow situations. A hosted service environment is ideal for processing overflow inbound call traffic from our customer's on-premises facilities during peak call volumes. It is also ideal for high volume automated outbound message delivery campaigns, as an alternative to an on-premises IVR or voice portal for smaller enterprises, for internal campaigns, customer service surveys and speaker verification applications, and for accessing special features such as credit card processing, on-line demographic services, or utilizing fax-on-demand or fax broadcast campaigns.

We have supplied Hosted Services to the cable industry for more than eight years. New ordering technologies for pay-per-view in the cable and satellite industries, however, have resulted in a decline in the overall utilization of 800 number services for ordering, which, in turn, has resulted in a decline in our pay-preview revenues. In response to this decline, we have focused our sales and marketing efforts on new applications in vertical markets such as in the utility industry and on direct-to-consumer marketing, financial services, and Internet-based applications. As a result, our non-cable revenues exceeded our cable revenues for the first time in the fourth quarter of 2000.

We offer the following four IVR Hosted Services products:

1. DIALEXPRESS(TM) - - high volume outbound calling technology

used for promotional messaging and other proactive customer contacts;

2. LEAD CAPTURE - - automated, telephone-delivered, custom questionnaire initiated and completed by sales prospects to capture critical sales leads;

3. SPEECH ENABLED DIRECTORY (*"SPEED"*) - - voice-enabled, company-wide call routing and directory functionality that empowers callers to self-direct their calls by speaking the name of the person, the functional area or the department they wish to reach; and

4. SITE LOCATOR - - a locate-by-phone service that helps potential customers find the nearest location or distributor for their desired product or service. This product is an extremely cost-effective tool for building store traffic, determining market segmentation, and measuring marketing media effectiveness.

7

| **10-K** | **10th Page of 47** | TOC | 1st | Previous | Next | Bottom | Just 10th |

Each of these products is typically billed on a per minute and per transaction basis.

We also offer a full range of professional services including project management, application development, and ongoing customer service which allows customers to specify fully-customized applications. In addition, we offer CyberStats(TM), an online reporting tool for our Hosted Services customers. CyberStats provides real-time reports on transaction details through our Hosted Services center. Users can access CyberStats on the Internet and elect to have reports delivered to them via their PC, email or fax.

On September 15, 1999, we sold our predictive dialer product line to Nobel Systems Corporation. That sale contributed other income of $509,000, as reported on our financial statements. See Item 8, "*Financial Statements and Supplementary Data*," for more details regarding that sale.

**SALES AND MARKETING**

General. We have sold over 6,000 systems to customers in 55 countries. We provide technological solutions to companies in a variety of industries, including banking, insurance, financial services, media, public utilities, healthcare, service providers, transportation, telecommunications, retailing, government agencies, oil and gas, manufacturing, education and newspaper publishing. Our customer base includes some of the largest domestic banking firms, some of the largest insurance companies and numerous Fortune 500 companies. Our products are sold through a direct sales force, domestic and international distributors, and value added resellers. We believe we will continue to rely on direct distribution because of the increasing complexity of our applications which is largely due to the requirements of speech recognition technology. We will continue to do this at least until industry open standards are agreed upon and speech recognition development tools are improved.

Even though direct distribution may be mandated by the complexity of applications, customers prefer to purchase contact center technologies as part of a total system. Automated call handling technologies, however, appear to be sold increasingly as one element of a contact center portfolio by system integrators, telecommunications companies and switch vendors. As a result, we believe we must develop strong distribution partnerships in many markets to ensure that our products are represented in the markets where they can be sold. Consequently, we are actively adding and soliciting distribution partners in a number of important regions. We currently maintain five sales offices in the United States as well as one in each of London, Amsterdam and Stockholm.

Domestic Sales. The percentage of our total revenue represented by domestic sales, including maintenance fees, for the last three fiscal years is as follows: 69% in 2000, 81% in 1999, and 78% in 1998. During those years, no single distributor or customer accounted for more than 10% of our total revenues. Our direct sales force closed more than 94% of our domestic sales (excluding maintenance, patents, and Hosted Services) in 2000.

International Sales. The percentage of our total revenues represented by international sales, including maintenance fees, for the last three fiscal years is as follows: 31% in 2000, 19% in 1999, and 22% in 1998. See Note 12 of the "*Notes to Consolidated Financial Statements*" for additional information

regarding international operations. All of our product lines and services are
sold worldwide and are offered in 15 different languages. We maintain a direct
sales force in London to market our systems in various countries around the
world and have opened offices in Amsterdam and Stockholm. Sales in the United
Kingdom are denominated in pounds sterling and are subject to foreign currency
adjustments. Sales in all other foreign countries are denominated in United
States dollars. We attempt to conduct business in international markets in
compliance with each country's applicable laws and regulations, including safety
and telecommunication laws, import duties and quotas. We have not experienced
any difficulty in obtaining export licenses for foreign sales from the United
States Department of Commerce.

    Marketing Organization and Vertical Market Focus. Our marketing
------------------------------------------------
organization is charged with (i) enhancing our corporate image; (ii) increasing
demand for our voice processing products; (iii) creating market differentiation;
and (iv) identifying future development opportunities for market-driven
features. The marketing organization conducts market and competitive research;
participates in industry trade shows and conferences; creates marketing
communications materials, advertising and public relations campaigns; and
maintains relationships with key industry analysts and media contacts. Our
strategic marketing plan is focused on the following four vertical

<div align="center">8</div>

| 10-K | 11th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 11th |

markets: financial services, media (cable and satellite television and newspaper), utilities, and healthcare. Sales to these markets represented approximately 73% of our total revenues for 2000; 79% for 1999; and 84% for 1998. We market our products to industry leaders within these vertical markets as management believes industry leaders have the greatest need for self-service and transaction processing technologies, are most likely to require system expansion and additional services, and serve as an important source of customer referrals.

**PRODUCT DEVELOPMENT**

Our product development consists of system and software specification, software design and coding, and third party software integration. Employees of, and contractors managed by, our research and development department perform all product development. We continually strive to identify and develop new products and new features for existing products to expand our market. Furthermore, we perform rigorous testing prior to releasing new products and features. Nevertheless, products as complex as those we produce often contain undetected errors, or *"bugs,"* when first released. These *"bugs"* are often discovered only after the product has been used by many different customers and in varying applications.

Our product development organization consisted of the following numbers of individuals for the years indicated: 33 in 2000, 41 in 1999, and 55 in 1998. We spent $3.2 million for research and development in 2000, $4.4 million in 1999, and $5.6 million in 1998.

**MANUFACTURING AND SUPPLIERS**

Our manufacturing operation consists of limited in-house configuration, product assembly, product testing and quality and revision control of our products. We may obtain hardware components from third parties for our products, including telephony interface and voice recognition boards. We do not believe we are dependent on a single source to supply the components we use in our products. We are also currently able to obtain key components in a timely manner from a variety of sources.

**BACKLOG**

Our year end 2000 backlog was approximately $9.9 million and $9.3 million for year end 1999. We believe that all orders in backlog at December 31, 2000 are firm and will be delivered within the next fiscal year. Because the possibility exists for customers to make changes to their original orders, to alter or significantly delay delivery schedules or to cancel their orders, the backlog total as of any particular date may not be indicative of actual revenues for any future period.

**PROPRIETARY RIGHTS AND INTELLECTUAL PROPERTY**

We establish and protect our proprietary rights in our products and technologies through a combination of registered copyrights, trademarks, service marks, trade secret and patent protection. We also enter into confidentiality agreements with our employees, distributors and customers, and seek to limit access to the distribution of our software, documentation and other proprietary information. We currently hold 65 registered trademarks in 15 countries and a total of 14 pending trademark and patent registrations as well as seven copyrights. We believe, however, that technological innovation, expertise, and

market responsiveness can be as important to us as those legal protections.

VocalPoint is a registered trademark, the rights to which we sold in the third quarter of 2000. As part of the agreement for that sale, we maintain the unrestricted right to full use of the trademark until such time as the product enters *"end-of life"* and service commitments have expired. Syntellect, Infobot, VocalPoint, VocalPoint Interactive Web Response, Cyberstats, VistaGen, VistaView, DialExpress and Home Ticket are our current or pending trademarks. All other products mentioned in this Annual Report to the Securities and Exchange Commission (this *"Annual Report"*) are trademarks or pending trademarks of their respective owners.

9

| 10-K | 12th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 12th |

Our Vista product line uses a licensed third party software, which provides a portion of the architectural foundation for the product. We have secured a permanent, perpetual, world-wide, non-exclusive, non-revocable license to this software which allows us to use, copy, modify, distribute, and license the source code in connection with our Vista product.

**EMPLOYEES**

As of December 31, 2000, we employed a total of 286 individuals, 280 on a full-time basis and 6 on a part-time basis. Of those employees, 53 are in sales, 19 in marketing, 61 in customer support, 57 in application services, 33 in product development, 30 in Hosted Services and 33 in administration.

**EXECUTIVE OFFICERS OF THE REGISTRANT**

Set forth below is information with respect to our officers, including such information as their names, ages, positions and offices held with us as of March 20, 2001.

Anthony V. Carollo, Jr., 59, became our Chairman and Chief Executive Officer ("CEO") on November 4, 1999 after serving as Chairman and interim CEO since May 14, 1999. He has served as a director since August 1998. Mr. Carollo was the President of Xantel Corporation from April 1998 to November 1999. Previously, Mr. Carollo was the President and Chief Operating Officer of Fujitsu Business Communication Systems and a former Vice President and General Manager of ROLM Corporation. He has also held numerous financial positions, both at ROLM, Arcata Communications and Arthur Andersen & Company. Mr. Carollo currently also serves as a director of Marshall & Ilsley Trust Company of Arizona and Spectralink Corporation. Mr. Carollo holds a BS degree from the University of Santa Clara and an MBA degree from UCLA.

Timothy P. Vatuone, 51, became our Vice President and Chief Financial Officer on February 14, 2000. Before working with us, he served as Vice President and Chief Financial Officer of Vivid Semiconductor, Inc., a venture backed, LCD panel technology start-up, where he raised over $70 million in equity, lease and bank financing. Previously, Mr. Vatuone was Vice President and Chief Financial Officer of Capetronic International Holdings, Ltd., an Asian-based manufacturer of computer CRT displays. He has also held numerous other financial management positions in technology companies such as Hewlett-Packard, Convergent Technologies and Roche. Mr. Vatuone received a BS degree in economics and an MBA degree from the University of Santa Clara.

Charles F. Sonneborn, 40, became our Vice President and Controller on February 13, 2001. Previously, Mr. Sonneborn was our Controller, Financial Operations from June 13, 2000. Prior to joining us, he was the Controller for Xantel Corporation, a computer telephone software developer. Previously, he was General Manager and Chief Financial Officer for Prochem, a Phoenix based manufacturer of cleaning equipment and chemicals. He has held other financial and operational management positions in privately held direct marketing and manufacturing companies such as The Eastwood Company and Group Dekko Companies. Mr. Sonneborn received a BS degree in accounting from Indiana University and an MBA degree from Indiana Wesleyan University.

W. Scott Coleman, 45, currently serves as our Chief Technology Officer and Vice President of Operations. Previously, Mr. Coleman has served in various capacities since 1993 as our President of Call Center Systems, Senior Vice President and General Manager of Call Center Systems, and Vice President of

Product Development. He has been involved in the voice processing industry since 1982, serving as Vice President of American Telesystems Corporation, where he was responsible for product strategy, business development and product development activities. Mr. Coleman holds a BS degree in electrical engineering from Mississippi State University and an MS degree in electrical engineering from the Georgia Institute of Technology.

Carol E. Reid, 49 became our Vice President of Marketing on June 12, 2000 and also serves as interim Vice President of Sales. Prior to joining us, she was the Chief Executive Officer and the Vice President of Sales and Marketing for Xantel Corporation, a computer telephone software developer. Earlier, she served as Global Account Manager for Calico Commerce, Region Manager for Chordiant, and Eastern Region Sales Manager for Aspect Telecommunications where she built their initial sales teams from Boston to Washington D.C.

10

| 10-K | 13th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 13th |
|------|-----------------|-----|-----|----------|------|--------|-----------|

Peter K. Trompetter, 46, became Vice President of Global Development on May 15, 2000. Before joining us, he worked for software companies such as NAS, KPN, Sequent and TechForce in various international senior management positions and began his senior management career in 1976 at N.C.M. N.V. in the Netherlands. Mr. Trompetter is multi-lingual and is responsible for implementing a strategy of global product and account development including product related marketing alliances and after-sales customer support.

### ITEM 2 -- PROPERTIES

Our corporate headquarters is located in a 37,301 square foot facility in Phoenix, Arizona. Our lease for this facility commenced in July 2000 and continues through October 2005. The facility houses our core business and includes space for customer support, research and development, sales, marketing, production, training and administrative functions.

We also lease a 38,904 square foot facility in Roswell, Georgia and a 1,619 square foot facility in Atlanta, Georgia. These facilities house our Hosted Services, including our Home Ticket pay-per-view service and other applications offered through our subsidiary, SIS. As of December 31, 2000, in addition to the sales office in Roswell, Georgia, we leased four other sales and support offices in the United States and one in London. As of that date, the aggregate monthly rental payment for our office facilities was approximately $119,000. We leased two additional offices, one in Amsterdam and one in Stockholm, in January 2001.

### ITEM 3 -- LEGAL PROCEEDINGS

From time to time we are involved in legal proceedings of a character incident to our normal business operations. We are not currently a party to any material pending legal proceedings.

### ITEM 4 -- SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of our stockholders, through the solicitation of proxies or otherwise, during the fourth quarter of 2000.

### PART II

### ITEM 5 -- MARKET FOR THE REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

Our common stock has been traded in the over-the-counter market and quoted through The Nasdaq Stock Market ("NASDAQ") since March 29, 1990, under the symbol "SYNL". The following table sets forth the high and low sale prices of the common stock for the two most recent fiscal years as reported on NASDAQ.

[Download Table]

| YEAR ENDED 2000 | HIGH | LOW |
|-----------------|------|-----|
| 1st Quarter.... | $ 7 1/16 | $2 15/16 |
| 2nd Quarter.... | 6 11/16 | 3 |
| 3rd Quarter.... | 9 3/16 | 5 11/16 |
| 4th Quarter.... | 8 3/16 | 3 1/4 |

[Download Table]

| YEAR ENDED 1999 | HIGH | LOW |
|---|---|---|
| 1st Quarter.... | $ 3 5/8 | $ 1 1/8 |
| 2nd Quarter.... | 1 27/32 | 1 1/8 |
| 3rd Quarter.... | 2 5/8 | 1 |
| 4th Quarter.... | 3 3/8 | 1 5/16 |

11

| 10-K | **14th Page of 47** | TOC | 1st | Previous | Next | Bottom | Just 14th |

On <u>March 20, 2001</u>, the closing sale price for our common stock was $2.44 per share. On that date there were 184 holders of record of our common stock. This figure does not reflect beneficial ownership of shares held in nominee names. We have never declared or paid a cash dividend on our common stock. We presently intend to retain earnings for use in our business and do not anticipate paying cash dividends on outstanding shares in the foreseeable future.

## ITEM 6 -- SELECTED FINANCIAL DATA

The following selected consolidated financial data should be read in conjunction with our consolidated financial statements and related notes and with "<u>Management's Discussion and Analysis of Financial Condition and Results of Operations</u>" included elsewhere in this Annual Report. The selected consolidated financial data presented below under the captions "Statement of Operations Data" and "Balance Sheet Data" for, and as of the end of, each of the years in the five-year period ended <u>December 31, 2000</u>, are derived from our consolidated financial statements, which financial statements have been audited by <u>KPMG LLP</u>, independent certified public accountants. The consolidated financial statements as of <u>December 31, 2000</u> and <u>1999</u>, and for each of the years in the three-year period ended <u>December 31, 2000</u>, and the report thereon, are included elsewhere in this Annual Report.

STATEMENT OF OPERATIONS DATA (in thousands, except per share amounts)

[Enlarge/Download Table]

| | YEARS ENDED DECEMBER 31, | | | | |
|---|---|---|---|---|---|
| | 2000 | 1999 | 1998 | 1997 | 1996 |
| Net revenues ......................... | $ 48,032 | $ 47,831 | $ 47,953 | $ 48,182 | $ 55,305 |
| Cost of revenues ..................... | 19,737 | 24,712 | 22,658 | 25,678 | 27,783 |
| Gross margin ................. | 28,295 | 23,119 | 25,295 | 22,504 | 27,522 |
| Operating expenses: | | | | | |
| Selling, marketing and administrative | 21,007 | 18,854 | 20,386 | 19,463 | 21,383 |
| Product development ................. | 3,230 | 4,448 | 5,573 | 5,874 | 5,943 |
| Depreciation and amortization ....... | 1,817 | 2,489 | 2,538 | 3,908 | 3,229 |
| Fixed asset write-down .............. | -- | -- | -- | 1,303 | -- |
| Total operating expenses ..... | 26,054 | 25,791 | 28,497 | 30,548 | 30,555 |
| Operating income (loss) ............. | 2,241 | (2,672) | (3,202) | (8,044) | (3,033) |
| Gain on sale of patent portfolio ....... | -- | -- | -- | 7,860 | -- |
| Other income, net ..................... | 256 | 806 | 584 | 304 | 253 |
| Income (loss) before income taxes ...... | 2,497 | (1,866) | (2,618) | 120 | (2,780) |
| Income tax expense (benefit) .......... | 255 | -- | -- | (21) | -- |
| Net income (loss) ..................... | $ 2,242 | $ (1,866) | $ (2,618) | $ 141 | $ (2,780) |
| Earnings (loss) per share - diluted .... | $ .18 | $ (.14) | $ (.19) | $ .01 | $ (.21) |
| Shares used in per share calculation ... | 12,699 | 13,034 | 13,441 | 13,788 | 13,256 |

BALANCE SHEET DATA (in thousands)

[Enlarge/Download Table]

| | AS OF DECEMBER 31, | | | | |
|---|---|---|---|---|---|
| | 2000 | 1999 | 1998 | 1997 | 1996 |
| Working capital ................... | $ 6,416 | $ 9,867 | $14,797 | $13,488 | $13,677 |
| Total assets ...................... | 27,101 | 26,224 | 32,133 | 34,808 | 34,808 |
| Long-term debt, less current portion | 316 | 293 | 445 | 530 | 229 |
| Shareholders' equity .............. | 11,177 | 14,390 | 19,813 | 22,186 | 22,021 |

12

| 10-K | 15th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 15th |

ITEM 7 -- MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
        RESULTS OF OPERATIONS

RESULTS OF OPERATIONS

YEAR ENDED DECEMBER 31, 2000 COMPARED TO YEAR ENDED DECEMBER 31, 1999

NET REVENUES

Net revenues for 2000 were $48.0 million compared to $47.8 million reported
for 1999. These annual revenues were derived from our three operating business
segments of Licenses and Hardware, Services and Hosted Services which
represented 43%, 45% and 12% of net revenues, respectively, for 2000, and 36%,
48% and 16% of net revenues, respectively, for 1999.

Our core product is Vista, an open standards-based Interactive
Communications Management ("ICM") software platform for enterprise customer call
centers. Vista combines several call center technologies with a distributed
client-server architecture, open standard components, web-based management
system and a graphical application development tool. We believe Vista provides
customers with flexibility, scalability and efficiency, high degrees of
redundancy, and superior processing performance. Vista Interactive Voice
Response ("IVR"), Vista Computer Telephony Integration ("CTI"), Interactive Web
Response ("IWR") and voice recognition are currently available. Non-core or
legacy products include VocalPoint, an IVR platform; and VocalPoint Interactive
Services, providing CTI functionality, IWR, and Premier and Premier 030
proprietary IVR systems.

In late 1998, we began the transition of becoming a software-based company
from a hardware/software-based company. In 2000, we began to change the
reporting of business segments to Licenses and Hardware, Services, and Hosted
Services from the previous structure of Systems, Hosted Services (SIS), and
Patents. System sales and Maintenance and other services as reported in the 1999
and 1998 Annual Reports have been restated as Licenses and Hardware and Services
for the 2000 Annual Report.

Licenses and Hardware revenues for 2000 were $20.9 million, an increase of
$3.8 million, or 22%, compared to the $17.1 million for 1999. The increase in
2000 was due to the strength of the Vista product line which has shown increased
sales in every quarter since revenues commenced in the third quarter of 1998. In
2000, the Vista product line accounted for 84% of Licenses and Hardware sales.
VocalPoint systems sales declined 41% in 2000 as the Vista product line more
than replaced the declining sales.

Services revenues for 2000 were $21.4 million compared to $23.0 million for
1999, a decrease of $1.6 million, or 7%. The components of Services revenues
consist of patent infringement lawsuits, $1.6 million decrease; maintenance
revenues, $0.9 million decrease but showed an upward trend in the second half of
2000 due to the increased number of installations in late 1999 and early 2000;
application services, $0.8 million increase; project management, $0.6 million
increase; installation, $0.7 million decrease; and other services, $0.2 million
increase.

Hosted Services revenues for 2000 were $5.7 million compared to $7.7
million for 1999. This is a decrease of $2.0 million, or 26%. The primary reason
for the decline was due to Home Ticket, a pay-per-view service for cable
television providers which is offered through our SIS subsidiary. The cable TV

industry has been deploying new order entry technologies for consumer purchases of pay-per-view events which do not utilize toll free 800 numbers. This has resulted in a downward trend in transaction processing fees; a trend which is expected to continue. To offset the decline in pay-per-view services, Hosted Services has offered other outsourced electronic capabilities including DialExpress (message delivery), Lead Capture, Speech Enabled Directory, Site Locators, broadcast faxing, call center processing, and audiotext.

Domestic and International Sales for 2000 were $33.2 million, or 69%, and $14.8 million, or 31%, of total revenues, respectively, compared to $38.9 million, or 81%, and $8.9 million, or 19% of total revenues, respectively, for 1999.

13

| 10-K | 16th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 16th |

**GROSS MARGIN**

The gross margin percentage for the year ended December 31, 2000 was 59% of net revenues, as compared with 48% for the year ended December 31, 1999. Gross margins on License and Hardware revenues in 2000 were $15.4 million compared to $10.9 million in 1999, representing a 41% increase in margins. Margin percentages were 74% and 64% of sales for 2000 and 1999, respectively. This increase is primarily due to our ongoing transition from a hardware/software-based company to a software-based company. Additionally, gross margin was positively affected by decreases in the inventory reserve of $0.7 million and $1.4 million in the years 2000 and 1999, respectively, due to a higher than expected usage of inventory from discontinued product lines. Gross margins on Services revenues in 2000 were $11.2 million, or 52%, compared to $9.6 million, or 42% in 1999, an increase of $1.6 million primarily due to the reduction in third party contractor expense. Gross margins on Hosted Services decreased by $0.9 million from $2.6 million, or 34%, to $1.7 million, or 30%, in 2000 as compared to 1999 primarily caused by the relatively fixed nature of Hosted Services costs. We include those costs directly associated with the generation of revenue in its computation of gross margin, including direct labor, application development, travel, maintenance, customer support, supplies and hardware. Gross margins will fluctuate on a year-to-year basis due to changes in competitive pressures, sales volume, product mix, variations in the ratio of domestic versus international sales, or changes in the mix of direct and indirect sales activity. Accordingly, the gross margins reported for 2000 are not necessarily indicative of the results to be expected for future periods.

**OPERATING EXPENSES**

Operating expenses for 2000 were $26.1 million, an increase of $0.3 million, or 1%, from the $25.8 million reported for 1999. Selling, marketing, and administrative expenses (including depreciation and amortization) increased $1.5 million, or 7%, primarily due to an increase in the number of employees in domestic sales and administration, employee incentives, desktop software, and occupancy costs related to the move of our headquarters to a new facility. In 2000, research and development costs decreased $1.2 million, or 27%. The spending decreases are primarily the result of our transition from a hardware/software-based company to a software-based company. However, we anticipate that research and development spending will increase in future years. Operating expenses decreased due to reductions of the accounts receivable reserves by $0.6 million and $0.1 million in the years 2000 and 1999, respectively. The change in 2000 was primarily due to an increased effort and control of collections and a decrease in aged accounts receivables.

**NET INCOME (LOSS)**

We reported a net income of $2.2 million, or $.18 per diluted share, for 2000, compared to a net loss of $1.9 million, or $(.14) per share for 1999, representing a $4.1 million increase over the prior year.

**YEAR ENDED DECEMBER 31, 1999 COMPARED TO YEAR ENDED DECEMBER 31, 1998**

**NET REVENUES**

Net revenues for 1999 remained constant at $47.8 million as compared to $48.0 million reported for 1998. Net revenues consisted of Licenses and Hardware, Services and Hosted Services, which represented 36%, 48% and 16% of net revenues, respectively, for 1999, and 41%, 40% and 19% of net revenues,

SEC Info - Syntellect Inc - 10-K - For 12/31/00

respectively, for 1998.

Licenses and Hardware revenues for 1999 were $17.1 million, a decrease of $2.5 million, or 13%, as compared to $19.6 million for 1998. This decrease was primarily due to the decline in hardware sales as we transitioned to a software-based company.

Services revenues for 1999 were $23.0 million, an increase of $3.6 million, or 19%, as compared to $19.4 million for 1998. The increase in revenues was primarily due to an enhanced product offering with the Vista product creating the need for more application development, project management and consulting services. This increase was offset by a decline of $2.2 million in maintenance revenue which was consistent with our expectations as we had earlier advised customers that certain products were not Year 2000 compliant and would not be made so, causing some maintenance contracts not to be renewed.

14

| **10-K** | **17th Page of 47** | TOC | 1st | Previous | Next | Bottom | Just 17th |

Hosted Services revenues were $7.7 million for 1999, a decrease of $1.2 million, or 13%, from the $8.9 million reported in 1998. The primary reason for the decline was due to our Home Ticket service. The cable TV industry has been deploying new order entry technologies for consumer purchases of pay-per-view events which do not utilize toll free 800 numbers. This change resulted in a downward trend in transaction processing fees; a trend that was expected to continue. To offset the decline in pay-per-view services, Hosted Services has offered other outsourced electronic capabilities including DialExpress, Lead Capture, Speech Enabled Directory, Site Locators as well as benefits enrollment, broadcast faxing, call center processing, and audiotext.

Domestic and International Sales for 1999 were $38.9 million, or 81%, and $8.9 million, or 19%, of total revenues, respectively, compared to $37.5 million, or 78%, and $10.5 million, or 22% of total revenues, respectively, for 1998.

GROSS MARGIN

The gross margin percentage for the year ended December 31, 1999 was 48% of net revenues, as compared with 53% for the year ended December 31, 1998. The gross margin on Licenses and Hardware remained flat at $10.9 million, yet the gross margin percentage increased to 64% for 1999 compared to 59% for 1998. The increase in 1999 was due to the decline in hardware sales which has a lower gross margin percentage. Gross margin was positively affected by decreases in the inventory reserve of $1.4 million and $1.1 million in the years 1999 and 1998, respectively, due to a higher than expected usage of inventory from discontinued product lines. The gross margin on Services for 1999 was $9.6 million as compared to $10.5 million in 1998, or 42% and 51%, respectively. This decline was primarily due to the increase in third party contractor expense in 1999 as we transitioned to a software-based company. Gross margin on Hosted Services decreased by $1.3 million from $3.9 million, or 44%, to $2.6 million, or 34%, in 1999 as compared to 1998 primarily caused by the relatively fixed nature of Hosted Services costs.

OPERATING EXPENSES

Operating expenses for 1999 were $25.8 million, a decrease of $2.7 million, or 9%, from the $28.5 million reported for 1998. Selling, marketing, and administrative expenses (including depreciation and amortization) decreased $1.5 million, or 7%, primarily due to the consolidation of the corporate structure and general cost reductions which started during the second quarter of 1999. Research and development costs decreased $1.1 million, or 20%. 1998 was impacted by the development of the Vista product which was released in May of 1998. Operating expenses decreased due to reductions of the accounts receivable reserves of $0.1 million and $0.3 million in the years 1999 and 1998, respectively. The 1999 decrease was primarily due to a lower reserve coverage needed for aged account receivables at December 31, 1999 as compared to December 31, 1998.

NET INCOME (LOSS)

We reported a net loss of $1.9 million, or $(.14) per share, for 1999, compared to a net loss of $2.6 million, or $(.19) per share for 1998.

LIQUIDITY AND CAPITAL RESOURCES

We had working capital of $6.4 million at December 31, 2000, compared to

$9.9 million at <u>December 31, 1999</u>, and the current ratio was 1.4:1 and 1.9:1 on such dates, respectively. Cash, cash equivalents, short-term investments and marketable securities available-for-sale at the end of 2000 was $7.3 million as compared to $6.2 million at <u>December 31, 1999</u>.

Cash provided by operating activities during 2000 was $6.8 million. Deferred revenue increased by $3.5 million due to fourth quarter payments and orders that are expected to be recognized in 2001.

Cash provided from investing during 2000 was $0.3 million due to proceeds of $0.3 million received from the sale of property and equipment from our previous headquarters location, the purchase of $1.0 million in property and equipment, and $1.0 million in maturities of marketable securities.

15

| 10-K | 18th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 18th |

Cash used in financing activities during 2000 was $5.8 million primarily due to the $6.5 million purchase of treasury stock and $1.1 million in proceeds from the issuance of common stock.

We use a letter of credit, secured by a $75,000 certificate of deposit, to secure the lease on our Chicago facility. Accordingly, the disposal of the certificate of deposit is restricted by the letter of credit agreement. On October 11, 2000, we entered into a $4 million revolving line of credit agreement with a financial institution. The purpose for this line of credit is to fund general operations with all of our assets as collateral. The loan agreement contains various restrictions on us, including limitations on the incurrence of additional debt, and restrictions on our ability to repurchase our stock, make acquisitions, or consolidate or merge into any other entity. In addition, the loan agreement contains certain financial covenants, including a minimum interest coverage ratio, a minimum liquidity ratio, and a maximum funded senior debt to EBITDA ratio. We violated certain restricted covenants pertaining to the line of credit agreement. However, the financial institution waived these violations. At December 31, 2000, we had no outstanding borrowings under this line of credit.

We expect that our current cash and cash equivalents combined with future cash flows from operating activities and the line of credit will be sufficient to support our operations during 2001.

On November 13, 1998, the Board of Directors approved a stock buyback plan to purchase up to 1.5 million shares of our common stock over the following two years. We completed the buyback plan during the third quarter of 1999. On November 5, 1999, we announced a new buyback plan pursuant to which we were authorized to acquire up to 1 million shares over a one-year period. On August 8, 2000 the Board of Directors revised this plan by approving the buyback of an additional 500,000 shares and extending the buyback period to August 8, 2001. On November 10, 2000, the Board of Directors authorized an additional 500,000 share buyback with no time limitation. As of March 20, 2001, we have repurchased a total of 3,135,000 shares under these plans since November 13, 1998 and are authorized to repurchase 365,000 additional shares.

## OPERATING BUSINESS SEGMENTS

An operating business segment is defined as a component of an enterprise that engages in business activities which may earn revenues and incur expenses, whose results are regularly reviewed by a chief operating decision maker, and for which discrete financial information is available. We have three operating business segments which are organized around differences in products and services: Licenses and Hardware, Services, and Hosted Services. See Note 12 of the "Notes to Consolidated Financial Statements" for additional information regarding our business segments.

Licenses and Hardware is our operating business segment that includes our contact center software platform called Vista. Vista is an all-in-one solution for interactive voice response, interactive web response, computer telephony interaction, fax on demand, automatic speech recognition, and other applications.

Services is our operating business segment that includes customer support in the areas of consulting services, project management, application development, installation, education services, and maintenance. We generally sell these services as part of the initial sale or in some cases as post

implementation add-ons. This segment also includes patent litigation against third parties.

Hosted Services is our operating business segment which provides products and services including Home Ticket Pay-Per-View, DialExpress, Lead Capture, Speech Enabled Directory, Site Locator, Cyberstats, and a variety of out-sourced electronic capabilities such as benefits enrollment and broadcast faxing which we offer through our subsidiary, SIS.

### RECENT ACCOUNTING PRONOUNCEMENTS

In June 1998, the Financial Accounting Standards Board (*"FASB"*) issued Statement of Financial Accounting Standards (*"SFAS"*) No. 133, *"Accounting for Derivative Instruments and Hedging Activities."* In June 2000, the FASB issued SFAS No. 138, *"Accounting for Certain Derivative Instruments and Certain Hedging Activities, an Amendment of SFAS 133."* SFAS No. 133 and SFAS No. 138 require that all derivative instruments be recorded on the balance sheet at their respective fair values. We have adopted the provisions of both SFAS No. 133 and No. 138

16

| 10-K | 19th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 19th |
| --- | --- | --- | --- | --- | --- | --- | --- |

as of January 1, 2001, and believe that such adoption will not have a material effect on our consolidated financial statements.

## ITEM 7A. -- QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

### INTEREST RATE RISK

Our exposure to market risk for changes in interest rates relates to our cash investment portfolio. Our general policy is to limit the risk of principal loss and to ensure the safety of invested funds by limiting market and interest rate risk. We place our investments in instruments with high credit quality issuers. We classify all liquid investments with a maturity date of three months or less as cash equivalents. We classify investments with a maturity date between three and twelve months as either short-term investments or marketable securities. The average interest rate on short-term investments is 4.65%. We do not expect any material loss with respect to our cash investment portfolio since marketable securities have generally been held until maturity and unrealized gains and losses are negligible.

Our only long-term liabilities are capital lease obligations at a fixed rate. Therefore, we do not believe there is any material exposure to market risk changes in interest rates as it relates to our current or long-term liabilities.

### FOREIGN CURRENCY EXCHANGE RATE RISK

We invoice all international customers in U.S. dollars except for the customers of our United Kingdom ("U.K.") subsidiary, which are invoiced in pounds sterling. Our U.K. subsidiary's financials including balance sheet, revenue, and operating expenses are recorded in pounds sterling. Therefore, our exposure to foreign currency exchange rate risk occurs when we translate the financial results of that subsidiary to U.S. dollars in consolidation. At this time, we do not use instruments to hedge our foreign exchange exposure in the U.K. because the effects of foreign exchange rate fluctuations are not material for us.

### ADDITIONAL CAUTIONARY FACTORS THAT MAY AFFECT FUTURE RESULTS

Our disclosure and analysis in this Annual Report contain some forward-looking statements. Forward-looking statements give our current expectations or forecasts of future events. You can identify such statements by the fact that they do not relate strictly to historical or current facts. These statements may include words such as "anticipate," "likely," "expect," "intend," "believe," and other words and phrases of similar meaning in connection with any discussion of future operating or financial performance. In particular, these forward-looking statements include, for example, statements relating to future actions, prospective products, future performance, results of current and anticipated products, sales efforts, and operating expenses. From time to time, we also may provide oral or written forward-looking statements in other materials we release to the public.

We reasonably believe that any or all of our forward-looking statements in this Annual Report and in any other public statements we make are true at the time they are made. However, such statements may turn out to be wrong. They can be affected by inaccurate assumptions we might make or by known or unknown risks and uncertainties. Consequently, no forward-looking statement can be guaranteed, and actual future results may vary materially. We undertake no obligation to publicly update forward-looking statements, whether as a result of new

information, future events or otherwise. You are advised, however, to review any and all further disclosures we make on related subjects in our 10-Q and 8-K filings with the SEC and in other materials we publicly release.

Also note that below is a cautionary discussion of risks, uncertainties and possibly inaccurate assumptions relevant to our business. These are just some factors that we think could cause our actual results to differ materially from expected and historical results. Other factors besides those discussed below and throughout this Annual Report could also adversely affect us. This discussion is provided as permitted by Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934.

17

| **10-K** | **20th Page of 47** | TOC | 1st | Previous | Next | Bottom | Just 20th |

Our markets are characterized by rapid technological changes which may cause us
------------------------------------------------------------------------------
to incur significant development costs and prevent us from attracting new
------------------------------------------------------------------------------
customers.
------------------------------------------------------------------------------

     The market for our products is characterized by rapid technological
change, frequent new product introductions and enhancements, uncertain product
life cycles and changing end-user customer demands. The introduction of products
embodying new technologies and the emergence of new industry standards could
render existing products and services obsolete or unmarketable and cause us to
incur significant costs to develop new or enhanced products to meet the
competition of such new technologies or industry standards. If we are unable to
develop new products and services or if we are unable to develop such products
fast enough to meet this competition, we could be prevented from attracting new
customers and from retaining the installed base of customers we currently have.
Such events could have a material adverse effect on our business, financial or
market performance.

Our future business prospects depend in part on our ability to maintain and
------------------------------------------------------------------------------
improve our current products and services and develop new ones.
------------------------------------------------------------------------------

     We believe that our future business prospects depend in large part on our
ability to maintain and improve our current products and services and to develop
new products and services on a timely basis. Our products will have to achieve
market acceptance, maintain technological competitiveness and meet an expanding
range of end-user customer requirements. As a result of the complexities
inherent in our products, major new products and product enhancements require
long development and testing periods. We may not be successful in developing and
marketing, on a timely and cost effective basis, product enhancements or new
products that respond to technological change, evolving industry standards or
end-user customer requirements. We may also experience difficulties that could
delay or prevent a successful development, introduction or marketing of product
enhancements, and our new products and product enhancements may not achieve
market acceptance. Significant delays in the general availability of new
releases of our products or significant problems in the installation or
implementation of new releases of our products could have a material adverse
effect on our business, financial or market performance. In addition, we cannot
assure you that any new product or feature we introduce will receive market
acceptance. Future announcements we make of new products may cause customers to
defer purchases of our existing products, which could also adversely affect our
business, financial or market performance.

If the technology we license from others for embedding in our products does not
------------------------------------------------------------------------------
continue to be available, we could be forced to modify our products or eliminate
------------------------------------------------------------------------------
product functions.
------------------------------------------------------------------------------

     We license technology from others which we embed in some of our products.
If one or more of these licenses terminates or cannot be renewed on satisfactory
terms, we could be forced to modify the affected products to use alternative
technology or we may be required to eliminate the affected product function,

either of which alternatives could have a material adverse effect on us. In addition, should the licensors of our embedded technology cease operations or should their technology contain defects or be subject to adverse intellectual property claims, we could be adversely and materially affected.

We obtain hardware components from third parties
--------------------------------------------------------------------------------

     We obtain hardware components from third parties for our products, including, without limitation, telephony interface and voice recognition boards. We do not believe that we are dependent on a single source to supply the components we use in our product. We are currently able to obtain key components in a timely manner from a variety of sources. However, if we are unable to secure alternate suppliers of key components or alternate assembly sources in a timely manner when we needed them, our results of operations could be affected adversely.

We depend on key personnel and on our ability to recruit additional skilled
--------------------------------------------------------------------------------
personnel, in a very competitive recruiting environment, to conduct and grow our
--------------------------------------------------------------------------------
business effectively.
--------------------------------------------------------------------------------

     Our future success also depends upon our ability to attract, train, assimilate and retain qualified personnel. Competition for individuals with skills in the computer telephony software industry is intense, particularly for those with relevant technical and/or sales experience. We cannot assure you that we will be able to retain our key employees or that we can attract, train, assimilate or retain other qualified personnel in the future in the numbers we

18

| 10-K | 21st Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 21st |

will require. Our inability to attract and retain qualified personnel in the future could have material adverse effects on our business, financial or market performance.

We have never had a work stoppage and none of our employees are represented by labor unions. However, a limited number of sales representatives are responsible for a substantial portion of our direct sales. The loss of these representatives could adversely affect our future operating results.

**We face competitive pressures which may have a materially adverse effect on us.**
-----------------------------------------------------------------------------

The market for our computer telephony software products is highly competitive and, because there are relatively low barriers to entry in certain parts of this market, we expect competition to increase in the future. In addition, because our industry is relatively new and evolving and characterized by rapid technological change, it is difficult for us to predict whether, when and by whom new competing technologies or new competitors may be introduced into our markets. Currently, our competition comes from several different market segments, including computer telephony platform developers, computer telephony applications software developers and telecommunications equipment vendors. We cannot assure you that we will be able to compete effectively against current and future competitors.

In addition, increased competition or other competitive pressures may result in price reductions, reduced margins or loss of market share, any of which could have material adverse effects on our business, financial condition or results of operations. Many of our current and potential competitors have longer operating histories, significantly greater financial, technical, marketing, customer service and other resources, greater name recognition and a larger installed base of customers than we do. As a result, these competitors may be able to respond to new or emerging technologies and changes in customer requirements faster and more effectively than we can, or to devote greater resources to the development, promotion and sale of products than we can.

Current and potential competitors have established, and may in the future establish, cooperative relationships among themselves or with third parties, including mergers or acquisitions, to increase the ability of their products to address the needs of our current or prospective end-user customers. Some of these competitors also currently have a larger market share than we do and, were they to increase their market share through such cooperative relationships, mergers or acquisitions or through product development, promotion and sale, such developments could have material adverse effects on our business, financial or market performance.

**Because of the competitive, rapidly changing nature of the computer telephony**
-----------------------------------------------------------------------------
**software industry, we must continually identify the most effective means for**
-----------------------------------------------------------------------------
**selling and marketing our products.**
-----------------------------------------------------------------------------

The computer telephony software industry is very competitive and rapidly changing. Information technology purchasers can be reluctant to believe that new technology is ready for mass implementation. As a result, we must continually identify markets for our products and services and apply the most effective means for addressing those markets, both internationally and domestically. We

are required to have a thorough understanding of the industry's direction and an appreciation for the end-user's demands for functionality. We are also required to effectively balance both direct and indirect sales channels and to train our sales force to find new customers and further develop our installed customer base while keeping thoroughly familiar with our products and product mix. If we are unable to generate increasing revenues through focused attention on these sales and marketing elements, we could cause material adverse effects on our business, financial or market performance.

We may not be able to protect our proprietary rights adequately, which could
--------------------------------------------------------------------------
allow third parties to copy or otherwise obtain and use our technology without
--------------------------------------------------------------------------
authorization.
--------------------------------------------------------------------------

     We consider our computer telephony software products to be proprietary. In an effort to protect our proprietary rights, we rely primarily on a combination of patent, copyright, trademark and trade secret laws, as well as licensing and other agreements with others including our end-user customers, consultants, suppliers, and resellers and on employee and third-party non-disclosure agreements. These laws and agreements provide only limited protection of our proprietary rights, and the protection they provide varies and may not provide us with adequate protection in all circumstances. We have filed a patent application directed to several inventions embodied in our

19

| 10-K | 22nd Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 22nd |

computer telephony software products. We also hold 65 registered trademarks in 15 countries and 13 pending registrations. We also hold seven registered copyrights.

Because our means of protecting our proprietary rights may not be adequate, it may be possible for a third party to copy or otherwise obtain and use our technology without authorization. A third party could also develop similar technology independently. Also, even though we hold patents and other proprietary rights in our products, the development and sale of our products could violate the proprietary rights of others, including the patent rights of others. Should this be or become the case, we could be required to redesign our products to avoid violating such proprietary rights, or we could be forced to acquire or license those proprietary rights. Any of such alternatives could materially increase the cost of our products and, consequently, their attractiveness to our customers. In addition, the laws of some countries in which we sell our products do not protect our software and intellectual property rights to the same extent as the laws of the United States. Unauthorized copying, use or reverse engineering of our products or the redesign of our products to avoid proprietary rights held by others or the cost of obtaining necessary technology rights could all materially adversely affect our business, financial or market performance.

Comparisons of our period-to-period operating results are not necessarily
--------------------------------------------------------------------------
meaningful.
--------------------------------------------------------------------------

We believe that period-to-period comparisons of our operating results are not necessarily meaningful, and you should not rely on them as an indication of our future performance. In addition, our operating results in a future quarter or quarters may fall below expectations of securities analysts or investors and, as a result, the price of our common stock may fluctuate. Because we cannot predict when our potential end-user customers will place orders and finalize contracts, we cannot accurately forecast our revenues and operating results for future quarters. We recognize revenues upon satisfaction of the requirements of AICPA Statement of Position 97-2, which generally occurs in the same quarter that the order is received. As a result, our quarterly revenues and operating results depend primarily on the size, quantity and timing of orders received for our products during each quarter. If a large number of orders or several large orders do not occur or are deferred or delayed, our revenues in a quarter could be substantially reduced.

Our customers could change their minds about our products, and backlog totals as
--------------------------------------------------------------------------
of a certain date may not be indicative of actual revenues.
--------------------------------------------------------------------------

We can give no assurance that our existing customers will continue their current buying patterns or that changes within their industries will not adversely affect our ability to retain or attract new customers. In addition, although we believe that all orders in our backlog at December 31, 2000 are firm and will be delivered within the fiscal year, customers can make changes in their orders, or they may alter or significantly delay their delivery schedules or they may even cancel their orders. Therefore, our total backlog as of any particular date may not be indicative of actual revenues for any future period.

If our end-user customers do not perceive our products to be effective or high

--------------------------------------------------------------------------------
quality, our brand and name recognition will suffer.
--------------------------------------------------------------------------------

     We believe that establishing and maintaining brand and name recognition is
critical for attracting, retaining and expanding end-user customers in our
target markets. We also believe that the importance of reputation and name
recognition will increase as competition in our market increases. Promotion and
enhancement of our name will depend on the effectiveness of our marketing and
advertising efforts and on our success in providing high-quality products and
related services and on the performance of our resellers, none of which can be
assured. If our end-user customers do not perceive our product or related
services or those of our resellers to be effective or of high quality, our brand
and name recognition would suffer which could have a material adverse effect on
our business, financial or market performance.

Our products could have defects for which we are potentially liable and which
--------------------------------------------------------------------------------
could result in loss of revenue, increased costs or loss of credibility or such
--------------------------------------------------------------------------------
defects could delay acceptance of our products in the market.
--------------------------------------------------------------------------------

     Our products, including components supplied by others, may contain errors
or defects, especially when first introduced or when new versions are released.
Despite internal product testing, errors in our new products or

                                       20

releases could be found after commencement of commercial shipments. This could result in additional development costs, diversion of technical and other resources from our other development efforts, or the loss of credibility with current or future end-user customers. This could also result in a loss of revenue or a delay in market acceptance of our products, which, in turn, could have a material adverse effect upon our business, financial, or market performance. Our license agreements with our end-user customers typically contain provisions designed to limit our exposure to potential product liability and some <u>contract</u> claims. However, not all of these agreements contain these types of provisions but even when they do, these provisions vary as to their terms and may not be effective under the laws of some jurisdictions. A product liability, warranty, or other claim brought against us could have a material effect on our business, financial, or market performance.

**We may need to license third-party technologies and may be unable to do so on acceptable or any terms.**

To the extent we need to license third-party technologies, we may be unable to do so on commercially reasonable terms or at all. In addition, we may fail to successfully integrate licensed technology into our products or services. Third-party licenses may expose us to increased risks, including risks associated with the integration of new technology, the diversion of resources from the development of our own proprietary technology, and our inability to generate revenue from new technology sufficient to offset associated acquisition, development and maintenance costs. Our inability to obtain any of such licenses could delay our product and service development until equivalent technology can be identified, licensed and integrated. This, in turn, could adversely affect our business, financial and market performance.

**Pay-per-view revenues have declined and our other outsourced electronic capabilities may not supplant those lost revenues**

The cable TV industry has been introducing new ordering technologies for consumer purchases of pay-per-view events which do not utilize toll free 800 numbers. Consequently, we are experiencing a downward trend in transaction processing fees; a trend which we expect to continue. To offset this decline in pay-per-view services, Hosted Services is offering other, outsourced electronic capabilities including DialExpress, Lead Capture, Speech Enabled Directory, and Site Locators as well as benefits enrollment, broadcast faxing, call center processing, and audiotext. We cannot give any assurance, however, as to when, if ever, our efforts will completely supplant these declining pay-per-view revenues.

**Our stock price has been and could continue to be volatile.**

Our stock price has been and could continue to be volatile due to a number of factors including, without limitation:

    a.    actual or anticipated fluctuations in our operating results;

    b.    announcements by us, our competitors or our end-user customers;

c.   changes in financial estimates of securities analysts or
     investors regarding us, our industry, our competitors or our
     end-user customers;

d.   technological innovations or the introduction of new products
     by us or others;

e.   the operating and stock price performance of other comparable
     companies or of our competitors or end-user customers;

f.   revenue or earnings in any quarter fail to meet expectations
     of the investment community;

g.   the volume of our shares typically traded in any trading
     session;

h.   our purchases in the market of our own shares;

21

| 10-K | 24th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 24th |

       i.    purchases and sales by our officers, directors, employees and
            affiliates; and

       j.    general market or economic conditions.

**ITEM 8 -- FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

    The Independent Auditors' Report of <u>KPMG LLP</u> and the Consolidated Financial
Statements of Syntellect Inc. and <u>subsidiaries</u> as of <u>December 31, 2000</u> and <u>1999</u>,
and for each of the years in the three-year period ended <u>December 31, 2000</u>,
follow:

<div align="center">22</div>

## INDEPENDENT AUDITORS' REPORT

The Board of Directors and Shareholders
Syntellect Inc.:

We have audited the accompanying consolidated balance sheets of Syntellect Inc. and subsidiaries as of December 31, 2000 and 1999, and the related consolidated statements of operations and comprehensive income, shareholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2000. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Syntellect Inc. and subsidiaries as of December 31, 2000 and 1999, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States of America.

                                        /S/ KPMG LLP

Phoenix, Arizona
February 7, 2001

                          23

| 10-K | 26th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 26th |

SYNTELLECT INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS
DECEMBER 31, 2000 AND 1999
(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

[Enlarge/Download Table]

|  | 2000 | 1999 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 7,334 | $ 6,184 |
| Short-term investments ($75 restricted at December 31, 2000 and $100 restricted at December 31, 1999) | 75 | 100 |
| Marketable securities ($1,001 restricted at December 31, 1999) | -- | 1,001 |
| Trade receivables, net of allowance for doubtful accounts of $225 and $784 at December 31, 2000 and 1999, respectively | 12,423 | 9,999 |
| Other receivables | 9 | 1,406 |
| Note receivable | 57 | -- |
| Inventories | 1,415 | 2,041 |
| Prepaid expenses | 711 | 677 |
| Total current assets | 22,024 | 21,408 |
| Property and equipment, net | 3,814 | 4,787 |
| Note receivable, non-current portion | 270 | -- |
| Other assets | 993 | 29 |
| Total assets | $ 27,101 | $ 26,224 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,934 | $ 1,873 |
| Accrued liabilities | 3,186 | 3,268 |
| Customer deposits | 2,916 | 3,238 |
| Deferred revenue | 6,421 | 2,914 |
| Capital lease obligations | 151 | 248 |
| Total current liabilities | 15,608 | 11,541 |
| Capital lease obligations, less current portion | 316 | 293 |
| Total liabilities | 15,924 | 11,834 |
| Shareholders' equity: | | |
| Preferred stock, $.01 par value. Authorized 2,500,000 shares; no shares issued or outstanding | -- | -- |
| Common stock, $.01 par value. Authorized 25,000,000 shares; issued 14,505,298 and 13,899,487, respectively | 145 | 139 |
| Additional paid-in capital | 62,311 | 61,177 |
| Accumulated deficit | (39,696) | (41,938) |
| Accumulated other comprehensive loss | (169) | (32) |
|  | 22,591 | 19,346 |
| Treasury stock, at cost, 3,332,432 and 1,885,732 shares, respectively | (11,414) | (4,956) |
| Total shareholders' equity | 11,177 | 14,390 |
| Commitments and contingencies (Notes 7 and 8) | | |
| Total liabilities and shareholders' equity | $ 27,101 | $ 26,224 |

See accompanying notes to consolidated financial statements.

24

| 10-K | 27th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 27th |

### SYNTELLECT INC. AND SUBSIDIARIES

#### CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME
#### YEARS ENDED DECEMBER 31, 2000, 1999 AND 1998
#### (IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

[Enlarge/Download Table]

|  | 2000 | 1999 | 1998 |
|---|---|---|---|
| **Net revenues:** | | | |
| Licenses and hardware | $ 20,906 | $ 17,092 | $ 18,395 |
| Services | 21,412 | 23,007 | 20,633 |
| Hosted services | 5,714 | 7,732 | 8,925 |
| Total net revenues | 48,032 | 47,831 | 47,953 |
| **Cost of revenues:** | | | |
| Licenses and hardware | 5,509 | 6,188 | 7,506 |
| Services | 10,226 | 13,441 | 10,127 |
| Hosted services | 4,002 | 5,083 | 5,025 |
| Total cost of revenues | 19,737 | 24,712 | 22,658 |
| Gross margin | 28,295 | 23,119 | 25,295 |
| **Operating expenses:** | | | |
| Selling, marketing and administrative | 22,824 | 21,343 | 22,924 |
| Research and development | 3,230 | 4,448 | 5,573 |
| Total operating expenses | 26,054 | 25,791 | 28,497 |
| Operating income (loss) | 2,241 | (2,672) | (3,202) |
| **Other income (expense), net:** | | | |
| Interest income, net | 278 | 264 | 629 |
| Gain on sale of Dialer product line | -- | 509 | -- |
| Other income (expense), net | (22) | 33 | (45) |
| Total other income, net | 256 | 806 | 584 |
| Income (loss) before income taxes | 2,497 | (1,866) | (2,618) |
| Income tax expense | 255 | -- | -- |
| Net income (loss) | $ 2,242 | $ (1,866) | $ (2,618) |
| Earnings (loss) per common share -- basic | $ 0.19 | $ (.14) | $ (.19) |
| Earnings (loss) per common share -- diluted | $ 0.18 | $ (.14) | $ (.19) |
| Weighted average shares -- basic | 11,742 | 13,034 | 13,441 |
| Weighted average shares -- diluted | 12,699 | 13,034 | 13,441 |
| **Other comprehensive income (loss), net of tax:** | | | |
| Foreign currency translation adjustment | (137) | (5) | 16 |
| Unrealized gain (loss) on marketable securities | -- | (6) | 12 |
| Other comprehensive income (loss) | (137) | (11) | 28 |
| Comprehensive income (loss) | $ 2,105 | $ (1,877) | $ (2,590) |

See accompanying notes to consolidated financial statements.

25

| 10-K | 28th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 28th |

### SYNTELLECT INC. AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
### YEARS ENDED DECEMBER 31, 2000, 1999 AND 1998
### (IN THOUSANDS, EXCEPT SHARE AMOUNTS)

[Enlarge/Download Table]

| | COMMON STOCK | | ADDITIONAL PAID-IN CAPITAL | DEFERRED COMPENSATION | ACCUMULATED DEFICIT |
| | SHARES | $.01 PAR VALUE | | | |
|---|---|---|---|---|---|
| Balance at January 1, 1998 | 13,576,761 | $136 | $60,727 | $(33) | $(37,454) |
| Issuance of common stock upon exercise of stock options | 31,193 | -- | 33 | -- | -- |
| Issuance of common stock under employee stock purchase plan | 91,141 | 1 | 157 | -- | -- |
| Amortization of deferred compensation related to stock options | -- | -- | -- | 33 | -- |
| Net loss | -- | -- | -- | -- | (2,618) |
| Foreign currency translation adjustment | -- | -- | -- | -- | -- |
| Net unrealized holding gain on marketable securities | -- | -- | -- | -- | -- |
| Purchase of 3,500 shares of treasury stock | -- | -- | -- | -- | -- |
| Balance at December 31, 1998 | 13,699,095 | $137 | $60,917 | $ -- | $(40,072) |
| Issuance of common stock upon exercise of stock options | 97,825 | 1 | 158 | -- | -- |
| Issuance of common stock under employee stock purchase plan | 102,567 | 1 | 102 | -- | -- |
| Net loss | -- | -- | -- | -- | (1,866) |
| Foreign currency translation adjustment | -- | -- | -- | -- | -- |
| Net unrealized holding loss on marketable securities | -- | -- | -- | -- | -- |
| Purchase of 1,706,500 shares of treasury stock | -- | -- | -- | -- | -- |
| Balance at December 31, 1999 | 13,899,487 | $139 | $61,177 | $ -- | $(41,938) |
| Issuance of common stock upon exercise of stock options | 494,942 | 5 | 820 | -- | -- |
| Issuance of common stock under employee stock purchase plan | 110,869 | 1 | 314 | -- | -- |
| Net income | -- | -- | -- | -- | 2,242 |
| Foreign currency translation adjustment | -- | -- | -- | -- | -- |
| Purchase of 1,425,000 shares of treasury stock | -- | -- | -- | -- | -- |
| Balance at December 31, 2000 | 14,505,298 | $145 | $62,311 | $ -- | $(39,696) |

[Enlarge/Download Table]

| | ACCUMULATED COMPREHENSIVE INCOME (LOSS) | TREASURY STOCK | TOTAL SHAREHOLDERS' EQUITY |
|---|---|---|---|
| Balance at January 1, 1998 | $ (49) | $ (1,141) | $ 22,186 |
| Issuance of common stock upon exercise of stock options | -- | -- | 33 |
| Issuance of common stock under employee stock purchase plan | -- | -- | 158 |
| Amortization of deferred compensation related to stock options | -- | -- | 33 |
| Net loss | -- | -- | (2,618) |
| Foreign currency translation adjustment | 16 | -- | 16 |
| Net unrealized holding gain on marketable securities | 12 | -- | 12 |
| Purchase of 3,500 shares of treasury stock | -- | (7) | (7) |
| Balance at December 31, 1998 | $ (21) | $ (1,148) | $ 19,813 |
| Issuance of common stock upon exercise of stock options | -- | -- | 159 |
| Issuance of common stock under employee stock purchase plan | -- | -- | 103 |
| Net loss | -- | -- | (1,866) |
| Foreign currency translation adjustment | (5) | -- | (5) |
| Net unrealized holding loss on marketable securities | (6) | -- | (6) |
| Purchase of 1,706,500 shares of treasury stock | -- | (3,808) | (3,808) |
| Balance at December 31, 1999 | $ (32) | $ (4,956) | $ 14,390 |
| Issuance of common stock upon exercise of stock options | -- | -- | 825 |
| Issuance of common stock under employee stock purchase plan | -- | -- | 315 |
| Net income | -- | -- | 2,242 |
| Foreign currency translation adjustment | (137) | -- | (137) |
| Purchase of 1,425,000 shares of treasury stock | -- | (6,458) | (6,458) |
| Balance at December 31, 2000 | $ (169) | $ (11,414) | $ 11,177 |

See accompanying notes to consolidated financial statements.

26

### SYNTELLECT INC. AND SUBSIDIARIES

#### CONSOLIDATED STATEMENTS OF CASH FLOWS
YEARS ENDED DECEMBER 31, 2000, 1999 AND 1998
(IN THOUSANDS)

[Enlarge/Download Table]

|  | 2000 | 1999 | 1998 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ 2,242 | $ (1,866) | $ (2,618) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Loss on sale of property, plant, and equipment | 49 | -- | -- |
| Depreciation and amortization | 1,817 | 2,489 | 2,538 |
| Provision for doubtful accounts | 318 | 1,806 | 597 |
| Stock option compensation expense | -- | -- | 33 |
| Increase in accounts receivable | (1,847) | (2,009) | (905) |
| (Increase) decrease in inventories | 626 | 932 | (380) |
| Increase (decrease) in accounts payable | 1,061 | (687) | 400 |
| Decrease in accrued liabilities | (82) | (10) | (2,193) |
| Increase (decrease) in deferred revenue | 3,507 | 197 | (480) |
| Change in other assets and liabilities | (916) | 447 | 1,772 |
| Net cash provided by (used in) operating activities | 6,775 | 1,299 | (1,236) |
| **Cash flows from investing activities:** | | | |
| Purchase of marketable securities | -- | (14,190) | (23,289) |
| Maturities of marketable securities | 1,026 | 21,381 | 23,236 |
| Purchase of property and equipment | (1,015) | (1,713) | (1,988) |
| Proceeds from notes receivable | -- | -- | 4,217 |
| Proceeds from sale of property and equipment | 254 | -- | -- |
| Net cash provided by investing activities | 265 | 5,478 | 2,176 |
| **Cash flows from financing activities:** | | | |
| Proceeds from sale of common stock | 1,140 | 262 | 191 |
| Purchase of treasury stock | (6,458) | (3,808) | (7) |
| Payments on capital lease obligations | (435) | (278) | (194) |
| Net cash used in financing activities | (5,753) | (3,824) | (10) |
| Effect of exchange rates on cash | (137) | (5) | 16 |
| Net increase in cash and cash equivalents | 1,150 | 2,948 | 946 |
| Cash and cash equivalents at beginning of year | 6,184 | 3,236 | 2,290 |
| Cash and cash equivalents at end of year | $ 7,334 | $ 6,184 | $ 3,236 |
| **Supplemental disclosure of cash flow information:** | | | |
| Cash paid for interest | $ 57 | $ 47 | $ 68 |
| Cash paid for income taxes | $ 20 | $ 29 | $ 2 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES:** | | | |
| Property and equipment acquired under capital leases: | $ 362 | $ 134 | $ 166 |

See accompanying notes to consolidated financial statements.

27

| 10-K | 30th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 30th |

## SYNTELLECT INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### DECEMBER 31, 2000, 1999 AND 1998

(1) Summary of Significant Accounting Policies

   Nature of Business and Principles of Consolidation

   Syntellect Inc. and its wholly-owned subsidiaries ("Syntellect" or the
"Company") develops, markets, and integrates voice and information processing
software and application software worldwide. The Company offers an inbound voice
processing product line, a worldwide distribution network, and a vertical market
focus in the financial services, media, telecommunications and healthcare
industries. Syntellect also provides interactive transaction-based Hosted
Services for those customers who prefer to outsource their voice processing
applications, including cable and satellite pay-per-view orders, dial express,
site locator, call redirect, and lead capture.

   The consolidated financial statements include the accounts of Syntellect
Inc. and its wholly-owned subsidiaries. All significant intercompany balances
and transactions have been eliminated in consolidation.

   Use of Estimates

   Management of the Company has made a number of estimates and assumptions
relating to the reporting of assets, liabilities, revenues, expenses and the
disclosure of contingent assets and liabilities to prepare these financial
statements in conformity with generally accepted accounting principles. Actual
results could differ from those estimates.

   Revenue Recognition

   Syntellect recognizes revenue from sales of Licenses and Hardware, and
Services in accordance with Statement of Position 97-2, "Software Revenue
Recognition" ("SOP 97-2"), Statement of Position 98-9, "Modification of SOP
97-2, Software Revenue Recognition, With Respect to Certain Transactions," and
Staff Accounting Bulletin ("SAB") No. 101, "Revenue Recognition in Financial
Statements." Revenues from Hosted Services are recognized in accordance with SAB
No. 101. These statements require that revenue be recognized when each of the
following four conditions has been met: 1) persuasive evidence of an
arrangement exists, 2) delivery has occurred or services have been rendered, 3)
the seller's price to the buyer is fixed or determinable, and 4) collectibility
is reasonably assured.

   Cash Equivalents

   Cash equivalents consist of money market accounts and overnight deposits
with original maturities of three months or less.

   Short-term Investments

   Short-term investments are comprised of certificate of deposits with
maturity dates between three and twelve months. These certificate of deposits
are restricted as of December 31, 2000 and 1999.

Marketable Securities

    Marketable securities are classified as available-for-sale. These
securities are stated at estimated fair value based on market quotes with any
net unrealized holding gain or loss included in the consolidated financial
statements as a component of shareholders' equity until realized.

28

| 10-K | **31st Page of 47** | TOC | 1st | Previous | Next | Bottom | Just 31st |

SYNTELLECT INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

DECEMBER 31, 2000, 1999 AND 1998

Inventories

Inventories are stated at the lower of cost or market. Cost is primarily determined using the weighted average method.

Property and Equipment

Property and equipment are stated at cost. Equipment held under capital leases is stated at the lower of the present value of minimum lease payments or fair value at the inception of the lease. Property and equipment are depreciated using the straight-line method over estimated useful lives ranging from three to seven years. Equipment held under capital leases and leasehold improvements are amortized using the straight-line method over the shorter of the lease term or the estimated useful life of the asset.

The Company accounts for impairment of long-lived assets under the provisions of Statement of Financial Accounting Standards ("SFAS") No. 121, "Accounting for the Impairment of Long-Lived Assets and Long-Lived Assets to Be Disposed Of." This statement requires that long-lived assets and certain identifiable intangibles be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell.

Warranty Expense

Syntellect generally provides customers with product warranties for periods ranging from one month to six months after shipment. The Company has provided a reserve for estimated warranty expense at time of sale.

Product Development

Development of new software products and enhancements to existing software products are expensed as incurred until technological feasibility has been established. After technological feasibility is established, any additional costs would be capitalized in accordance with SFAS No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased, or Otherwise Marketed." Because Syntellect believes its current process for developing software is essentially completed concurrent with the establishment of technological feasibility, no costs have been capitalized to date.

Income Taxes

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement

carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carry-forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

29

| 10-K | 32nd Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 32nd |

### SYNTELLECT INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

### DECEMBER 31, 2000, 1999 AND 1998

Stock Based Compensation

In accordance with the provisions of Accounting Principals Board (*"APB"*) Opinion No. 25, *"Accounting for Stock Issued to Employees,"* the Company measures stock based compensation expense as the excess of the market price at the grant date over the amount the employee must pay for the stock. The Company's policy is to grant stock options at fair market value at the date of grant; accordingly, no compensation expense is recognized. As permitted, the Company has elected to adopt the pro forma disclosure provisions of SFAS No. 123, *"Accounting for Stock Based Compensation"* (*"SFAS No. 123"*).

In March 2000, the Financial Accounting Standards Board (*"FASB"*) issued FASB Interpretation No. 44, *"Accounting for Certain Transactions Involving Stock Compensation (an interpretation of APB 25)."* This interpretation clarifies the application of APB. No. 25 by clarifying the definition of an employee, the determination of non-compensatory plans and the effect of modifications to stock options. This interpretation was effective July 1, 2000 and did not have a material effect on the Company's consolidated financial statements.

Recent Accounting Pronouncements

In June 1998, the Financial Accounting Standards Board issued SFAS No. 133, *"Accounting for Derivative Instruments and Hedging Activities."* In June 2000, the FASB issued SFAS No. 138, *"Accounting for Certain Derivative Instruments and Certain Hedging Activities, an Amendment of SFAS 133."* SFAS No. 133 and SFAS No. 138 require that all derivative instruments be recorded on the balance sheet at their respective fair values. The Company has adopted the provision of both SFAS No. 133 and No. 138 as of January 1, 2001, and believes that such adoption will not have a material effect on the Company's consolidated financial statements

Reclassifications

Certain 1998 and 1999 balances have been reclassified to conform to 2000 presentation.

(2) Disposition of Syntellect Network Systems Inc. Subsidiary

In April 1996, the Company sold its Syntellect Network Systems Inc. subsidiary (*"SNS"*) under a stock purchase agreement with an unrelated third party. Under the agreement, the Company sold all of the issued and outstanding shares of SNS common stock for $720,000. The Company received $30,000 of the sales price in cash at closing with the remaining $690,000 to be received in 23 monthly installments of $30,000, without interest, beginning May 1996. The Company recognized the gain on this transaction on a cash collected basis. In 1998, the third party filed bankruptcy and the Company was unable to collect and recognize the balance of $180,000 in deferred gain on sale.

(3) Marketable Securities

The Company has classified all marketable securities as available-for-sale at December 31, 1999. The amortized cost, gross unrealized holding gains and

losses and fair value of the available-for-sale securities by major security
type are as follows:

30

| 10-K | 33rd Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 33rd |

SYNTELLECT INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

DECEMBER 31, 2000, 1999 AND 1998

[Download Table]

| | AMORTIZED COST | GROSS UNREALIZED HOLDING GAINS | GROSS UNREALIZED HOLDING LOSSES | FAIR VALUE |
|---|---|---|---|---|
| | | (IN THOUSANDS) | | |
| As of December 31, 1999 | | | | |
| Mortgage-backed securities: restricted | $1,001 | $ -- | $ -- | $ 1,001 |

All marketable securities held at December 31, 1999 have contractual maturities of one year or less.

(4) Inventories

Inventories consist of the following:

[Download Table]

| | (IN THOUSANDS) DECEMBER 31, | |
| | 2000 | 1999 |
|---|---|---|
| Finished goods ............................. | $ 507 | $ 705 |
| Purchased components ....................... | 460 | 611 |
| Repair, warranty and maintenance inventories | 621 | 1,600 |
| | 1,588 | 2,916 |
| Less reserve for obsolescence ............. | (173) | (875) |
| | $ 1,415 | $ 2,041 |

The Company contracts with several third parties to perform on-site hardware maintenance for customers in certain geographic areas. Inventory held by the Company for the third party maintenance program is included in repair, warranty and maintenance inventory.

(5) Property and Equipment

Property and equipment consist of the following:

[Download Table]

| | (IN THOUSANDS) DECEMBER 31, | |
| | 2000 | 1999 |
|---|---|---|

| | | |
|---|---|---|
| Furniture, fixtures and computer equipment ... | $ 6,184 | $ 6,141 |
| Hosted Services equipment .................... | 6,430 | 6,246 |
| Leasehold improvements ...................... | 475 | 528 |
| | 13,089 | 12,915 |
| Less accumulated depreciation and amortization | (9,275) | (8,128) |
| | $ 3,814 | $ 4,787 |

During 2000 and 1999, the Company wrote off certain fully depreciated property and equipment.

31

| 10-K | 34th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 34th |
|------|-----------------|-----|-----|----------|------|--------|-----------|

### SYNTELLECT INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

### DECEMBER 31, 2000, 1999 AND 1998

(6) Accrued Liabilities

   Accrued liabilities consist of the following:

[Download Table]

|  | (IN THOUSANDS) DECEMBER 31, | |
|--|------|------|
|  | 2000 | 1999 |
| Accrued compensation and benefits | $1,914 | $2,299 |
| Accrued legal and accounting .... | 154 | 226 |
| Accrued royalties .............. | 120 | 138 |
| Other accrued liabilities ....... | 998 | 605 |
|  | $3,186 | $3,268 |

(7) Credit Facilities and Lease Commitments

   Credit facilities:

   On October 11, 2000, the Company entered into a $4 million revolving line of credit agreement with a financial institution. The purpose for this line of credit is to fund general operations. At December 31, 2000, the Company violated certain restricted covenants pertaining to the line of credit agreement. However, the financial institution waived these violations. At December 31, 2000, the Company had no outstanding borrowings under the line of credit. The Company also uses a letter of credit, secured by a $75,000 certificate of deposit, to secure the lease on its Chicago facility.

   Capital leases consist of the following:

[Enlarge/Download Table]

|  | (IN THOUSANDS) DECEMBER 31, | |
|--|------|------|
|  | 2000 | 1999 |
| Capital lease obligations with interest ranging from 9% to 10%, collateralized by equipment ................................... | $ 467 | $ 541 |
| Less current portion .................................................... | (151) | (248) |
|  | $ 316 | $ 293 |

   Equipment held under capital lease is included in property and equipment as follows:

[Download Table]

(IN THOUSANDS)

|                                              | DECEMBER 31, | |
|                                              | 2000 | 1999 |
|                                              | ------- | ------- |
| Furniture, fixtures and computer equipment   | $    664 | $  1,203 |
| Less accumulated amortization ............   | (183) | (716) |
|                                              | $    481 | $    487 |

The Company leases office facilities and various equipment under non-cancelable operating leases that expire at various dates through 2005. In March 2000, the Company entered into a five year lease for a new 37,301 square foot office facility in Phoenix. The lease commenced in July 2000 at an initial monthly rate of $63,500. Rental expense under operating leases was $1.2 million in 2000, $1.6 million in 1999, and $1.8 million in 1998. Future minimum lease payments under non-cancelable operating leases (with initial or remaining lease terms in excess of one year) and the present value of future minimum capital lease payments at December 31, 2000 are as follows:

32

| 10-K | 35th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 35th |

SYNTELLECT INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

DECEMBER 31, 2000, 1999 AND 1998

[Download Table]

|  | (IN THOUSANDS) | |
| YEAR | CAPITAL LEASES | OPERATING LEASES |
| ---- | -------------- | ---------------- |
| 2001................................ | $   188 | $1,228 |
| 2002................................ | 134 | 1,258 |
| 2003................................ | 93 | 1,152 |
| 2004................................ | 93 | 1,152 |
| 2005................................ | 54 | 1,152 |
|  | ------- | -------- |
| Total minimum lease payments........ | $   562 | $  5,942 |
|  | ------- | ======== |
| Less amounts representing interest... | (95) |  |
|  | --------- |  |
| Net minimum lease payments.......... | $   467 |  |
|  | ======= |  |

(8) Litigation

    Syntellect is involved in various legal proceedings and claims arising in
the ordinary course of business. The Company is not currently a party to any
material pending legal proceedings.

(9) Shareholders' Equity

    Stock Option Plans

    Syntellect maintains various stock option plans for employees, consultants
and non-employee directors as follows:

    Syntellect adopted a stock option plan in 1984 that provides for the
issuance of up to 1,590,000 shares of common stock to employees under incentive
and non-statutory stock grants. The plan was amended in July 1994 to
include Syntellect's consultants and advisors as eligible participants.
Incentive stock options may be granted at a price not less than the fair market
value of the common stock at the date of grant. Non-statutory stock options may
be granted with an exercise price not less than 50% of the fair market value of
the common stock at the date of grant. The options generally become exercisable
over a 50 month period commencing at the date of grant and expire in ten years.
The plan was amended on February 17, 1998 to accelerate the vesting of
outstanding options in the event of a change in control and to delete certain
other language. As of December 31, 1995, all options under this plan have been
granted.

    Syntellect adopted a long-term incentive plan effective February 1, 1995,
which has been amended through June 1, 2000. The plan originally provided for
the issuance of up to 750,000 shares of common stock to employees, consultants
and advisors under incentive stock options, non-qualified stock options, stock
appreciation rights, performance shares, restricted stock, dividend equivalents

and other stock-based awards. On <u>May 20, 1997</u>, the number of shares authorized for issuance under the plan increased from 750,000 to 1,500,000, and on <u>June 1, 2000</u> increased to 2,100,000. Incentive stock options may be granted with an exercise price to be determined by the Board of Directors, that is not less than the fair market value of the common stock at the date of grant and their terms may not exceed ten years from the date of grant. Options generally become exercisable over a 50 month period commencing at the date of grant and expire in ten years. The plan terminates in February 2005.

Syntellect adopted a non-employee director stock plan in 1995 that provides for the issuance of up to 50,000 shares of common stock to eligible participants under non-qualified stock option grants. On <u>May 21, 1998</u>, the number of shares authorized for issuance under the plan increased from 50,000 to 150,000. Under the plan, non-employee directors are granted a one-time option to purchase 10,000 shares upon election or appointment to the Board of Directors and an annual option to purchase a specified number of additional shares. On <u>June 1, 2000</u>, the

33

| 10-K | 36th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 36th |

### SYNTELLECT INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

### DECEMBER 31, 2000, 1999 AND 1998

number of additional shares specified for the annual option grant was increased from 2,000 shares per year to 5,000 shares. Options may be granted with an exercise price not less than the fair market value on the date of grant and expire six years from the date of grant. The one time grant to purchase 10,000 shares vests as follows: 24% one year after the date of grant with the remainder vesting at the rate of 2% per month over the following 38 months. The annual option grants to purchase 5,000 shares vest in full one year after the date of grant. The plan has no scheduled termination date.

At December 31, 2000, 902,147 options with a weighted average exercise price of $2.45 were exercisable under the above plans at prices ranging from $0.87 to $7.00. A summary of the combined stock option activity for all plans during the three-year period ended December 31, 2000 is as follows:

[Enlarge/Download Table]

|  | OPTIONS | | |
|---|---|---|---|
|  | AVAILABLE FOR GRANT | OUTSTANDING OPTIONS | WEIGHTED AVERAGE EXERCISE PRICE PER OPTION |
| Balance, December 31, 1997.............. | 708,547 | 1,745,584 | $ 2.92 |
| Increase in reserved shares........ | 100,000 | -- | -- |
| Granted............................ | (729,300) | 729,300 | 1.77 |
| Canceled........................... | 405,219 | (405,219) | 3.48 |
| Exercised.......................... | -- | (31,193) | 1.73 |
| Plan shares expired................ | (36,788) | -- | -- |
| Balance, December 31, 1998.............. | 447,678 | 2,038,472 | $ 2.42 |
| Granted............................ | (740,500) | 740,500 | 1.95 |
| Canceled........................... | 656,733 | (656,733) | 3.01 |
| Exercised.......................... | - - | (97,825) | 1.63 |
| Plan shares expired................ | (4,420) | -- | -- |
| Balance, December 31, 1999.............. | 359,491 | 2,024,414 | $ 2.09 |
| Increase in reserved shares........ | 600,000 | -- | -- |
| Granted............................ | (804,400) | 804,400 | 4.95 |
| Canceled........................... | 221,475 | (221,475) | 2.99 |
| Exercised.......................... | -- | (494,942) | 1.67 |
| Plan shares expired................ | (92,986) | -- | -- |
| Balance, December 31, 2000.............. | 283,580 | 2,112,397 | $ 3.19 |

[Enlarge/Download Table]

|  | 2000 | 1999 | 1998 |
|---|---|---|---|
| Options exercisable at year-end (in thousands) ................. | 902 | 1,135 | 1,156 |
| Weighted average fair value of options granted during the year... | 3.74 | $ 1.21 | $ 1.23 |

The following table summarizes information about stock options outstanding at December 31, 2000:

[Enlarge/Download Table]

SEC Info - Syntellect Inc - 10 ˮ - For 12/31/00

| Range of Exercise Prices | | Options Outstanding | Weighted Average Remaining Contractual Life in Years | Weighted Average Exercise Price | Options Exercisable | Weighted Average Exercise Price |
|---|---|---|---|---|---|---|
| $ 0.87 | -- $ 1.94 | 941,137 | 7.1 | $ 1.46 | 531,337 | $ 1.26 |
| $ 2.25 | -- $ 3.75 | 263,760 | 6.3 | $ 2.90 | 194,288 | $ 3.01 |
| $ 4.38 | -- $ 5.13 | 558,700 | 8.9 | $ 4.69 | 88,389 | $ 4.57 |
| $ 5.25 | -- $ 7.00 | 348,800 | 8.1 | $ 5.64 | 88,133 | $ 6.26 |
| $ 0.87 | -- $ 7.00 | 2,112,397 | 7.6 | $ 3.19 | 902,147 | $ 2.45 |

34

| 10-K | 37th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 37th |

### SYNTELLECT INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

### DECEMBER 31, 2000, 1999 AND 1998

Syntellect has adopted the disclosure-only provisions of SFAS No. 123. Had compensation cost for Syntellect's stock option grants and stock purchase plan discussed below been determined based on the fair value at the grant date, as prescribed by the provisions of SFAS No. 123, the Company's net income (loss) and net income (loss) per common share would have been:

[Enlarge/Download Table]

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| *(IN THOUSANDS EXCEPT PER SHARE AMOUNTS)* | | | |
| Net income (loss) -- as reported ......................... | $ 2,242 | $ (1,866) | $ (2,618) |
| Net income (loss) -- pro forma ........................... | $ 970 | $ (2,092) | $ (3,143) |
| Net income (loss) per common share -- basic as reported ... | $ 0.19 | $ (0.14) | $ (0.19) |
| Net income (loss) per common share -- pro forma ........... | $ 0.08 | $ (0.16) | $ (0.23) |

The fair value of each option grant is estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions:

[Enlarge/Download Table]

| | | | |
|---|---|---|---|
| Expected dividend yield................................. | 0% | 0% | 0% |
| Expected stock price volatility......................... | 95% | 87% | 87% |
| Risk-free interest rate................................. | 6.17% | 5.98% | 5.7% |
| Expected life of options................................ | 5 years | 5 years | 2.35 years |

#### Employee Stock Purchase Plan

Syntellect has an employee stock purchase plan that provides for the purchase of up to 800,000 shares of common stock. The number of shares was increased by 400,000 as approved by the shareholders on May 21, 1998. Under the plan, eligible participants may purchase common stock semi-annually at the lower of 85% of the fair market value on either the first day or last day of the offering period, whichever is lower. During 2000, 52,087 and 58,782 shares were purchased at $2.55 and $3.08 per share, respectively. During 1999, 57,101 and 45,466 shares were purchased at $0.96 and $1.06 per share, respectively. During 1998, 49,825 and 41,316 shares were purchased at $1.59 and $1.91 per share, respectively. At December 31, 2000, 123,360 shares of common stock were available for issuance under the plan. Amounts that would be expensed under SFAS No. 123 are included in pro forma net income (loss) above.

#### (10) Employee Benefit Plans

Effective January 1, 1997, Syntellect adopted a 401(k) plan covering all eligible employees of the Company. Under the plan, participants may contribute up to 15% of their total compensation, subject to certain limitations. For the years ended December 31, 1999 and 1998, the Company provided matching contributions equal to one third of employee contributions up to a maximum of 7% of the employee's total compensation. In November 1999, the Board of Directors moved to amend the plan so as to qualify it as a 401(k) Safe Harbor Plan, effective January 1, 2000. Per the amendment, the Company matched each employee's elective deferral up to 4% of compensation, subject to Internal Revenue Service limitations, for the year 2000 and will continue to do so. All such qualified matchings are immediately 100% vested. Syntellect made matching contributions to the 401(k) plan of $451,000 in 2000, $260,000 in 1999, and

$249,000 in 1998. The matching contribution is subject to annual review and adjustment by the Board of Directors. Additional discretionary contributions may also be made to the plan in amounts determined by the Board of Directors.

35

| 10-K | 38th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 38th |

**SYNTELLECT INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**DECEMBER 31, 2000, 1999 AND 1998**

(11) Income Taxes

The provision for income taxes includes income taxes currently payable (receivable) and those deferred because of temporary differences between the financial statement and tax bases of assets and liabilities that will result in taxable or deductible amounts in the future and any increase or decrease in the valuation allowance for deferred income tax assets.

Income (loss) before income tax expense for the years ended December 31, 2000, 1999 and 1998 consists of the following:

[Download Table]

|  | | *(IN THOUSANDS)* | |
|  | *2000* | *1999* | *1998* |
| U.S. operations ........ | $ 1,270 | $(2,938) | $(3,603) |
| International operations | 972 | 1,072 | 985 |
|  | $ 2,242 | $(1,866) | $(2,618) |

The components of income tax expense are as follows:

[Download Table]

|  | | *(IN THOUSANDS)* | |
|  | *2000* | *1999* | *1998* |
| Federal............... | $ 69 | $    -- | $    -- |
| Foreign............... | 186 | -- | -- |
| State................. | -- | -- | -- |
|  | $ 255 | $    -- | $    -- |
| Current............... | $255 | -- | -- |
| Deferred.............. | -- | -- | -- |
|  | $ 255 | $    -- | $    -- |

Income tax expense differed from the amounts computed by applying the statutory U.S. federal income tax rate of 34% to income (loss) before income taxes as a result of the following:

[Enlarge/Download Table]

|  | | *(IN THOUSANDS)* | |
|  | *2000* | *1999* | *1998* |

| | | | |
|---|---|---|---|
| Computed *"expected"* income tax expense (benefit) ........................... $ | 849 | $ (634) | $ (890) |
| Increase (decrease) in income tax expense resulting from: | | | |
|   State income tax benefit net of federal income tax effect .............. | -- | -- | (146) |
|   Increase (decrease) in valuation allowance ........................... | (675) | 916 | 1,349 |
|   Utilization of foreign net operating losses not previously recognized .. | -- | (364) | (306) |
|   Other, net ............................................................ | 81 | 82 | (7) |
| Total income tax expense ......................................... $ | 255 | $ -- | $ -- |

The income tax effects of temporary differences that give rise to the Company's deferred income tax assets are as follows:

36

| 10-K | 39th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 39th |

### SYNTELLECT INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

### DECEMBER 31, 2000, 1999 AND 1998

[Download Table]

|  | *(IN THOUSANDS)* | |
|  | *2000* | *1999* |
| Deferred income tax assets: | | |
| Net operating loss and tax credit carry-forwards ........ | $ 13,863 | $ 13,402 |
| Warranty and inventory allowances ...................... | 104 | 1,086 |
| Accrued expenses ....................................... | 810 | 747 |
| Allowance for doubtful accounts ....................... | 82 | 321 |
| Property and equipment due to differences in depreciation | 28 | -- |
| Gross deferred income tax assets ...................... | 14,887 | 15,556 |
| Less valuation allowance .............................. | (14,887) | (15,556) |
| Net deferred income tax asset ........................ | $    -- | $    -- |

The decrease and increase in the valuation allowance for the net deferred income tax asset for the years ended December 31, 2000 and 1999 were $ 669,000 and $916,000 respectively. Under SFAS No. 109, deferred income tax assets and liabilities are recognized for differences between the financial statement carrying amounts and the tax bases of assets and liabilities which will result in future deductible or taxable amounts and for net operating loss and tax credit carry-forwards. A valuation allowance is then established to reduce the deferred income tax assets to the level at which it is *"more likely than not"* that the income tax benefits will be realized. Realization of income tax benefits of deductible temporary differences and operating loss and tax credit carry-forwards depends on having sufficient taxable income within the carry-back and carry-forward periods. Sources of taxable income that may allow for realization of income tax benefits include (1) taxable income in the current year or prior years that is available through carry-back, (2) future taxable income that will result from the reversal of existing taxable temporary differences, and (3) future taxable income generated by future operations.

As of December 31, 2000 the Company had net operating loss, investment tax credit, alternative minimum tax credit and research and development tax credit carry-forwards of approximately $31.2 million, $15,000, $152,000, and $1.2 million, respectively, which expire at various dates through the year 2019.

(12) Business Segments, Geographic Data and Major Customers

Syntellect develops, markets, and integrates voice and information processing systems and application software worldwide. The Company offers a diversified product line which includes inbound voice processing, a worldwide distribution network, and a vertical market focus on the financial services, media, telecommunications and healthcare industries. The Company also provides Hosted Services for those customers who prefer to outsource their voice processing applications. In addition to its primary office facility in Phoenix,

the Company also maintains five sales offices in the United States and one in
London.

    Effective for financial statements for fiscal periods beginning after
December 15, 1997, Statement of Financial Accounting Standards No. 131,
"Disclosures about Segments of an Enterprise and Related Information," requires
that an enterprise disclose certain information about operating business
segments. The Company evaluates its business and allocates resources based on
revenues and income (loss) by segment. An operating business segment is defined
as a component of an enterprise that engages in business activities which may
earn revenues and incur expenses, whose results are regularly reviewed by a
chief operating decision maker, and for which discrete financial information is
available. The Company has three operating business segments in 2000, 1999 and
1998 which are organized around differences in products and services: Licenses
and Hardware; Services; and Hosted Services.

<div align="center">37</div>

| 10-K | 40th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 40th |

### SYNTELLECT INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

### DECEMBER 31, 2000, 1999 AND 1998

[Download Table]

*(IN THOUSANDS)*

| YEAR ENDED DECEMBER 31, 2000 | LICENSES & HARDWARE | SERVICES | HOSTED SERVICES | TOTAL |
|---|---|---|---|---|
| Revenues from customers | $ 20,906 | $ 21,412 | $ 5,714 | $ 48,032 |
| Depreciation and amortization | 811 | 406 | 600 | 1,817 |
| Segment income (loss) before income taxes | 2,343 | 742 | (588) | 2,497 |
| Expenditures for segment assets | 557 | 274 | 184 | 1,015 |
| **AS OF DECEMBER 31, 2000** | | | | |
| Segment assets | $ 13,566 | $ 10,316 | $ 3,219 | $ 27,101 |
| Capital lease obligation | 312 | 155 | -- | 467 |
| **YEAR ENDED DECEMBER 31, 1999** | | | | |
| Revenues from customers | $ 17,092 | $ 23,007 | $ 7,732 | $ 47,831 |
| Depreciation and amortization | 1,311 | 656 | 522 | 2,489 |
| Segment loss before income taxes | (1,540) | (42) | (284) | (1,866) |
| Expenditures for segment assets | 561 | 276 | 876 | 1,713 |
| **AS OF DECEMBER 31, 1999** | | | | |
| Segment assets | $ 11,956 | $ 10,542 | $ 3,726 | $ 26,224 |
| Capital lease obligation | 362 | 179 | -- | 541 |
| **YEAR ENDED DECEMBER 31, 1998** | | | | |
| Revenues from customers | $ 18,395 | $ 20,633 | $ 8,925 | $ 47,953 |
| Depreciation and amortization | 1,268 | 625 | 645 | 2,538 |
| Segment income (loss) before income taxes | (3,829) | 311 | 900 | (2,618) |
| Expenditures for segment assets | 719 | 354 | 915 | 1,988 |
| **AS OF DECEMBER 31, 1998** | | | | |
| Segment assets | $ 16,208 | $ 12,094 | $ 3,831 | $ 32,133 |
| Capital lease obligation | 459 | 226 | -- | 685 |

Net revenues, by geographic area, for the three-year period ended December 31, 2000 are as follows:

[Download Table]

*(IN THOUSANDS)*

| Geographic Area | 2000 | 1999 | 1998 |
|---|---|---|---|
| United States | $33,257 | $38,885 | $37,471 |
| United Kingdom | 13,901 | 8,335 | 8,448 |
| Other | 874 | 611 | 2,034 |

```
           -------      -------      -------
           $48,032      $47,831      $47,953
           =======      =======      =======
```

    No single customer accounted for more than 10% of the Company's revenues in
2000, 1999 or 1998.

                                    38

| 10-K | 41st Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 41st |

### SYNTELLECT INC. AND SUBSIDIARIES

#### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

#### DECEMBER 31, 2000, 1999 AND 1998

Long lived assets, by geographic area, for the two-year period ended December 31, 2000 are as follows:

[Download Table]

|                 | (IN THOUSANDS) |        |
| Geographic Area | 2000           | 1999   |
| --------------- | ------         | ------ |
| United States   | $3,692         | $4,579 |
| United Kingdom  | 122            | 208    |
|                 | ------         | ------ |
|                 | $3,814         | $4,787 |

The Company conducted business with a major media company who was also a significant shareholder of the Company during the year ended 1998. Revenues from this customer in 1998 were $1.4 million, $0.8 million in 1999, and $0.1 million in 2000.

(13) Fair Value of Financial Instruments

Statement of Financial Accounting Standards No. 107, *"Disclosures about Fair Value of Financial Instruments,"* requires that Syntellect disclose estimated fair values for its financial instruments. The carrying amount of cash and cash equivalents approximates fair value because their maturity is generally less than three months. The carrying amount of short-term investments approximates fair value due to the liquidity of the investments and their maturities which are less than or equal to twelve months. The fair value of marketable securities classified as available-for-sale is based on quoted market prices at the reporting date for those or similar investments. The carrying amount of accounts receivable, accounts payable and accrued liabilities approximates fair value as they are expected to be collected or paid within 90 days of year-end.

(14) Supplemental Financial Information

A summary of additions and deductions related to the allowances for accounts receivable and inventories for the years ended December 31, 2000, 1999 and 1998 follows:

[Download Table]

|                                     | (IN THOUSANDS) CHARGED |            |                        |
| BALANCE AT BEGINNING OF YEAR        | TO COSTS AND EXPENSES  | DEDUCTIONS | BALANCE AT END OF YEAR |
| ----------                          | --------               | ---------- | -------                |

Allowance for doubtful accounts:

| | | | | |
|------|----------|----------|------------|--------|
| 2000 | $    784 | $    318 | $   (877)  | $  225 |
| 1999 | $    932 | $  1,806 | $(1,954)   | $  784 |
| 1998 | $  1,199 | $    597 | $   (864)  | $  932 |

39

| 10-K | 42nd Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 42nd |

SYNTELLECT INC. AND **SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)

DECEMBER 31, 2000, 1999 AND 1998

(15) Quarterly Results of Operations (Unaudited)

[Enlarge/Download Table]

Year ended December 31, 2000

(in thousands)

|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Net revenues | $12,718 | $ 12,061 | $ 11,695 | $ 11,558 |
| Gross profit | 6,867 | 7,490 | 7,065 | 6,873 |
| Operating income (loss) | 1,210 | 833 | 394 | (196) |
| Net income (loss) | 1,197 | 1,001 | 476 | (432) |
| Basic net income (loss) per share | .10 | .08 | .04 | (.04) |
| Diluted net income (loss) per share | .09 | .08 | .04 | (.04) |

[Enlarge/Download Table]

Year ended December 31, 1999

|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Net revenues | $ 11,248 | $ 11,012 | $ 14,057 | $ 11,514 |
| Gross profit | 5,098 | 4,507 | 7,639 | 5,875 |
| Operating income (loss) | (1,669) | (2,830) | 1,586 | 249 |
| Net income (loss) | (1,589) | (2,739) | 2,133 | 329 |
| Basic net income (loss) per share | (.12) | (.20) | .16 | .03 |
| Diluted net income (loss) per share | (.12) | (.20) | .16 | .03 |

Net revenues for the quarter ended September 30, 2000 as originally filed on Form 10-Q were $12,424 and are hereby restated to $11,695. This is to reflect accounting standards guidelines governing revenue recognition from the sale of licensing of software that require $654 to be recognized in the fourth quarter of 2000 and $75 in 2001 or when earned.

40

| 10-K | 43rd Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 43rd |

**ITEM 9 -- CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

<div align="center">

**PART III**

</div>

**ITEM 10 -- DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT**

Information regarding our continuing directors and nominees is set forth under the caption "*Information Concerning Directors and Nominees*" in our Proxy Statement for our 2001 Annual Meeting of Stockholders (the "*2001 Proxy Statement*") which we are incorporating by reference into this Annual Report. We have set forth information concerning our executive officers in Part I of this Annual Report and information regarding compliance with Section 16(a) of the Securities Exchange Act of 1934 under the caption "*Section 16(a) Beneficial Ownership Reporting Compliance*" in our 2001 Proxy Statement. With the exception of the foregoing information and other information specifically incorporated by reference into this Annual Report, we are not filing the 2001 Proxy Statement as a part of this Annual Report.

**ITEM 11 -- EXECUTIVE COMPENSATION**

We are incorporating by reference in this Annual Report the information available under the caption "*Executive Compensation*" in our 2001 Proxy Statement. We are not incorporating by reference, however, the information found under caption "*Board Compensation Committee Report on Executive Compensation*" and "*Stock Price Performance Graph*" in our 2001 Proxy Statement.

**ITEM 12 -- SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

We are incorporating by reference in this Annual Report the information regarding security ownership of certain of our beneficial owners and management furnished under the caption "*Security Ownership of Certain Beneficial Owners and Management*" in our 2001 Proxy Statement.

**ITEM 13 -- CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

Not applicable.

<div align="center">

**PART IV**

</div>

**ITEM 14 -- EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K**

(a) 1. FINANCIAL STATEMENTS - INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

The following Consolidated Financial Statements of Syntellect Inc. and subsidiaries, related notes, and independent auditors report are filed as part of this Annual Report:

<div align="center">

41

</div>

[Enlarge/Download Table]

|  | PAGE NUMBERS IN OUR 2000 ANNUAL REPORT |
|---|---|
| Independent Auditors' Report -- KPMG LLP | 23 |
| Consolidated Balance Sheets -- December 31, 2000 and 1999 | 24 |
| Consolidated Statements of Operations and Comprehensive Income -- Years ended December 31, 2000, 1999 and 1998 | 25 |
| Consolidated Statements of Shareholders' Equity -- Years ended December 31, 2000, 1999 and 1998 | 26 |
| Consolidated Statements of Cash Flows -- Years ended December 31, 2000, 1999 and 1998 | 27 |
| Notes to Consolidated Financial Statements | 28 |

### (a) 2. FINANCIAL STATEMENT SCHEDULES

All schedules have been omitted because the information required to be set forth therein is not applicable or is included in the Consolidated Financial Statements or notes thereto.

### (a) 3. EXHIBITS

[Enlarge/Download Table]

| EXHIBIT NO. | DESCRIPTION | PAGE NUMBERS IN OUR 2000 ANNUAL REPORT OR METHOD OF FILING |
|---|---|---|
| (2)(i) | Agreement and Plan of Reorganization as of December 6, 1995, between Syntellect Inc., Syntellect Acquisition Co., and Pinnacle Investment Associates Inc. | Incorporated by reference to Exhibit No. 2 to Syntellect's Registration Statement on Form S-4 dated February 9, 1996 (the "S-4") |
| (2)(ii) | Form of Affiliate Agreement between Syntellect Inc. and affiliates of Pinnacle Investment Associates Inc. | Incorporated by reference to Exhibit No. 10.10 to Syntellect's S-4 |
| (3)(i)(a) | Restated Certificate of Incorporation of Registrant, filed with the Delaware Secretary of State on April 2, 1990 | Incorporated by reference to Exhibit No. 3-A to Syntellect's Registration Statement on Form S-1 dated February 23, 1995 (the "S-1") |
| (3)(i)(b) | Certificate of Amendment to Restated Certificate of Incorporation of Registrant, filed with the Delaware Secretary of State on May 18, 1993 | Incorporated by reference to Exhibit No. 3.1(b) to Syntellect's S-4 |
| (3)(i)(c) | Certificate of Amendment to Restated Certificate of Incorporation of Registrant filed with the Delaware Secretary of State on March 14, 1996 | Incorporated by reference to Exhibit 3.1(c) to Syntellect's 1995 Form 10-K |
| (3)(ii) | Amended and Restated Bylaws of Registrant as of February 13, 2001 | Filed Herewith |
| (4) | Specimen Certificate representing Common Stock | Incorporated by reference to Exhibit No. 4 to Amendment No. 1 of Syntellect's S-1 |
| (10)(i) | Syntellect Inc. Restated Stock Option Plan (as amended through February 17, 1998) | Filed Herewith |
| (10)(ii) | Syntellect Inc. 1990 Employee Stock Purchase Plan (as amended through May 21, 1998) | Filed Herewith |
| (10)(iii) | Syntellect Inc. Long-term Incentive Plan (as amended through June 1, 2000) | Filed Herewith |
| (10)(iv) | Syntellect Inc. Executive 401(K) Plan | Filed Herewith |

42

| 10-K | 45th Page of 47 | TOC | 1st | Previous | Next | Bottom | Just 45th |

[Enlarge/Download Table]

| | | |
|---|---|---|
| (10)(v) | Syntellect Inc. Nonemployee Director Stock Plan (as amended through June 1, 2000) | Filed Herewith |
| (10)(vi) | Lease Agreement dated March 6, 2000 between Denali National Trust, Inc. and Syntellect Inc. for an office facility in Phoenix, Arizona | Filed Herewith |
| (10)(vii) | Form of Indemnification Agreement between Syntellect and its directors and officers | Incorporated by reference to Exhibit No. 10-L to Syntellect's S-1 |
| (10)(viii) | Form of Registration Rights Agreement | Incorporated by reference to Exhibit 10.13 to Syntellect's S-4 |
| (11) | Statement Regarding Computation of Net Income (Loss) Per Share | Filed Herewith |
| (21) | Subsidiaries of Registrant | Filed Herewith |
| (23) | Consents of Experts | Filed Herewith |

**(b) REPORTS ON FORM 8-K.**

No Report on Form 8-K was filed during 2000.

43

Contract No. 5600005639

**AGREEMENT**

**between**

**SOUTHERN CALIFORNIA GAS COMPANY**

**and**

**SYNTELLECT, INC.**

**for**

**VISTA INTERACTIVE VOICE RESPONSE SYSTEM**

JUL 1 6 2001

**EXHIBIT 2**

97

# TABLE OF CONTENTS

ARTICLE                                                                                    PAGE

1.    SCOPE ....................................................................................................................1
2.    PROJECT MANAGEMENT ......................................................................................2
3.    STANDARDS FOR MATERIALS..............................................................................3
4.    SOFTWARE LICENSE ..............................................................................................3
5.    USE OF SOFTWARE AND INFORMATION .............................................................4
6.    WARRANTY AND SERVICE .....................................................................................5
7.    DELIVERY AND INSTALLATION ..............................................................................7
8.    TESTING AND CUTOVER .........................................................................................8
9.    ACCEPTANCE ...........................................................................................................9
10.    DOCUMENTATION ...................................................................................................9
11.    TRAINING...................................................................................................................9
12.    CHANGES ................................................................................................................10
13.    DELAYS ...................................................................................................................10
14.    COMPENSATION .....................................................................................................11
15.    FUTURE PRICE GUARANTEES.............................................................................11
16.    PAYMENT.................................................................................................................11
17.    AUDIT .......................................................................................................................12
18.    TAXES ......................................................................................................................13
19.    INSURANCE .............................................................................................................13
20.    INDEMNITY ..............................................................................................................15
21.    TIME OF THE ESSENCE .........................................................................................16
22.    LIQUIDATED DAMAGES FOR LATE DELIVERY FOR SUPPLIER DELAY...........16
23.    TERMINATION .........................................................................................................16
24.    LIENS........................................................................................................................17
25.    TITLE, FREIGHT TERMS, RISK OF LOSS OR DAMAGE .....................................18
26.    NOTICES OR DEMANDS.........................................................................................18
27.    REPRESENTATIVES ...............................................................................................19
28.    GOVERNING LAW ...................................................................................................19
29.    COMPLIANCE WITH LAWS .....................................................................................19
30.    EQUAL EMPLOYMENT OPPORTUNITY .................................................................19
31.    DISPUTES ................................................................................................................20
32.    VALIDITY ..................................................................................................................20
33.    CALENDAR YEAR 2000 COMPLIANCE ..................................................................20
34.    NONWAIVER.............................................................................................................21
35.    SURVIVAL.................................................................................................................21
36.    NONDISCLOSURE....................................................................................................21
37.    EMERGING BUSINESS ENTERPRISES .................................................................21
38.    ASSIGNMENT AND SUBCONTRACTING ...............................................................21
39.    NO ORAL MODIFICATIONS ....................................................................................22
40.    CAPTIONS ................................................................................................................22
41.    COUNTERPARTS .....................................................................................................22
42.    AUTHORITY ..............................................................................................................23
43.    ORDER OF PRECEDENCE ......................................................................................23
44.    COMPLETE AGREEMENT .......................................................................................23

SCHEDULE A – STATEMENT OF WORK
SCHEDULE B - COMPENSATION
SCHEDULE E – INSURANCE – Intentionally Omitted
– Intentionally Omitted
– Intentionally Omitted

## HARDWARE/SOFTWARE SYSTEM AGREEMENT

This Hardware/Software System Agreement ("Agreement") is made effective as of June 19, 2001 between Southern California Gas Company ("COMPANY") and SYNTELLECT, INC. ("Supplier").

The parties hereby agree as follows:

**1.     SCOPE**

Supplier shall design, develop, manufacture, sell, deliver, install and warranty, and COMPANY shall pay for, the Vista Interactive Voice Response System including equipment hardware, software, and Services, collectively referred to herein as the "System", in accordance with all exhibits, addenda and schedules. The System is more fully described in the drawings, schedules, exhibits, addenda and technical specifications included in Southern California Gas Company's Request for Proposal dated February 28, 2001, incorporated herein by reference.

1.1.     Supplier shall provide all labor, equipment, materials, supplies, tools, transportation and services necessary for, or reasonably incidental to, the complete performance of this Agreement.

1.2.     Supplier shall provide all design, engineering, System and applications operational database development (including in-depth user interviews to determine most effective designs and feature/application profiles, configurations, class-of-service, etc.), and input of all system and application databases into appropriate System components necessary for System performance in the manner contemplated by this Agreement.

1.3.     Supplier shall perform all work in accordance with specifications set forth herein and in accordance with the highest workmanlike and professional standards utilized in the telecommunications industry.

1.4.     It is the intent of this Agreement that the entire installation be complete in every respect, and any minor items omitted but obviously necessary to accomplish this intent shall be furnished and installed by Supplier at no additional cost to Company.

1.5.     The work shall be subject to inspection by Company or its representatives at all times, and in the event of questionable work, Company's reasonable decisions with respect to necessary corrective action shall be final.

1.6.     Supplier shall coordinate and fully cooperate in a timely manner with local utility companies, other common carriers and any other suppliers representing Company with respect to work described herein. However, such cooperation shall in no way extend Supplier's obligation to provide work or warranty beyond that which is described in this Agreement.

1.7.   Definitions

    1.7.1.   "Custom Application Programs" means software application programs that Supplier develops specifically to the Company's written application specifications and provides to the Company pursuant to this Agreement. Custom Application Programs do not include Software, programming routines or subroutines not unique to Company's application, or any other program, routine, or subroutine developed prior to or outside the scope of this Agreement.

    1.7.2.   Equipment or Hardware means all computer hardware, including servers, peripherals, and any other parts and accessories and hardware documentation Supplier sells to the Company pursuant to this Agreement.

    1.7.3.   "Services" is the collective reference to the development of Custom Application Programs, application development, custom modifications, integration, Hardware and software installation and testing, project management, implementation consulting, and training, whether at Supplier's location, Company's location, or otherwise. Services do not include maintenance support.

    1.7.4.   "Software" means Supplier's and any third party's proprietary software (including telephone and host connectivity cards) licensed to the Company pursuant to this Agreement. Software does not include Custom Application Programs.

2.   **PROJECT MANAGEMENT**

    2.1.   Supplier warrants that the work shall be managed, to Company's satisfaction, by a qualified and designated Supplier project manager ("Project Manager"), who shall: (1) be available to Company at all reasonable times; (2) be responsive to Company's questions, problems and/or concerns; (3) be on-site at scheduled times to inspect work in progress; and (4) be on-site during critical phases of work, including system and applications testing, and System Cutover (as defined herein).

    2.2.   Project Manager, whose name and phone numbers (office, home and pager) shall be provided to Company prior to initiation of any on-site work under this Agreement, shall: (1) be Supplier's single-point-of-contact to Company; (2) have overall responsibility for all work described herein until System Acceptance; and (3) have the authority to make necessary decisions and enlist necessary resources to ensure successful completion of all work under this Agreement in the timeframe stated herein.

    2.3.   Project Manager, or appropriate Supplier designee, shall be trained in and responsible for identification of any hazardous material relative to any construction portion of this project.

3.    **STANDARDS FOR MATERIALS**

    3.1.    All purchased equipment shall be new, not used or refurbished, shall include the latest models and versions of all components and software, and shall conform with the highest current applicable industry standards.  Defective or damaged  hardware and materials shall be replaced or repaired, prior to final System Acceptance (as defined herein), in a manner which meets the approval of Company and at no additional cost to Company.

    3.2.    During the Warranty Period and during any subsequent Supplier-provided maintenance period, Supplier shall replace defective hardware/components with new hardware /components of equal or greater performance characteristics, engineering/design levels, and appearance as the replaced hardware/components.

4.    **SOFTWARE LICENSE**

    4.1.    Supplier grants to Company a non-exclusive, non-transferable license to install, use, and execute the Software in object code form on a per-port basis at the location specified herein.  If the Company is bought, sold or merged with another entity, Supplier will grant use of the Software license to the successor entity (even in another location) as long as the Company notifies Supplier in writing thirty (30) days in advance of the transaction. The Software license shall become effective upon Delivery of the Software and shall remain in force unless terminated as provided in Section 23.  Supplier's grant to Company does not include any right to grant sub-licenses or otherwise transfer such rights except as provided in Section 38.  Supplier, or any third party that owns the Software, retains title to and all exclusive rights in the Software, including related copyrights.  Company shall not reverse engineer, decompile, disassemble or otherwise attempt to render a source code equivalent of the Software.

    4.2.    Company is permitted to make a single archive copy of the Software.  Any copy must contain the same copyright notice and proprietary markings as the original Software.  Use of software on any equipment other than that for which it was obtained, removal from the United States, or any other material breach shall automatically terminate this license.

    4.3    Right of Entry and Inspection.  To assist Supplier in the performance of its duties under this Agreement and in the protection of its proprietary rights, Company hereby authorizes a Supplier representative to enter Company's designated premises and inspect the Software at any reasonable time during regular business hours with reasonable advanced notice.

    4.4    Restricted Rights.  All Software and documentation furnished pursuant to this Agreement were developed at private expense and are provided with RESTRICTED RIGHTS.  Any use, duplication, or disclosure by or for an agency of the United States Government shall be subject to the restricted rights applicable to commercial computer software under FAR Clause 52.227-19 or DFARS 252.227-7013 or any successor.

## 5.    USE OF SOFTWARE AND INFORMATION

5.1.    Company agrees that any technical and business information ("Information") or Software owned by Supplier or its suppliers and furnished to Company under this Agreement shall remain the property of Supplier or the supplier, and shall:

5.1.1.  be used only to install, operate or maintain the product for which it was originally furnished;

5.1.2.  not be reproduced or copied, in whole or in part, except as necessary for use as authorized under this Agreement or unless otherwise agreed to in writing;

5.1.3.  not be used to develop other software;

5.1.4.  together with any copies, be returned or destroyed when no longer needed or permitted for use with the product for which it was initially furnished; and

5.1.5.  not be removed from the United States.

5.2.    Company shall keep information designated "confidential" or "proprietary" and software in confidence except for any part that:

5.2.1.  Company rightfully obtains free of any obligation to keep confidential;

5.2.2.  is in the public domain through acts not attributable to Company; or

5.2.3.  Company independently develops.

5.3.    If any Hardware is subsequently assigned to another end user, upon written request, Supplier will grant the new end user the right to use any related Software and Information, provided the new end user also agrees, in writing, to Supplier's terms and conditions and pays any scheduled fees.

## 6.    WARRANTY AND SERVICE

6.1 Software Support.  Supplier warrants that it will support the Software for a period of twelve (12)months from the date of System Acceptance and repair or replace any Software defects reported during the warranty period.  Support services shall be provided according to Supplier's Proposal dated March 21, 2001, incorporated herein by reference. Remedies for Software defects reported during the warranty period consist of, but are not limited to, Software problem fixes, Software releases as required, and Help Line support. Software support ("Maintenance") after the warranty period is provided by Supplier under separate agreement.

6.1.1. The Software warranty includes Software releases that generally contain changes, corrections, fixes, or additions. Depending upon Company's coverage, Company will be responsible for labor and/or travel and living expenses and other costs associated with each release received. Software releases may also contain new features and/or functionality. Enabled new features and/or functionality are not included as part of the warranty and are chargeable to the Company along with any labor, travel and living expenses, and other costs associated with each new feature and/or functionality purchased. Company is responsible for purchasing the required hardware and/or software if the release, new feature, and/or functionality requires upgrades in the existing Hardware and/or Software.

6.2.    <u>Customer Application Programs Support</u>.    Supplier warrants that it will support Custom Application Programs for a period of twelve (12) months from the date of System Acceptance, provided Company has prepaid Supplier for annual maintenance services that include Custom Application Program coverage with the original Services order. In the event Company does not purchase such services, and prepay with the original Services order, Supplier will only support the Custom Application Programs for a period of thirty (30) days from the date of Acceptance. Warranty support does not cover Company-developed applications or any Custom Application Programs modified by the Company or any third party. In the event Company, or any third party, makes any modifications or alterations other than functions related to normal system administration via the appropriate VistaGen® editors to the Custom Application Programs, further support of the affected Custom Application Programs will be provided on a time and materials basis using Supplier's prevailing time and material rates plus travel expenses and other related costs. Warranty support will resume for the balance of the term if Supplier is able to remedy the problem, stabilize the affected Custom Application Program, or return such software to its original condition. If Supplier is unable to do so, Company will not receive credit for the balance of the warranty period or a refund of any monies paid towards an extended or upgraded warranty.

6.3. For the warranties described in this Article, Company must give Supplier notice of any claimed defect within the warranty period.

6.4. During the Warranty Period, Supplier agrees at its expense and its option to either repair or replace any defective System component (including any software and hardware installed at the time of Cutover and any added during the Warranty Period). Supplier shall provide such repair services and replacement parts as are necessary to keep the System operating in accordance with the System manufacturer's specifications and requirements of this Agreement, twenty-four (24) hours per day, seven (7) days per week, at no additional cost to Company, unless it is determined that the System component is outside the Supplier System delivery scope.

6.5.    <u>Level of Support</u>

6.5.1. An "Emergency" shall be deemed to exist when System problems materially interfere with Company's ability to utilize the System as contemplated herein or the normal conduct of Company's business as reasonably determined by Company; or when an authorized responsible Company representative declares an Emergency. The number of

persons authorized to declare an Emergency shall be limited and their names or titles shall be mutually agreed on in writing, signed by both parties. Non-Emergency requests for service shall be deemed as "Routine Service".

6.5.2. When a request for Emergency Service is received from Company, Supplier agrees to cause qualified maintenance personnel, as required, to arrive at Company's facility within 4 hours (Vista Gold) of said request, twenty-four (24) hours per day, seven (7) days per week.

6.5.3. In the event of an Emergency, Supplier shall: (1) prioritize Company's Emergency; (2) escalate within Supplier's technical and management organizations as necessary to resolve the Emergency; (3) use its best efforts to correct the Emergency within twenty-four (24) hours from receipt of notice of such Emergency; and (4) maintain continuous effort until the Emergency is corrected to Company's reasonable satisfaction. In the event that any Emergency is not corrected by Supplier within twenty-four (24) hours from receipt of notice with respect thereto, Supplier shall replace that portion of the System causing such Emergency with new items of equipment or software (meeting the requirements hereof) within forty-eight (48) hours from receipt of the notice with respect to such Emergency.

6.5.4. In the event that Supplier elects to perform field repair on defective Hardware and such repaired Hardware continues to experience repeated failures adversely affecting the System, Supplier shall, upon Company's written request, replace such defective equipment rather than continuing to perform field repairs thereon.

6.5.5. If, as a result of Service performed pursuant to this Section, Supplier concludes that the problem results from a software failure, and that the System's use is materially affected thereby; then Supplier shall immediately commence correction procedures on such software.

6.5.6. Non-Emergency Support. When System problems exist that do not materially interfere with Company's ability to utilize the System, then Supplier shall provide support according to Section 7.4.1.4.

6.6. Company shall be entitled to have its employees make software additions, moves and changes to the database for the System and moves and changes to the System hardware provided herein ("Alterations"), and Supplier shall be deemed to have given its consent thereto as long as all such Alterations are performed in accordance with the applicable portions of the System manufacturer's and Supplier's practices, copies of which shall be provided to Company by Supplier prior to System Acceptance. Alterations performed by Company shall have no negative effect on the System warranty.

6.7. If Supplier modifies and/or changes the software to correct service affecting problems which Supplier (or System manufacturer) deems to have resulted from the software design, such modified and/or changed software shall be provided and licensed to Company without charge.

6.8.    For a period of five (5) years from execution of this Agreement, Supplier shall offer Company all software patches, engineering level enhancements, software and hardware retrofits, and feature and performance enhancements and upgrades to System that are offered or provided to others, and the costs of such modifications shall be free or at rates equal to or better than those offered to others with similar size and type systems. In the event that the modification is software related, a license for use of such modification shall be provided to Company at no charge.

6.9.    Should Company deem it appropriate, and Supplier does not object in writing within fifteen (15) days after notification to Supplier pursuant to Article 25 herein, Company may temporarily use any such defective System or any part thereof, until the System can be repaired or replaced and Company shall not be liable for payment or compensation for such temporary use. If Supplier does object, the parties shall meet immediately to work out a mutually satisfactory resolution.

6.10.    If the nature of any defects in the System is such that it is inappropriate to have the System corrected, Company may deduct from any amounts then due or which become due to Supplier under Article 16 hereof, such monies as Company considers a proper equivalent for the difference in value of the System furnished from that specified herein.

6.11.    This Article shall not be construed as a limitation of Supplier's liability. The remedy provided for herein for breach of warranty, is in addition to all other remedies Company may have for Supplier's negligence or breach of contract.

7.    **DELIVERY AND INSTALLATION**

7.1.    Supplier shall deliver the System equipment, hardware and software products and install same at Company's designated facility ("Facility") within a reasonable time after delivery thereof. Delivery will be made in accordance with Schedule A - Statement of Work.

7.2.    Company agrees to furnish the required space which shall be ready to receive the System at the time scheduled for delivery.

7.3.    Supplier shall be responsible for furnishing all storage and staging facilities for the equipment and materials to be used in the performance of the work. Company will not provide storage space nor will it be responsible for the security of materials, equipment or System components prior to their installation and Cutover.

7.4.    Throughout the progress of the work, Supplier shall keep the working area free from debris of all types, and remove from the Facility in a manner reasonably acceptable to Company, all refuse resulting from any work being done by it. At the completion of the work under this Agreement, Supplier shall leave the Facility in a clean and finished condition to the reasonable satisfaction of Company.

7.5.    Supplier shall be liable and responsible for any building damages caused by reason of its work hereunder. Repairs of any kind required will be made and charged to

Supplier. Supplier shall take reasonable precautions to protect the Facility areas adjacent to the work. No cutting, notching, drilling or altering of any kind shall be done to the Facility by Supplier without first obtaining written permission from Company.

8. **TESTING AND CUTOVER**

8.1.    Upon completion of installation of software and applications, and prior to Cutover, as defined in Schedule A – STATEMENT OF WORK, Supplier shall perform complete System tests in accordance with the applicable System manufacturer installation manuals and in accordance with the Detailed Project Plan. The Detailed Project Plan shall be defined during the course of this project and mutually agreed upon by both parties. Such agreement shall not be unreasonably withheld. Such tests shall be under the observation of Company or its representative. Supplier shall furnish all necessary test equipment and perform all work required to determine or modify the performance of the System to meet the specified functions.

8.2.    At such time as all tests have been completed to Supplier's satisfaction, Supplier shall give Company written notice thereof. Company will then validate that all systems, peripherals and applications are performing and functioning properly. All of the above must be performing and functioning with no degradation to prior system functionality. Company will have the sole right to determine the timing of System Cutover based on the above testing. If Company notifies Supplier in writing of deficiencies in the results of such tests, Supplier shall not proceed to Cutover until such material deficiencies have been corrected to Company's reasonable satisfaction.

8.3.    Supplier shall use its best efforts to cause System Cutover to occur by August 15, 2001, ("Cutover Date"), subject to mutually agreeable changes confirmed by Supplier in writing. The term "Cutover" is further defined in the Schedule A - Statement of Work.

9. **ACCEPTANCE**

9.1.    Within a thirty (30) calendar day period after Cutover ("Acceptance Period"), Company shall notify Supplier, in writing, of its acceptance of the System ("System Acceptance") or specify in reasonable detail those deficiencies which Company deems unacceptable. The System shall not be accepted until all such deficiencies are corrected and the Acceptance Period shall be extended by five calendar days plus the number of days between the notice of the deficiencies and Supplier's correction of such deficiencies, for each notice of deficiency given by Company. System Acceptance shall not be unreasonably withheld. System Acceptance shall be deemed to occur on the earlier of (1) the date of Company's written notice that it has accepted the System or (2) the day following the final day of the Acceptance Period if Company has failed to notify Supplier of any defect.

9.2.    Company shall make reasonable efforts to notify Supplier of any deficiencies in the System promptly upon discovery of the deficiencies.

9.3.    If the System is not accepted within ninety (90) consecutive days after Cutover, Company shall have the option to (1) request replacement equipment be installed (up to and including the entire System if necessary to bring System into operational conformance); (2) terminate this Agreement; (3) delete the defective portion of the System from this Agreement; or (4) extend the Acceptance Period. Company's options shall remain in force until such time as the System is accepted.

9.4.    Acceptance is further described in Schedule A – Statement of Work.

10.    **DOCUMENTATION**

10.1.    Within thirty (30) days after System Cutover, Supplier shall provide Company with reproducible plans and other documentation accurately reflecting system design.

10.2.    Complete information concerning the System features and application design shall also be provided. Documentation must be presented in a manner acceptable to Company.

11.    **TRAINING**

11.1.    After the System is installed, but prior to Cutover, training sessions will be provided by Supplier's personnel. A TRAIN-THE-TRAINER APPROACH <u>WILL NOT BE ACCEPTABLE</u>.

11.2.    Training sessions will be conducted at Company's San Dimas Customer Resource Center and shall include hands-on training utilizing the Vista platform with trainers describing and demonstrating function, activation and application of all features and services provided.

11.3.    Company shall make reasonable efforts to make all System users available for training prior to System Cutover.

11.4.    Supplier shall provide sufficient on-site training, at no additional cost to Company, to permit Company to perform the following procedures in a manner consistent with Supplier's approved standards and practices: (1) software additions, moves and changes to the system database; and (2) moves and changes to the System hardware.

12.    **CHANGES**

12.1.    Either party may initiate a request for a change in this Agreement by advising the other party of the change in writing. As soon as practicable after notice of such request, Supplier shall prepare and forward to Company in writing the proposed changes in this Agreement.

12.2.   If the parties fail to agree on an Amendment to this Agreement ("Amendment") relating to a proposed change, Company reserves the option to retain others to provide the services subject to the change order.

12.3.   Supplier shall implement a change in this Agreement only after Supplier has received a written Amendment executed by an authorized procurement agent or officer of Company. All changes shall be performed under the Terms and Conditions of this Agreement. Supplier hereby expressly waives any compensation for any change not authorized by a written Amendment to this Agreement.

### 13.   DELAYS

13.1.   Supplier shall notify Company in writing immediately of any delay, or anticipated delay in Supplier's performance of this Agreement due to causes or circumstances beyond the reasonable control of Supplier, and the reason for and anticipated length of the delay. Company may extend the date of performance for a period equal to the time lost by reason of the delay if Company, in its sole judgment, determines that the delay is due to causes or circumstances beyond the reasonable control of Supplier. Supplier shall not be eligible under any circumstances for additional compensation due to any such extension of time. Any extension to the contract term pursuant to this Article, shall be documented by a written Amendment to this Agreement.

13.2.   If requested by Company, Supplier shall delay manufacture and/or shipment to the extent that Company's ability to receive, install, and/or use the System is delayed due to causes beyond Company's reasonable control. Company shall notify Supplier immediately of any such delay, or anticipated delay, and Supplier shall, upon request, extend the date of performance for a period equal to the time lost by reason of the delay.

13.3.   If Company elects to store the System after delivery either at the site or at any other location designated by Company, Supplier will, at Company's request, provide its recommendations for proper storage. Upon removal from storage, Company is responsible for inspecting and restoring the System to its "as delivered" condition. If storage is provided by Supplier, regardless of location, Supplier is responsible for restoring the System to its original "as delivered" condition. Any special packaging charges that Company directs shall be charged to Company's account.

14.    **COMPENSATION**

Supplier shall receive as full compensation, for timely performance hereunder, the sum of $842,903.00, which includes any applicable California sales or use tax. The compensation is itemized as to its elements in SCHEDULE B - COMPENSATION.

15.    **FUTURE PRICE GUARANTEES**

Supplier shall provide hardware and software at prices at or below those stated in Schedule B Compensation, for five (5) years from the effective date of this contract.

16.    **PAYMENT**

16.1.    So long as Company is satisfied that this Agreement is being performed according to its provisions, Company shall pay to Supplier the sum set forth in Article 14 in the following manner:

16.1.1. Payments will be made on the basis of identifiable milestones verified by Company during the implementation of the project. Milestone payments may be invoiced upon occurrence of the milestone event as set out in SCHEDULE A – STATEMENT OF WORK. Notwithstanding the foregoing, invoices per completed milestones will not be accepted more frequently than once per month. If the contract price is increased by Amendment, upon completion of the next payment milestone, Company will pay the percent value of the completed milestone as defined above, plus any additional monies so that the total payments to date equal the cumulative payment percent based on the amended contract price.

16.2.    Amounts referenced above in Article 16.1 shall be due and payable net thirty (30) days of Company's receipt and approval of Supplier's invoice, adequately and accurately referencing this Agreement and describing the nature and amount of the payment requested.

16.3.    Invoices shall properly identify any tax as a sales or use tax and separately state the amount of such tax and any freight, installation, technical service or other charge which is excludable from such tax.

16.4.    Company may withhold payment of the whole or part of any amount due or claimed to be due by Supplier to such extent as may be necessary to protect Company from loss on account of any of the following:

16.4.1.    Defective System <u>not</u> remedied.

16.4.2. Third party claims filed or reasonable evidence indicating probable filing of such claims.

16.4.3. Failure of Supplier to make payment promptly to its employees, suppliers or subcontractors.

16.4.4. Damage caused by Supplier to others and/or Company; or

16.4.5. Failure of Supplier to diligently execute the work and maintain satisfactory progress required to meet the schedule.

16.4.6. Any other material breach by Supplier of its obligations.

16.5.    Invoices shall be submitted in duplicate to:

> Southern California Gas Company
> Attention: Marcia Gonzales
> 1050 Overland Ct.
> San Dimas, California, 91773-3017

## 17.    AUDIT

17.1.    Company reserves the right to designate its own employee representative(s) or its contracted representatives with a certified public accounting firm who shall have the right to audit and to examine any cost, payment, settlement or supporting documentation resulting from any items set forth in this Agreement other than the fixed price agreed upon in this Agreement or any fixed price amendments to this Agreement. Any such audit(s) shall be undertaken by Company or its representative(s) at reasonable times and in conformance with generally accepted auditing standards. Supplier agrees to cooperate fully with any such audit(s).

17.2.    Supplier shall include, when possible, a similar clause in its agreements with its subcontractors reserving the right to designate Supplier's own employee representative(s), its contracted representative from a certified public accounting firm, and representative(s) from Company, who shall have the right to audit and to examine any cost, payment, settlement or other supporting documentation resulting from any item set forth in its agreements.

17.3.    Supplier will be notified in writing of any exception taken as a result of an audit. Supplier agrees to directly refund the amount of any exception to Company within ten (10) days (or alternatively, with prior written approval of Company, deduct the dollar amount from the next invoice submitted to Company). If Supplier fails to make such payment, Supplier agrees to pay interest, accruing monthly, at a rate of ten percent (10%) per annum. Interest will be computed from the date of written notification of exception(s) to the date Supplier reimburses Company for any exception(s). In the event an audit verifies overcharges of five percent (5%) or more, then Supplier shall reimburse Company for the cost of the audit.

17.4.    This right to audit shall extend during the length of this Agreement and for a period of five (5) years following the date of final payment under this Agreement. Supplier

agrees to retain all necessary records/documentation for the entire length of this audit period.

17.5.  In the event of a dispute regarding payments/settlements, the dispute will be handled in accordance with Article 30, and no interest shall accrue during such dispute regardless of the final outcome.

18.  **TAXES**

18.1.  Contractor assumes exclusive liability for and shall pay before delinquency, all federal, state or local sales, use, excise and other taxes, charges or contributions imposed on, or with respect to, or measured by the equipment, materials, supplies or labor furnished hereunder or the wages, salaries or other remunerations paid to individuals employed in connection with the performance of the Services.  Provided that the conditions of indemnification as set forth in Article 20 are satisfied, Contractor shall hold harmless, indemnify and defend Company, together with any and all its officers, directors, agents and employees from any liability, penalty, interest and expense by reason of Contractor's failure to pay such taxes, charges or contributions.  Contractor and Company shall cooperate with each other to minimize the tax liability of both parties to the extent legally permissible, including separately stating taxable charges on Contractor's invoices and supplying resale and exemption certificates, if applicable, and other information as reasonably requested.

18.2.  Without limiting the generality of the foregoing, Contractor agrees to treat all individuals performing services under the Agreement as employees of the Contractor for purposes of Federal and State employment taxes.  No exceptions are permitted under this section without a written Amendment to this Agreement prior to an individual performing any Services under this Agreement.

18.3.  Without limiting any of the provisions of Article 17, Contractor agrees that, at any time during the performance of this Agreement, Company shall have the right to audit Contractor's compliance with the requirement stated in Article 18.2 that Contractor treat all individuals performing Services under this Agreement as employees of Contractor for Federal and State employment tax purposes.  Such audit shall occur at reasonable times with Contractor's full cooperation.

19.  **INSURANCE**

Insurance requirements set forth below do not in any way limit the amount or scope of liability of Supplier under this agreement.  The amounts listed indicate only the minimum amounts of insurance coverage Company is willing to accept to help insure full performance of all terms and conditions of this agreement.  All insurance required of Supplier under this agreement shall meet the following minimum requirements:

19.1.  CERTIFICATES:  NOTICE OF CANCELLATION.  On or before the effective date of this agreement, and thereafter during its term, Supplier shall provide Company with current certificates of insurance, executed by a duly authorized representative of each

insurer, as evidence of all insurance policies required under this Article 19. No insurance policy may be canceled, materially revised, or non-renewed without at least thirty (30) days prior written notice being given to Company. Insurance must be maintained without lapse in coverage during the term of this agreement. Company shall also be given certified copies of Supplier's policies of insurance, upon request.

19.2. ADDITIONAL INSURED. Company shall be named as an additional insured in each general liability policy. Such general liability insurance shall provide a severability of interest or cross-liability clause.

19.3. PRIMARY COVERAGE. The required policies, and any of Supplier's policies providing coverage excess of the required policies, shall provide that the coverage is primary for all purposes and Supplier will not seek any contribution from any insurance or self-insurance maintained by Company.

19.4. Company RATINGS. All required policies of insurance must be written by companies having an A. M. Best rating of "A-" or better, or equivalent.

19.5. DEDUCTIBLES: RETENTIONS. Supplier shall be solely responsible for any deductible or self-insured retention on insurance required hereunder.

19.6. REQUIRED INSURANCE. At all times during this agreement, Supplier shall provide and maintain, at its own expense, the following types of insurance:

19.6.1. General Liability Insurance. Supplier shall maintain an occurrence form commercial general liability policy, or policies, insuring against liability arising from bodily injury, property damage, personal and advertising injury, independent contractors liability, products and completed operations and contractual liability. Such coverage shall be in an amount of not less than $1,000,000 combined single limit per occurrence.

19.6.2. Automobile Liability Insurance. In the event that automobiles are used in connection with Supplier's performance of this agreement, Supplier shall maintain an automobile liability policy or policies insuring against liability for damages because of bodily injury, death, or damage to property, (including loss of use thereof), and occurring in any way related to the use, loading or unloading of any of Supplier's automobiles (including owned, hired and non-owned vehicles). Coverage shall be in an amount of not less than $1,000,000 each accident.

19.6.3. Workers' Compensation Insurance. In accordance with the laws of the State or States in which the work will be performed, Supplier shall maintain in force workers' compensation insurance for all of its employees. Supplier shall also maintain employer's liability coverage in an amount of not less than $1,000,000 per accident and per employee for disease. In lieu of such insurance, Supplier may maintain a self-insurance program meeting the requirements of the State or States in which the work will be performed along with the required employer's liability insurance.

19.7.  <u>WAIVER OF SUBROGATION</u>.  Each policy of general liability and automobile (including automobile physical damage) insurance maintained by Supplier shall contain a waiver of subrogation in favor of Company.

## 20.  <u>INDEMNITY</u>

20.1.  As between Company and Supplier, Supplier shall be solely liable for and Supplier shall indemnify, defend and hold Company, and its present and future direct or indirect parent company(ies), subsidiaries, affiliates, divisions and their respective directors, officers, shareholders, employees, agents, representatives, successors and assigns harmless from and against any and all claims, actions, suits, proceedings, losses, liabilities, penalties, damages, costs or expenses (including attorneys' fees and disbursements) of any kind whatsoever resulting from (1) injuries to or death of any and all individuals, including, without limitation, members of the general public, or any employee, agent, independent contractor or consultant or affiliate of either Company or Supplier, arising out of or connected in any manner with the delivery of or installation of the System, any defect in the System or Supplier's failure to warn Company about the System or the use of the System, or Supplier's or its subcontractor's performance of any services, whether or not the conduct of Supplier or any subcontractor was tortious and whether or not Company's tortious conduct contributed to the injuries or death, (2) damage to, loss, and/or destruction of property, including, without limitation, to, property of Company or Supplier arising out of or connected in any manner with the delivery of or installation of the System, any defect in the System or Supplier's failure to warn Company about the System or the use of the System, or Supplier's or its subcontractor's performance of any services, whether or not the conduct of Supplier or any subcontractor was tortious and whether or not Company's tortious conduct contributed to the property damages, (3) third party claims of any kind, whether based upon negligence, strict liability or otherwise, arising out of or connected in any manner to Supplier's or any of its subcontractor's acts or omissions in breach of this Agreement, or (4) Supplier's failure to comply with Article 28 hereunder.  The indemnification obligation shall not apply to the extent that injuries, death, loss, damage or destruction is caused by the willful misconduct of Company, its agents or employees, or Company's sole negligence.

20.2.  Supplier shall indemnify, defend and hold Company, and its present and future direct or indirect parent company(ies), subsidiaries, and affiliates and their directors, officers, shareholders, employees, agents and representatives harmless from and against any and all claims, actions, suits, proceedings, losses, liabilities, penalties, damages, costs or expenses (including attorneys' fees and disbursements) of any kind whatsoever arising from (1) actual or alleged infringement or misappropriation by Supplier or any subcontractor of any patent, copyright, trade secret, trademark, service mark, trade name, or other intellectual property right in connection with the System, including without limitation, any deliverable, (2) Supplier's violation of any third party license to use intellectual property in connection with the System, including, without limitation, any deliverable.

20.3.  If any claim is brought against Company, then Supplier shall be entitled to participate in, and, unless in the opinion of counsel for Company a conflict of interest between Company and Supplier may exist with respect to such claim, assume the defense of such claim, with counsel reasonably acceptable to Company.  If Supplier does not assume

the defense of Company, or if a conflict precludes Supplier from assuming the defense, then Supplier shall reimburse Company on a monthly basis for Company's defense through separate counsel of Company's choice. Even if Supplier assumes the defense of Company with acceptable counsel, Company, at its sole option, may participate in the defense, at its own expense, with counsel of its own choice without relieving Supplier of any of its obligations hereunder.

20.4.   Supplier's obligation to indemnify under this Article shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for Contractor under any statutory scheme, including, without limitation, under any Worker's Compensation Acts, Disability Benefit Acts or other Employee Benefit Acts.

## 21.   TIME OF THE ESSENCE

Time is expressly agreed to be of the essence of this Agreement and each, every, and all of the terms, conditions and provisions herein.

## 22.   LIQUIDATED DAMAGES FOR LATE DELIVERY FOR SUPPLIER DELAY

Supplier agrees that to insure timely execution of projects, a "Penalty" for late delivery is in order.  The mutually agreed to specifications, timelines, responsibilities, etc. are to be specified in a Detailed Project Plan (Milestone 1).  Delivery dates for the purposes of this Article 22 are to be identified within the Detailed Project Plan.  Supplier agrees to a Penalty for Supplier caused late delivery of one percent (1%) of the order price for each day of delay from the agreed delivery date, up to a maximum of twenty five (25) days.  The total Penalty imposed for late delivery would not exceed twenty five percent (25%).  The delivery dates would be extended and otherwise revised due to Company caused delays without penalty to Supplier.

## 23.   TERMINATION

23.1.   Company may, by written notice to Supplier, terminate all or any part hereof if Supplier (1) fails to make timely delivery of the System or timely progress with the performance of work thereon; (2) abandons the work called for hereunder; (3) becomes bankrupt or insolvent, or shall assign this Agreement, or sublet any part thereof, without the written authorization of Company, or (4) violates any of the material provisions of this Agreement, or executes this Agreement in bad faith.

23.2.   If Company terminates all or any part hereof, as provided in Section 22.1 of this Article:

23.2.1. Company may procure, upon such terms and in such manner as Company deems appropriate, System similar to that specified herein, and Supplier shall be liable to Company for all loss, damages, and excess cost in procuring such similar

System; provided, that Supplier shall continue performance hereunder to the extent not terminated under the provisions of this Article.

23.3.   Company may require Supplier to transfer title and deliver to Company the completed System, and such partially completed System and any materials, parts, tools, software development tools, compilers, third party software, components, dies, fixtures, jigs, patterns, plans, drawings, information and contract rights as Supplier has specifically produced or specifically acquired for the performance hereof or such part hereof as has been terminated (collectively, the "Specifically Acquired Materials").  Payment for the completed System delivered to and accepted by Company shall be at the contract price. Payment for Specifically Acquired Materials delivered to and accepted by Company shall be in an amount agreed upon by Company and Supplier, unless the Specifically Acquired Materials are included in the contract price.

23.4.   It is expressly agreed that Company may terminate all or part of this Agreement at any time for its sole convenience.  Upon termination pursuant to this Article, an equitable adjustment shall be made by Agreement between Company and Supplier for the reasonable value of the work performed prior to termination.  This equitable adjustment shall include amounts compensating Supplier for its actual cost of labor and materials, and for reasonable overhead and profit.  However, no profit shall be allowed if it is apparent that Supplier would have incurred a loss had the System been completed as originally specified. In no event shall the equitable adjustment include an amount for anticipated profit on unperformed work. Company shall have the right to review and verify, by independent audit, termination charges claimed by Supplier.

## 24.    LIENS

Without limiting the generality of Article 19, Contractor shall indemnify, defend, and hold Company, and its present and future direct or indirect parent company(ies), subsidiaries, affiliates and their directors, officers, shareholders, employees, agents and representatives, harmless from and against any mechanics lien or stop notice claim against Company by Supplier, subcontractors, employees or agents pertaining to the System specified in this Agreement.  If at the time of completion of the work hereunder, Supplier upon request by Company, does not provide satisfactory evidence that all claims of all such persons or entities have been paid, such amount as may be necessary to meet such lien or claim shall be retained from any amount due to Supplier hereunder until all such liens or claims have been fully discharged.

## 25.    TITLE, FREIGHT TERMS, RISK OF LOSS OR DAMAGE

25.1.    Title to the Hardware System shall pass to Company upon System Acceptance, automatically, without further documentation or action.  Freight terms shall be prepaid and allowed, F.O.B. destination.  Supplier shall bear all risk of loss or damage to the System until such System Acceptance.  Company agrees to cooperate with Supplier in the prosecution of any claim which may result from such assumption of risk by Supplier.  Title to the Hardware System as passed to Company from Supplier shall be free and clear of all liens, encumbrances and security interests.

25.2.    Supplier shall bear the responsibility for all risk of direct physical loss or damage to the System until such System Acceptance, except to the extent such damage or loss is solely caused by Company.  During the subsequent installation by Supplier, Supplier shall be responsible for its acts and/or negligence or those of its subcontractors, which result in damage and/or destruction of the System.  In the event of loss or damage, if it should become necessary to replace materials or equipment furnished by Company, the cost of replacement shall be paid by Supplier to Company.  Company may deduct such costs from any amounts due or to become due Supplier.

## 26.    NOTICES OR DEMANDS

Any notice, request, demand or other communication required or permitted under this Agreement, shall be deemed to be properly given by the sender and received by the addressee if made in writing and (1) if personally delivered; (2) three days after deposit in the mails if mailed by certified or registered air mail, post prepaid, with a return receipt requested; or (3) if sent by facsimile with confirmation sent as provided in (2) above.  All correspondence shall reference the contract number specified on the cover page of this Agreement.  All notices shall be addressed as follows to:

|  |  |
|---|---|
| COMPANY: | Sempra Energy<br>Attention: Director – Supply Management<br>101 Ash Street<br>San  Diego, CA  92101<br>Facsimilie No.: (619) 699-5177 |
| With a copy to: | Southern California Gas Company<br>Attention: Marcia Gonzales<br>1050 Overland Ct.<br>San Dimas, California  91773-3017<br>Facsimile No: (909) 305-8250<br>Contract No. 5600005639 |
| Supplier: | Syntellect Inc.<br>16610 N. Black Canyon Hwy, Suite 100<br>Phoenix, AZ  85053<br>Facsimile No:  (602) 789-2899 |

KL- C:\WINDOWS\TEMP\5600005639.DOC
S:\PCRMNT\DATA\STDFORMS\WONCP32\HSSR1.DOT

06/21/01 12:09 PM
Revision 1, 08/21/97

Attention:  Contract Administration

## 27.    REPRESENTATIVES

27.1.  Company Representative: Marcia Gonzales

Company designates, and Supplier accepts, the individual named above as Company Representative for all matters relating to Supplier's performance under this Agreement.  The actions taken by the Company Representative regarding such performance shall be deemed the acts of Company.  Company may, upon written notice to Supplier, pursuant to Article 25 hereof, change the designated Representative.

27.2.  Supplier Representative: Patti Bishop

Supplier designates, and Company accepts, the individual named above as Supplier Representative for all matters relating to Supplier's performance under this Agreement.  The actions taken by Supplier Representative shall be deemed the acts of Supplier.

## 28.    GOVERNING LAW

Interpretation of this Agreement and performance thereof shall be determined by the internal laws of the State of California.

## 29.    COMPLIANCE WITH LAWS

Supplier shall be deemed to be familiar with, and at all times shall comply with and observe all applicable federal, state and local laws, ordinances, rules, regulations and orders, and shall indemnify, and save Company harmless from and against any and all loss, liability and expense (including attorneys' fees) which Company may incur or suffer as a result of Supplier's failure to do so.

## 30.    EQUAL EMPLOYMENT OPPORTUNITY

If this Agreement is subject to Executive Order 11246 of September 24, 1965, Section 503 of the Rehabilitation Act of 1973, or the Vietnam Era Veterans' Readjustment Act of 1974, Supplier agrees to comply with the equal employment opportunity clauses set out at 41 CFR 60-1.4 and the requirements for affirmative action for veterans and disabled persons set out at 41 CFR 60-250.4 and 60-741.4, respectively, which clauses are incorporated herein by reference with the same force and effect as if stated in full text.

## 31.    DISPUTES

31.1.  Any dispute shall be referred to Company Manager-Supply Management and an officer of Supplier for resolution.  If Company and Supplier cannot reach an agreement

within a reasonable period of time, Company and Supplier shall have the right to pursue litigation as provided for herein.

31.2.    In the event of any litigation to enforce or interpret any terms of this Agreement, the parties agree that such action will be brought in the Superior Court of the County of San Diego, California (or, if the federal courts have exclusive jurisdiction over the subject matter of the dispute, in the U.S. District Court for the Southern District of California), and the parties hereby submit to the exclusive jurisdiction of said court.

31.3.    In any action in litigation to enforce or interpret any of the terms of this Agreement, the prevailing party shall be entitled to recover from the unsuccessful party all costs, expenses, (including expert testimony) and reasonable attorneys' fees and disbursements incurred therein by the prevailing party.

31.4.    In no event shall the litigation of any controversy or the settlement thereof delay the performance of this Agreement.

## 32.    VALIDITY

The invalidity, in whole or in part, of any provisions hereof shall not affect the validity of any other provisions hereof.

## 33.    CALENDAR YEAR 2000 COMPLIANCE

Contractor warrants that the products licensed to Company, hereunder and used by Company prior to, during, or after the calendar year 2000 shall exhibit Year 2000 Compliance. "Year 2000 Compliance" shall mean that the licensed products, including third party products incorporated herein (1)  manage and manipulate data involving dates, including single-century and multi-century formulas, and will not cause an abnormally ending (ABEND) scenario within the application, or result in incorrect values generated involving such dates; (2) ensure that all date-related functions and data fields including generated code include the indication of century; and (3) convert between date representations [e.g., Year-Month-Date (YMD), Julian, Gregorian, etc.].  Contractor acknowledges that products licensed by Company hereunder may require modification in order to correctly process dates for year 2000 and beyond.  Contractor shall assume all responsibility for Year 2000 Compliance.  Contractor shall provide any related upgrades and/or enhancements pertaining to Year 2000 Compliance at no additional charge to Company.  Company's sole financial obligation shall be to pay the normally incurred maintenance

## 34.    NONWAIVER

The failure of Company to insist upon or enforce, in any instance, strict performance by Supplier of any of the terms of this Agreement or to exercise any rights herein conferred shall not be construed as a waiver or relinquishment to any extent of its right to assert or rely upon any such terms or rights on any future occasion.

### 35.    SURVIVAL

The obligations imposed on Supplier and Supplier's employees by and pursuant to Articles 4, 6, 17, 18, 19, 20, 24, 28, 29, 31 and 36 shall survive termination of this Agreement.

### 36.    NONDISCLOSURE

Supplier shall <u>not</u> use for any purpose other than supplying the System under this Agreement or divulge, disclose, produce, publish, or permit access to, without the prior written consent of Company, any Confidential Information.  Confidential Information includes, without limitation, all information or materials prepared in connection with the work performed under this or any related subsequent agreement, designs, drawings, specifications, techniques, models, data, documentation, source code, object code, diagrams, flow charts, research, development, processes, procedures, know-how, manufacturing, development or marketing techniques and materials, development or marketing timetables, strategies and development plans, customer, supplier or personnel names and other information related to customers, suppliers or personnel, pricing policies and financial information, and other information of a similar nature, whether or not reduced to writing or other tangible form, and any other trade secrets.  Confidential Information does not include (1) information known to Supplier prior to obtaining the same from Company; (2) information in the public domain at the time of disclosure by Supplier; or (3) information obtained by Supplier from a third party who did not receive same, directly or indirectly, from Company.  Supplier shall use the higher of the standard of care that Supplier uses to preserve its own confidential information or a reasonable standard of care to prevent unauthorized use or disclosure of such Confidential Information.

### 37.    EMERGING BUSINESS ENTERPRISES

It is the policy of Company to provide maximum opportunity for women, minority and service disabled veteran business enterprises, hereafter referred to as emerging business enterprises ("EBE") to participate in the performance of contracts.  As part of Company's efforts toward achieving its EBE goals, Company requests and expects as performance to this Agreement, Supplier to make good faith efforts to utilize EBE subcontractors and subsuppliers

### 38.    ASSIGNMENT AND SUBCONTRACTING

38.1.    Supplier shall give personal attention to the execution of the Agreement, and shall <u>not</u> assign this Agreement without prior written authorization of Company.  No such written authorization, however, shall be construed as discharging or releasing Supplier in any way from the performance of the Agreement or the fulfillment of any obligation specified in this Agreement.

38.2.    Supplier agrees that all installation, warranty, maintenance and add/move/change work contemplated by this Agreement shall be performed by fully-qualified, Supplier-employed personnel unless otherwise stipulated herein.

38.3.   Supplier shall not contract for or permit any subcontract work to be performed without prior written authorization of Company.  In the event that Supplier proposes to subcontract any work contemplated by this Agreement, the names and addresses of all proposed subcontractors shall be furnished in writing to Company.  The selection of subcontractors must be acceptable to Company; any such acceptance shall not be unreasonably withheld.

38.4.   If, in Company's reasonable judgment, any subcontractors fail to perform the work in strict accordance with this Agreement, Supplier, after due notice from Company, shall discharge the same, but this discharge shall in no way release Supplier from its obligations and responsibilities under this Agreement.

38.5.   Every subcontractor performing work on the System on behalf of Supplier shall be bound by the conditions and provisions of this Agreement as far as they are applicable to their work.  Nothing contained herein shall create any contractual relations between the subcontractor and Company.

38.6.   Supplier shall be fully responsible to Company for the acts and omissions of its subcontractors.

39.   **NO ORAL MODIFICATIONS**

No modification of any provisions of this Agreement shall be valid unless in writing and signed by authorized representatives of the party against whom such modification is sought to be enforced.

40.   **CAPTIONS**

The captions in this Agreement are for convenience and reference only and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement.

41.   **COUNTERPARTS**

This Agreement may be executed in counterparts which, taken together, shall constitute a single instrument.

42.   **AUTHORITY**

Each individual executing this Agreement on behalf of Company and Supplier represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of said party and that this Agreement is binding upon said party in accordance with its terms.

43. **ORDER OF PRECEDENCE**

In the event of conflict between the documents that comprise the parts of this Agreement, the following order of precedence shall apply:

a)   Amendments to the body of this Agreement in reverse chronological order

b)   The original body of the final Agreement

c)   Supplier's proposal response dated March 21, 2001

d)   Southern California Gas Company's Request for Proposal dated February 28, 2001

44. **COMPLETE AGREEMENT**

This Agreement constitutes the complete and entire Agreement between the parties and supersedes any previous communications, representations, or agreement, whether oral or written, with respect to the subject matter hereof. There are no additions to, or deletions from, or changes in, any of the provisions hereof, and no understandings, representations, or agreements concerning any of the same, which are not expressed herein, unless stated below. THE PARTIES HEREBY AGREE THAT NO TRADE USAGE, PRIOR COURSE OF DEALING OR COURSE OF PERFORMANCE UNDER THIS AGREEMENT SHALL BE A PART OF THIS AGREEMENT OR SHALL BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT. The following schedules are attached hereto and incorporated herein by this reference:

SCHEDULE A – STATEMENT OF WORK
SCHEDULE B - COMPENSATION
SCHEDULE E – INSURANCE – Intentionally Omitted
– Intentionally Omitted
– Intentionally Omitted


IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above:

Syntellect, Inc.                              Southern California Gas Company

By: _____         By: _____

Name: _Tim Vaglione_____       Name: _____

Title: _VP & CFO_____       Title: _____

Date: _5/25/01_____       Date: _____

Southern California Gas Company

## SCHEDULE A – STATEMENT OF WORK

## A.  General

Supplier is responsible for installation and configuration of all the equipment according to this Schedule A.  The equipment will be installed on Company's premises at the following locations:
- Redlands Call Center located at 1981 Lugonia Ave, Redlands, CA
- San Dimas Call Center located at 1050 Overland Court, San Dimas, CA.

## B.  Supplier's Responsibilities

**1.    GENERAL**

a.  Supplier is responsible for insuring the proper interface and integration between all Company's peripherals and the Syntellect Vista IVR's.  All Company peripherals and their applications must function and perform with no degradation to current functionality.  Company peripherals are: Aspect ACD, CallPath, CR Portal IVR Integration Manager (IIM), RMS, Datamart, and Host S390 Mainframe (CIS).  Supplier will accomplish this by working closely with the Company's Technical Team, Sempra Energy IT organization, and the various vendors to insure that the Supplier IVR implementation is non-service impacting to the Company's Call Centers and implemented according to the Project Plan Timeline.

b.  Supplier will be responsible for the installation of the Vista software and initial development of all DNIS applications as currently defined in the VocalPoint system.

c.  Supplier will add speech technology to the following DNIS's, '007', '006', '014', and '016' as diagramed in Company's Request for Proposal dated February 28, 2001.

d.  Supplier will provide a complete set of final design documentation of the Company's System, including application source code at the time of implementation.  This documentation must be acceptable to Company.

e.  Company reserves the right to approve or disapprove any change in Supplier's project team members.  This is to assure that persons with vital experience and skill are not arbitrarily removed from the project by Supplier.  Prior written approval is required before changes in any Supplier personnel can be made

2.    **TRAINING**

a.  Supplier is responsible for providing a minimum of forty (40) hours of training, at Company's facility, for up to four (4) employees for each System installation to ensure that Technical Team staff is competent to perform all System-related administrative, diagnostic and proactive management functions associated with the system.  Supplier will arrange for training for System Administration, Application Development and all other training required at Supplier facilities in the timeframe required to meet established timelines and deadlines.

b. Supplier will be on Company's facilities during and after the implementation of the Syntellect IVR to insure that the Transfer of Knowledge from pre-implementation is complete.  The Company Project Manager will determine when the "Transfer of Knowledge" is complete.  The Syntellect IVR Developer will be available at Company's request during this time for consultation.

3.    **PROJECT MANAGER**

a.  The Supplier Project Manager will be responsible for communications on project status updates to the Company Project Manager.  These updates will be in person and/or in writing weekly once the equipment is installed.

b.  The Supplier Project Manager will provide a Detailed Project Plan (Milestone 1), including an Implementation Time Line, and a completely detailed plan for the integration of all Company peripherals: Aspect ACD, CallPath, CR Portal (IIM), RMS, Datamart and Host (CIS). These plans must be accepted and approved by Company and are made part of this Agreement by this reference.

# C.  Company's Responsibilities

♦  Company will purchase all the hardware required for the System under a separate Agreement .
♦  Company will  be responsible for preparing all the facilities for the implementation of the Syntellect Vista IVR.  This includes cabling, communications and coordination with peripheral vendors.
♦  Company is responsible for providing the hardware and the cost of modifications to the peripherals to accommodate the Syntellect IVR.
♦  Company will provide updated flowcharts and scripts to Supplier for the development of all applications.

## D.  Milestones

1.  Payment for Sytellect Software, Items 1 (one) through 8 (eight) on attached Schedule B - Compensation, will be:

- ♦ 40% - Upon Delivery of Software

- ♦ 60% - 30 Days After Delivery Date

2.  The following Milestone Payment Schedule will apply to Items 9 (nine) through 14 (fourteen) on the attached Schedule B – Compensation:

| Milestones | PAYMENT |
|---|---|
| 1. Detailed Project Plan, Peripheral Integration Plan | 20% |
| 2. Delivery of All Application Development | 20% |
| 3. System Cut Over          (as defined) | 20% |
| 4. System Acceptance      (as defined) | 30% |
| 5. Operational Acceptance    (as defined) | 10% |

## E.  System Cut Over

System Cut Over is defined as the IVR's in Redlands and San Dimas are up, running and accepting, networking and handling 100% of customer calls delivered by the ACD.

## F.  Acceptance

1.  Acceptance is defined as:

- ♦ The Supplier IVR's are processing calls to completion or transferring them to representatives as designed without interruption to customers,
- ♦ All applications are functioning as specified in the "Functional Specification".
- ♦ Host connectivity (CIS) is up and stable.
- ♦ Connectivity to IIM Application on CR Portal is passing ANI/DNIS information and is handling CTI transfers from IVR.
- ♦ Callpath connection for the sending of screenpop data to agent workstations is functioning to Company standards.
- ♦ Consolidated Stats server is up and available for retrieval of IVR data.
- ♦ All reporting is accurate and meets the Company requirements.
- ♦ Performance and functionality of Company peripherals meets or exceeds levels existing prior to the Syntellect IVR implementation.

2. <u>System Acceptance Period</u>

System Acceptance period will be a period of thirty (30) consecutive days where all the Acceptance Criteria are met.

3. <u>Operational Acceptance Period</u>

Operational Acceptance period will be a period of 90 consecutive days where all the Acceptance Criteria are met.

## G. Warranty Period

The Warranty period shall extend for 365 days after System Acceptance and shall be free of charge. Vista Gold Maintenance, excluding all custom applications will start thereafter and will be defined under a separate agreement.

## H. Service Level Agreement (SLA)

During System Acceptance period, Supplier will have an Application Developer on-site to insure immediate response. The Application Developer will stay on premises until released by Company personnel. This service will be provided by Supplier at no cost to the Company.

Southern California Gas Company

**SCHEDULE B - COMPENSATION**

Further definition of Article 14 - <u>COMPENSATION</u>, is as follows:

| No. | Description | Price |
|---|---|---|
| 1 | Vista Software - 504 Ports (Includes 24 Port Dev Server; Eng, Spanish, Cantonese, Mandarin, Korean & Viet & 48 Ports for Proactive Not App) | $24 |
| 2 | Consolidated Stats Server | $2 |
| 3 | Speech Recognition - Tier 2, 132 Ports (128 for Production & 4 for Dev Server) | $88 |
| 4 | Voice Forms ( 456 Ports) | $12 |
| 5 | Vista Gen Software | $2 |
| 6 | Remote Software (RSM Manager 2 Licenses) | $ |
| 7 | Fax Ports (9 Production and 1 Dev Server) | $5, |
| 8 | IWR Server (Server and 12 Sessions - Dev Server Only) | $13, |
| 9 | Application Services Estimates (Per RFP Diagrams) | $192, |
| 10 | Project Management, Documentation, Testing | $144, |
| 11 | Training and Operations Support | $14, |
| 12 | Maintenance (12 Months of Vista Gold Maintenance excluding all custom applications) | $79, |
| 13 | Installation (15 Servers) | $30,0 |
| 14 | Proactive Notification Software       (96 Ports of Proactive Notification) | $12,5 |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| | **TOTAL** | $842,9( |

Southern California Gas Company

## Exhibit A

## Verification of Electronic Delivery

I, _____, as Witness to the electronic delivery of software
sold to San Diego Gas & Electric and delivered electronically by
_____ on the _____ day of _____, _____, acknowledge the
following statements are true:

- All evaluations previously viewed by the customer in conjunction with this sale were uninstalled and removed by the Syntellect, Inc. representative at the time of the Electronic delivery of the product.
- All tangible materials used in the process of Electronic Delivery of the product were removed by the Syntellect, Inc. representative at the completion of the process. Absolutely no tangible materials or product were left at the completion of the Electronic Delivery.
- All product(s) purchased on the below mentioned purchase order (excluding service) were received by the customer and were delivered via Load & Leave method of Electronic Delivery. The vendor named below hereby certifies that the software transferred to the purchaser was delivered (1) by means of an electronic transfer from the seller's place of business or other remote location to the purchasers computer and the purchaser did not obtain tangible personal property, such as storage media, in the transaction or (2) by installing the program directly onto the purchaser's computer without the purchaser obtaining tangible personal property in the transaction.

Products included in the Electronic Delivery are: Vista Software, Vista Gen Software, Remote Software and Proactive Notification Software.

---

1.    **PURCHASE ORDER NUMBER: 5600005639**

Order Number: _____

Total Price: $260,018.00

KL- C:\WINDOWS\TEMP\5600005639.DOC
S:\PCRMNT\DATA\STDFORMS\NONCP3Z\HSSR1.DOT

08/21/01 12:09 PM
Revision 1, 08/21/97

128

Signed by:

Vendor:  Syntellect, Inc.                    Customer: San Diego Gas & Electric

_____                    _____

_____                    _____


                                            Third Party: _____

                                            _____

                                            _____

**EXHIBIT 3**

FILED

2007 JUN -6 PH 3: 44

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

1  ROBERT T. HASLAM (Bar No. 71134)
   Robert.Haslam@hellerehrman.com
2  ANDREW C. BYRNES (Bar No. 191516)
   Andrew.Byrnes@hellerehrman.com
3  HELLER EHRMAN LLP
   275 Middlefield Road
4  Menlo Park, CA  94025-3506
   Telephone: 650.324.7000
5  Facsimile:  650.324.0638
6
7  MICHAEL K. PLIMACK (Bar No. 133869)
   Michael.Plimack@hellerehrman.com
8  DALE A. RICE (Bar No. 146249)
   Dale.Rice@hellerehrman.com
9  HELLER EHRMAN LLP
   333 Bush Street
10 San Francisco, CA  94104-2878
   Telephone: 415.772.6000
11 Facsimile:  415.772.6268
12
13 Attorneys for Plaintiff
   RONALD A. KATZ TECHNOLOGY LICENSING, L.P.
14

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17 RONALD A. KATZ TECHNOLOGY        )   CV 07  3672 GAF
   LICENSING, L.P.,                 )
18                                   )   Case No.
                                     )
19                    Plaintiff,     )
                                     )                              (CTx)
20         v.                        )
                                     )   COMPLAINT FOR PATENT
21 AVON PRODUCTS, INC.; FIRST        )   INFRINGEMENT
   PREMIER BANK; PREMIER             )
22 BANKCARD, LLC; NAVY FEDERAL       )   DEMAND FOR JURY TRIAL
   CREDIT UNION; SEMPRA ENERGY;      )
23 SAN DIEGO GAS & ELECTRIC          )
   COMPANY; SOUTHERN                 )
24 CALIFORNIA GAS COMPANY;           )
   UNITEDHEALTH GROUP, INC.;         )
25 PACIFICARE HEALTH SYSTEMS,        )
   LLC; PACIFICARE OF                )
26 CALIFORNIA; RXSOLUTIONS, INC.     )
   D/B/A PRESCRIPTION SOLUTIONS;     )
27                                   )
28 UNITED HEALTHCARE SERVICES,       )

Heller
Ehrman LLP

COMPLAINT FOR PATENT INFRINGEMENT

EXHIBIT 3

130

1  INC.; UNITED HEALTHCARE, INC.;          )
2  UNITED HEALTHCARE                       )
   INSURANCE COMPANY,                       )
3                                           )
                        Defendants.        )
4  _____)

5      Plaintiff Ronald A. Katz Technology Licensing, L.P. ("Katz Technology

6  Licensing") hereby complains against Avon Products, Inc., First PREMIER Bank,

7  PREMIER Bankcard, LLC, Navy Federal Credit Union, Sempra Energy, San Diego

8  Gas & Electric Company, Southern California Gas Company, UnitedHealth Group,

9  Inc., PacifiCare Health Systems, LLC, PacifiCare of California, RxSolutions, Inc.

10 d/b/a Prescription Solutions, United HealthCare Services, Inc., United HealthCare,

11 Inc., and United HealthCare Insurance Company.  This Court has subject matter

12 jurisdiction over this action under 28 U.S.C. sections 1331 and 1338(a).

13                             **THE PARTIES**

14     1.     Plaintiff Katz Technology Licensing is a California limited partnership

15 with its principal place of business at 9220 Sunset Boulevard, Suite 315,

16 Los Angeles, California 90069.

17     2.     On information and belief, Defendant Avon Products, Inc. is a New

18 York corporation with its principal place of business at 1325 Avenue of the

19 Americas, New York, New York 10105.

20     3.     On information and belief, Defendant First PREMIER Bank is a South

21 Dakota corporation with its principal place of business at 601 South Minnesota

22 Avenue, Sioux Falls, South Dakota 57104.

23     4.     On information and belief, Defendant PREMIER Bankcard, LLC is a

24 South Dakota corporation with its principal place of business at 900 West Delaware

25 Street, Sioux Falls, South Dakota 57104.

26

27

28

Heller
Ehrman ᴸᴸᴾ

1

**COMPLAINT FOR PATENT INFRINGEMENT**

5. On information and belief, Defendant Navy Federal Credit Union is a federal credit union with its principal place of business at 820 Follin Lane, Vienna, Virginia 22180.

6. On information and belief, Defendant Sempra Energy is a California corporation with its principal place of business at 101 Ash Street, San Diego, California 92101.

7. On information and belief, Defendant San Diego Gas & Electric Company is (a) a California corporation with its principal place of business at 8326 Century Park Court, San Diego, California 92123, and (b) a subsidiary of Sempra Energy.

8. On information and belief, Defendant Southern California Gas Company is (a) a California corporation with its principal place of business at 555 West Fifth Street, Los Angeles, California 90013, and (b) a subsidiary of Sempra Energy.

9. On information and belief, Defendant UnitedHealth Group, Inc. is a Minnesota corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.

10. On information and belief, Defendant PacifiCare Health Systems, LLC is (a) a Delaware corporation with its principal place of business at 5995 Plaza Drive, Cypress, California 90630, and (b) a subsidiary of UnitedHealth Group, Inc.

11. On information and belief, Defendant PacifiCare of California is (a) a California corporation with its principal place of business at 5995 Plaza Drive, Cypress, California 90630, and (b) a subsidiary of UnitedHealth Group, Inc.

12. On information and belief, Defendant RxSolutions, Inc. d/b/a Prescription Solutions is (a) a California corporation with its principal place of business at 3515 Harbor Boulevard, Costa Mesa, California 92626, and (b) a subsidiary of UnitedHealth Group, Inc.

13. On information and belief, Defendant United HealthCare Services, Inc. is (a) a Minnesota corporation with its principal place of business at 9900 Bren Road

Heller
Ehrman LLP

2

**COMPLAINT FOR PATENT INFRINGEMENT**

132

East, Minnetonka, Minnesota 55343, and (b) a subsidiary of UnitedHealth Group, Inc.

14.    On information and belief, Defendant United HealthCare, Inc. is (a) a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343, and (b) a subsidiary of UnitedHealth Group, Inc.

15.    On information and belief, Defendant United HealthCare Insurance Company is (a) a Connecticut corporation with its principal place of business at 450 Columbus Boulevard, Hartford, Connecticut 06103, and (b) a subsidiary of UnitedHealth Group, Inc.

## JURISDICTION AND VENUE

16.    This is an action arising under the patent laws of the United States, 35 U.S.C. sections 101 *et seq.*  This Court has subject matter jurisdiction over this action under 28 U.S.C. sections 1331 and 1338(a).

17.    Defendant Avon Products, Inc. is subject to this Court's personal jurisdiction because, on information and belief, (1) it does substantial business in this district; (2) it operates infringing automated call processing systems that are available to its customers, including customers in this district; and/or (3) it regularly solicits business from, does business with, and derives revenue from goods and services provided to, customers in this district.

18.    Defendants First PREMIER Bank and PREMIER Bankcard, LLC (collectively, the "First Premier Defendants") are subject to this Court's personal jurisdiction because, on information and belief, (1) they do substantial business in this district; (2) they operate infringing automated call processing systems that are available to their customers, including customers in this district; and/or (3) they regularly solicit business from, do business with, and derive revenue from goods and services provided to, customers in this district.

19.    Defendant Navy Federal Credit Union is subject to this Court's personal jurisdiction because, on information and belief, (1) it does substantial business in this

COMPLAINT FOR PATENT INFRINGEMENT

Heller
Ehrman LLP

district; (2) it operates infringing automated call processing systems that are available to its customers, including customers in this district; and/or (3) it regularly solicits business from, does business with, and derives revenue from goods and services provided to, customers in this district.

20.   Defendants Sempra Energy, San Diego Gas & Electric Company, Southern California Gas Company (collectively, the "Sempra Defendants") are subject to this Court's personal jurisdiction because, on information and belief, (1) they do substantial business in this district; (2) they operate infringing automated call processing systems that are available to their customers, including customers in this district; and/or (3) they regularly solicit business from, do business with, and derive revenue from goods and services provided to, customers in this district.

21.   Defendants UnitedHealth Group, Inc., PacifiCare Health Systems, LLC, PacifiCare of California, RxSolutions, Inc. d/b/a Prescription Soutions, United HealthCare Services, Inc., United HealthCare, Inc., and United HealthCare Insurance Company (collectively, the "United Health Defendants") are subject to this Court's personal jurisdiction because, on information and belief, (1) they do substantial business in this district; (2) they operate infringing automated call processing systems that are available to their customers, including customers in this district; and/or (3) they regularly solicit business from, do business with, and derive revenue from goods and services provided to, customers in this district.

22.   Venue is proper in this judicial district under 28 U.S.C. sections 1391(c) and 1400(b) because the Defendants are incorporated, reside, have designated a registered agent in, and/or engage in significant business activities in this district as set forth in Paragraphs 17-21 above.

## BACKGROUND

23.   Ronald A. Katz ("Mr. Katz"), founder of Katz Technology Licensing, is the sole inventor of each of the patents-in-suit.  Mr. Katz has been widely recognized

Heller
Ehrman LLP

as one of the most prolific and successful inventors of our time, and his inventions over the last forty-plus years have been utilized by literally millions of people.

24.    In 1961, Mr. Katz co-founded Telecredit Inc. ("Telecredit"), the first company to provide online, real-time credit authorization, allowing merchants to verify checks over the telephone.  Further innovations from Telecredit include the first online, real-time, point-of-sale credit verification terminal, which enabled merchants to verify checks without requiring the assistance of a live operator, and the first device that used and updated magnetically-encoded cards in automated teller machines.  Multiple patents issued from these innovations, including patents co-invented by Mr. Katz.

25.    Telecredit was eventually acquired by Equifax, and has now been spun off as Certegy, a public company traded on the New York Stock Exchange.  Certegy continues to provide services in the credit and check verification field established by Mr. Katz and Telecredit.

26.    Mr. Katz's inventions have not been limited to telephonic check verification.  Indeed, Mr. Katz is responsible for advancements in many fields of technology.  Among his most prominent and well-known innovations are those in the field of interactive call processing.  Mr. Katz's inventions in that field are directed to the integration of telephonic systems with computer databases and live operator call centers to provide interactive call processing services.

27.    The first of Mr. Katz's interactive call processing patents issued on December 20, 1988.  More than fifty U.S. patents have issued to Mr. Katz for his inventions in the interactive call-processing field, including each of the patents-in-suit.

28.    In 1988, Mr. Katz partnered with American Express to establish FDR Interactive Technologies, later renamed Call Interactive, to provide interactive call processing services based on Mr. Katz's inventions.  The American Express business unit involved in this joint venture later became known as First Data.

Heller
Ehrman LLP

COMPLAINT FOR PATENT INFRINGEMENT

29.     Early clients of Call Interactive included *The New York Times*, ABC's *Monday Night Football*, KABC Radio, CBS News, and Beatrice Foods (Hunt-Wesson division).

30.     Many of these clients utilized Call Interactive technology for high-profile events. For example, CBS News hired Call Interactive to operate an interactive, real-time telephone poll to gauge viewer reaction to President George H.W. Bush's 1992 State of the Union address.

31.     Mr. Katz sold his interest in Call Interactive to American Express in 1989 but continued to provide advisory services to Call Interactive until 1992. American Express later spun off the First Data business unit into a separate corporation, and with that new entity went Mr. Katz's interactive call processing patents and the Call Interactive call processing business. The former Call Interactive, now known as First Data Voice Services, continues to provide call processing solutions today.

32.     In 1994, Mr. Katz formed Katz Technology Licensing, which acquired the rights to the entire interactive call processing patent portfolio, including the rights to each of the patents-in-suit, from First Data, the owner of all of the Katz interactive call processing patents at that time.

33.     The marketplace has clearly recognized the value of Mr. Katz's inventions. Indeed, over one hundred fifty companies have licensed the patents-in-suit. Licensees include IBM, Hewlett-Packard, Bank of America, JPMorgan Chase, Wells Fargo, HSBC, Verizon, Sprint, Microsoft, Delta Airlines, Merck, Sears, Citibank, and the Home Shopping Network. These licensees and others acknowledge the applicability of the patents-in-suit to multiple fields of use, including but not limited to financial services call processing, automated securities transactions, automated credit card authorization services, automated wireless telecommunication services and support, automated health care services, and product and service support.

Heller
Ehrman LLP

6

**COMPLAINT FOR PATENT INFRINGEMENT**

34.    Each of the defendants employs the inventions of certain of the patents-in-suit.  Katz Technology Licensing, through its licensing arm A2D, L.P., has repeatedly attempted to engage each defendant in licensing negotiations, but to date, none of the defendants has agreed to take a license to any of the patents-in-suit.

### THE ASSERTED PATENTS

35.    On December 20, 1988, the United States Patent and Trademark Office duly and legally issued United States Patent No. 4,792,968 (the "'968 Patent") to Ronald A. Katz for an invention entitled "Statistical Analysis System for Use With Public Communication Facility."  The '968 Patent expired on December 20, 2005.

36.    On May 29, 1990, the United States Patent and Trademark Office duly and legally issued United States Patent No. 4,930,150 (the "'150 Patent") to Ronald A. Katz for an invention entitled "Telephonic Interface Control System." The '150 Patent expired on December 20, 2005.

37.    On July 7, 1992, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,128,984 (the "'984 Patent") to Ronald A. Katz for an invention entitled "Telephone Interface Call Processing System With Call Selectivity."

38.    On October 5, 1993, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,251,252 (the "'252 Patent") to Ronald A. Katz for an invention entitled "Telephone Interface Call Processing System With Call Selectivity."

39.    On October 19, 1993, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,255,309 (the "'309 Patent") to Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis System."  The '309 Patent expired on December 20, 2005.

40.    On September 27, 1994, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,351,285 (the "'285 Patent") to

Heller
Ehrman LLP

7

COMPLAINT FOR PATENT INFRINGEMENT

1  Ronald A. Katz for an invention entitled "Multiple Format Telephonic Interface

2  Control System." The '285 Patent expired on December 20, 2005.

3      41.   On October 1, 1996, the United States Patent and Trademark Office duly

4  and legally issued United States Patent No. 5,561,707 (the "'707 Patent") to Ronald

5  A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis System."

6  The '707 Patent expired on December 20, 2005.

7      42.   On November 4, 1997, the United States Patent and Trademark Office

8  duly and legally issued United States Patent No. 5,684,863 (the "'863 Patent") to

9  Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis

10  System." The '863 Patent expired on December 20, 2005.

11      43.   On July 28, 1998, the United States Patent and Trademark Office duly

12  and legally issued United States Patent No. 5,787,156 (the "'156 Patent") to Ronald

13  A. Katz for an invention entitled "Telephonic-Interface Lottery System." The '156

14  Patent expired on December 20, 2005.

15      44.   On September 29, 1998, the United States Patent and Trademark Office

16  duly and legally issued United States Patent No. 5,815,551 (the "'551 Patent") to

17  Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis

18  System." The '551 Patent expired on December 20, 2005.

19      45.   On October 27, 1998, the United States Patent and Trademark Office

20  duly and legally issued United States Patent No. 5,828,734 (the "'734 Patent") to

21  Ronald A. Katz for an invention entitled "Telephone Interface Call Processing

22  System With Call Selectivity."

23      46.   On November 10, 1998, the United States Patent and Trademark Office

24  duly and legally issued United States Patent No. 5,835,576 (the "'576 Patent") to

25  Ronald A. Katz for an invention entitled "Telephonic-Interface Lottery Device." The

26  '576 Patent expired on July 10, 2005.

27      47.   On April 27, 1999, the United States Patent and Trademark Office duly

28  and legally issued United States Patent No. 5,898,762 (the "'762 Patent") to

eller
rman LLP

8

**COMPLAINT FOR PATENT INFRINGEMENT**

1  Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis
2  System." The '762 Patent expired on December 20, 2005.
3       48.    On June 29, 1999, the United States Patent and Trademark Office duly
4  and legally issued United States Patent No. 5,917,893 (the "'893 Patent") to
5  Ronald A. Katz for an invention entitled "Multiple Format Telephonic Interface
6  Control System." The '893 Patent expired on December 20, 2005.
7       49.    On October 26, 1999, the United States Patent and Trademark Office
8  duly and legally issued United States Patent No. 5,974,120 (the "'120 Patent") to
9  Ronald A. Katz for an invention entitled "Telephone Interface Call Processing
10  System With Call Selectivity."
11      50.    On March 7, 2000, the United States Patent and Trademark Office duly
12  and legally issued United States Patent No. 6,035,021 (the "'021 Patent") to Ronald
13  A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis System."
14  The '021 Patent expired on December 20, 2005.
15      51.    On March 28, 2000, the United States Patent and Trademark Office duly
16  and legally issued United States Patent No. 6,044,135 (the "'135 Patent") to Ronald
17  A. Katz for an invention entitled "Telephone-Interface Lottery System." The '135
18  Patent expired on July 10, 2005.
19      52.    On November 14, 2000, the United States Patent and Trademark Office
20  duly and legally issued United States Patent No. 6,148,065 (the "'065 Patent") to
21  Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis
22  System." The '065 Patent expired on July 10, 2005.
23      53.    On January 1, 2002, the United States Patent and Trademark Office duly
24  and legally issued United States Patent No. 6,335,965 (the "'965 Patent") to
25  Ronald A. Katz for an invention entitled "Voice-Data Telephonic Interface Control
26  System." The '965 Patent expired on December 20, 2005.
27      54.    On February 19, 2002, the United States Patent and Trademark Office
28  duly and legally issued United States Patent No. 6,349,134 (the "'134 Patent") to

Heller
Ehrman LLP

9

**COMPLAINT FOR PATENT INFRINGEMENT**

139

Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis System." The '134 Patent expired on December 20, 2005.

55.    On July 23, 2002, the United States Patent and Trademark Office duly and legally issued United States Patent No. 6,424,703 (the "'703 Patent") to Ronald A. Katz for an invention entitled "Telephonic-Interface Lottery System." The '703 Patent expired on July 10, 2005.

56.    On August 13, 2002, the United States Patent and Trademark Office duly and legally issued United States Patent No. 6,434,223 (the "'223 Patent") to Ronald A. Katz for an invention entitled "Telephone Interface Call Processing System With Call Selectivity." The '223 Patent expired on July 10, 2005.

57.    On January 28, 2003, the United States Patent and Trademark Office duly and legally issued United States Patent No. 6,512,415 (the "'415 Patent") to Ronald A. Katz for an invention entitled "Telephonic-Interface Game Control System." The '415 Patent expired on July 10, 2005.

58.    On January 13, 2004, the United States Patent and Trademark Office duly and legally issued United States Patent No. 6,678,360 (the "'360 Patent") to Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis System." The '360 Patent expired on July 10, 2005.

## FIRST CLAIM
### (Patent Infringement by Avon Products, Inc.)

59.    Katz Technology Licensing realleges and incorporates by reference Paragraphs 1-58 of this Complaint as if fully set forth herein.

60.    Avon Products, Inc. sells cosmetics, jewelry, clothing and gift items throughout the United States.

61.    On information and belief, Avon Products, Inc. uses infringing call processing systems to offer automated customer service to its customers. Using an automated system, in some instances in connection with operators, Avon Products,

Heller
Ehrman LLP

10

140

Inc. allows its customers to place an order, check account balance, check order status, make a payment, and perform various other functions.

62.    Katz Technology Licensing is the sole holder of the entire right, title, and interest in the '065, '120, '150, '223, '252, '285, '360, '551, '734, '762, '863, '893, '965, '968 and '984 Patents.

63.    On information and belief, in its automated operations described in Paragraph 61 (the "Accused Avon Services"), Avon Products, Inc. has been and is now infringing, actively inducing the infringement of, or contributing to the infringement of one or more claims of the patents identified in Paragraph 62 of this Complaint by making, using, offering to sell, or selling the Accused Avon Services.

64.    On information and belief, Avon Products, Inc. continues to infringe, actively induce the infringement of, and contribute to the infringement of one or more claims of the '120, '252, '734 and '984 Patents by making, using, offering to sell, or selling the Accused Avon Services.

65.    Avon Products, Inc.'s infringement of the patents identified in Paragraph 62 of this Complaint has been and is willful.

66.    Avon Products, Inc.'s infringement has caused and will continue to cause Katz Technology Licensing irreparable harm unless enjoined by this Court. Katz Technology Licensing has no adequate remedy at law.

## SECOND CLAIM
### (Patent Infringement By The First Premier Defendants)

67.    Katz Technology Licensing realleges and incorporates by reference Paragraphs 1-58 of this Complaint as if fully set forth herein.

68.    The First Premier Defendants provide banking and credit card services to customers throughout the United States.

69.    On information and belief, the First Premier Defendants use infringing call processing systems to offer automated banking and other financial services to their customers. Using an automated system, in some instances in connection with

Heller
Ehrman LLP

11

141

operators, the First Premier Defendants allow their customers to access information about their accounts, transfer funds between accounts, activate check cards, check the status of a credit card application, report a lost or stolen credit card, and perform various other functions.

70. Katz Technology Licensing is the sole holder of the entire right, title, and interest in the '065, '120, '135, '150, '156, '223, '285, '360, '551, '576, '707, '734, '762, '863, '893, '965, '968 and '984 Patents.

71. On information and belief, in their automated customer service operations described in Paragraph 69 (collectively, the "Accused First Premier Services"), the First Premier Defendants have been and are now infringing, actively inducing the infringement of, or contributing to the infringement of one or more claims of the patents identified in Paragraph 70 of this Complaint by making, using, offering to sell, or selling the Accused First Premier Services.

72. On information and belief, the First Premier Defendants continue to infringe, actively induce the infringement of, and contribute to the infringement of one or more claims of the '120, '734 and '984 Patents by making, using, offering to sell, or selling the Accused First Premier Services.

73. The First Premier Defendants' infringement of the patents identified in Paragraph 70 of this Complaint has been and is willful.

74. The First Premier Defendants' infringement has caused and will continue to cause Katz Technology Licensing irreparable harm unless enjoined by this Court. Katz Technology Licensing has no adequate remedy at law.

### THIRD CLAIM
**(Patent Infringement By Navy Federal Credit Union)**

75. Katz Technology Licensing realleges and incorporates by reference Paragraphs 1-58 of this Complaint as if fully set forth herein.

76. Navy Federal Credit Union offers banking and other financial services throughout the United States.

Heller
Ehrman LLP

12

COMPLAINT FOR PATENT INFRINGEMENT

77.   On information and belief, Navy Federal Credit Union uses infringing call processing systems to offer automated banking and investment services to its customers.  Using an automated system, in some instances in connection with operators, Navy Federal Credit Union allows its members to access information about their accounts, transfer funds between accounts, issue stop payments on checks, request copies of paid checks, make payments on their credit card accounts, and perform various other functions.

78.   Katz Technology Licensing is the sole holder of the entire right, title, and interest in the '065, '120, '134, '150, '223, '252, '285, '360, '551, '734, '762, '863, '893, '965, '968 and '984 Patents.

79.   On information and belief, in its automated operations described in Paragraph 77 (the "Accused Navy Federal Credit Union Services"), Navy Federal Credit Union has been and is now infringing, actively inducing the infringement of, or contributing to the infringement of one or more claims of the patents identified in Paragraph 78 of this Complaint by making, using, offering to sell, or selling the Accused Navy Federal Credit Union Services.

80.   On information and belief, Navy Federal Credit Union continues to infringe, actively induce the infringement of, and contribute to the infringement of one or more claims of the '120, '252, '734 and '984 Patents by making, using, offering to sell, or selling the Accused Navy Federal Credit Union Services.

81.   Navy Federal Credit Union's infringement of the patents identified in Paragraph 78 of this Complaint has been and is willful.

82.   Navy Federal Credit Union's infringement has caused and will continue to cause Katz Technology Licensing irreparable harm unless enjoined by this Court. Katz Technology Licensing has no adequate remedy at law.

Heller
Ehrman LLP

13

143

## FOURTH CLAIM
### (Patent Infringement By The Sempra Defendants)

83.    Katz Technology Licensing realleges and incorporates by reference Paragraphs 1-58 of this Complaint as if fully set forth herein.

84.    The Sempra Defendants, among other things, provide gas and electricity to customers in southern and central California.

85.    On information and belief, the Sempra Defendants use infringing call processing systems to offer automated customer service to their customers.  Using an automated system, in some instances in connection with operators, the Sempra Defendants allow their customers to access account information; sign up for new service; transfer service; make a payment or a payment arrangement; schedule a service request; request a duplicate bill, a twelve-month usage report, or a letter of credit; enter a meter read; report a gas leak, power outage or emergency; and perform various other functions.

86.    Katz Technology Licensing is the sole holder of the entire right, title, and interest in the '065, '120, '134, '135, '150, '156, '223, '252, '285, '309, '360, '415, '551, '703, '707, '734, '863, '893, '965, '968 and '984 Patents.

87.    On information and belief, in their automated customer service operations described in Paragraph 85 (collectively, the "Accused Sempra Services"), the Sempra Defendants have been and are now infringing, actively inducing the infringement of, or contributing to the infringement of one or more claims of the patents identified in Paragraph 86 of this Complaint by making, using, offering to sell, or selling the Accused Sempra Services.

88.    On information and belief, the Sempra Defendants continue to infringe, actively induce the infringement of, and contribute to the infringement of one or more claims of the '120, '252, '734 and '984 Patents by making, using, offering to sell, or selling the Accused Sempra Services.

Heller
Ehrman LLP

14
**COMPLAINT FOR PATENT INFRINGEMENT**

89.    The Sempra Defendants' infringement of the patents identified in Paragraph 86 of this Complaint has been and is willful.

90.    The Sempra Defendants' infringement has caused and will continue to cause Katz Technology Licensing irreparable harm unless enjoined by this Court. Katz Technology Licensing has no adequate remedy at law.

## FIFTH CLAIM
### (Patent Infringement by the United Health Defendants)

91.    Katz Technology Licensing realleges and incorporates by reference Paragraphs 1-58 of this Complaint as if fully set forth herein.

92.    The United Health Defendants offer health insurance and prescription medication services to customers throughout the United States.

93.    On information and belief, the United Health Defendants use infringing call processing systems to offer automated customer service and pharmacy services to their customers. Using automated systems, in some instances in connection with operators, the United Health Defendants allow their customers to access information about their policies, make credit card payments, order new identification cards, locate healthcare providers, order pharmacy products, and perform various other functions.

94.    Katz Technology Licensing is the sole holder of the entire right, title, and interest in the '021, '065, '120, '134, '135, '150, '156, '223, '252, '285, '309, '360, '551, '703, '707, '734, '762, '863, '893, '965, '968 and '984 Patents.

95.    On information and belief, in their automated customer service operations described in Paragraph 93 (collectively, the "Accused United Health Services"), the United Health Defendants have been and are now infringing, actively inducing the infringement of, or contributing to the infringement of one or more claims of the patents identified in Paragraph 94 of this Complaint by making, using, offering to sell, or selling the Accused United Health Services.

96.    On information and belief, the United Health Defendants continue to infringe, actively induce the infringement of, and contribute to the infringement of

Heller
Ehrman LLP

15
COMPLAINT FOR PATENT INFRINGEMENT

1    one or more claims of the '120, '252, '734 and '984 Patents by making, using,
2    offering to sell, or selling the Accused United Health Services.
3         97.' The United Health Defendants' infringement of the patents identified in
4    Paragraph 94 of this Complaint has been and is willful.
5         98. The United Health Defendants' infringement has caused and will
6    continue to cause Katz Technology Licensing irreparable harm unless enjoined by
7    this Court. Katz Technology Licensing has no adequate remedy at law.

**PRAYER FOR RELIEF**

9         WHEREFORE, Ronald A. Katz Technology Licensing, L.P., respectfully
10   requests that this Court enter judgment in its favor and against the defendants and
11   grant the following relief:
12        99. Adjudge that Avon Products, Inc. has been and is infringing one or more
13   claims of the patents identified in Paragraph 62 of this Complaint by offering the
14   Accused Avon Services;
15        100. Adjudge that Avon Products, Inc.'s infringement has been and is willful;
16        101. Enter an order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily,
17   and permanently enjoining Avon Products, Inc., and all persons in active concert or
18   participation with it, from any further acts of infringement, contributory
19   infringement, or inducement of infringement of the '120, '252, '734, and '984
20   Patents;
21        102. Order an accounting for damages resulting from Avon Products, Inc.'s
22   infringement of the patents identified in Paragraph 62 of this Complaint.
23        103. Enter an order, pursuant to 35 U.S.C. § 284, awarding to Katz
24   Technology Licensing damages adequate to compensate Katz Technology Licensing
25   for Avon Products, Inc.'s infringement, but in no event less than a reasonable royalty,
26   together with pre-judgment and post-judgment interest;
27
28

Heller
Ehrman LLP

16
**COMPLAINT FOR PATENT INFRINGEMENT**

104. Enter an order, pursuant to 35 U.S.C. § 284, and based on Avon Products, Inc.'s willful infringement, trebling all damages awarded to Katz Technology Licensing and against Avon Products, Inc.;

105. Adjudge that the First Premier Defendants have been and are infringing one or more claims of the patents identified in Paragraph 70 of this Complaint by offering the Accused First Premier Services;

106. Adjudge that the First Premier Defendants' infringement has been and is willful;

107. Enter an order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily, and permanently enjoining the First Premier Defendants, and all persons in active concert or participation with them, from any further acts of infringement, contributory infringement, or inducement of infringement of the '120, '734, and '984 Patents;

108. Order an accounting for damages resulting from the First Premier Defendants' infringement of the patents identified in Paragraph 70 of this Complaint;

109. Enter an order, pursuant to 35 U.S.C. § 284, awarding to Katz Technology Licensing damages adequate to compensate Katz Technology Licensing for the First Premier Defendants' infringement, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest;

110. Enter an order, pursuant to 35 U.S.C. § 284, and based on the First Premier Defendants' willful infringement, trebling all damages awarded to Katz Technology Licensing and against the First Premier Defendants;

111. Adjudge that Navy Federal Credit Union has been and is infringing one or more claims of the patents identified in Paragraph 78 of this Complaint by offering the Accused Navy Federal Credit Union Services;

112. Adjudge that Navy Federal Credit Union's infringement has been and is willful;

Heller
Ehrman LLP

COMPLAINT FOR PATENT INFRINGEMENT

1    113.   Enter an order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily,
2    and permanently enjoining Navy Federal Credit Union, and all persons in active
3    concert or participation with it, from any further acts of infringement, contributory
4    infringement, or inducement of infringement of the '120, '252, '734, and '984
5    Patents;

6    114.   Order an accounting for damages resulting from Navy Federal Credit
7    Union's infringement of the patents identified in Paragraph 78 of this Complaint.

8    115.   Enter an order, pursuant to 35 U.S.C. § 284, awarding to Katz
9    Technology Licensing damages adequate to compensate Katz Technology Licensing
10   for Navy Federal Credit Union's infringement, but in no event less than a reasonable
11   royalty, together with pre-judgment and post-judgment interest;

12   116.   Enter an order, pursuant to 35 U.S.C. § 284, and based on Navy Federal
13   Credit Union's willful infringement, trebling all damages awarded to Katz
14   Technology Licensing and against Navy Federal Credit Union;

15   117.   Adjudge that the Sempra Defendants have been and are infringing one
16   or more claims of the patents identified in Paragraph 86 of this Complaint by offering
17   the Accused Sempra Services;

18   118.   Adjudge that the Sempra Defendants' infringement has been and is
19   willful;

20   119.   Enter an order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily,
21   and permanently enjoining the Sempra Defendants, and all persons in active concert
22   or participation with them, from any further acts of infringement, contributory
23   infringement, or inducement of infringement of the '120, '252, '734 and '984
24   Patents;

25   120.   Order an accounting for damages resulting from the Sempra Defendants'
26   infringement of the patents identified in Paragraph  86 of this Complaint;

27   121.   Enter an order, pursuant to 35 U.S.C. § 284, awarding to Katz
28   Technology Licensing damages adequate to compensate Katz Technology Licensing

Heller
Ehrman LLP

18

**COMPLAINT FOR PATENT INFRINGEMENT**

for the Sempra Defendants' infringement, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest;

122.   Enter an order, pursuant to 35 U.S.C. § 284, and based on the Sempra Defendants' willful infringement, trebling all damages awarded to Katz Technology Licensing and against the Sempra Defendants;

123.   Adjudge that the United Health Defendants have been and are infringing one or more claims of the patents identified in Paragraph 94 of this Complaint by offering the Accused United Health Services;

124.   Adjudge that the United Health Defendants' infringement has been and is willful;

125.   Enter an order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily, and permanently enjoining the United Health Defendants, and all persons in active concert or participation with them, from any further acts of infringement, contributory infringement, or inducement of infringement of the '120, '252, '734 and '984 Patents;

126.   Order an accounting for damages resulting from the United Health Defendants' infringement of the patents identified in Paragraph 94 of this Complaint;

127.   Enter an order, pursuant to 35 U.S.C. § 284, awarding to Katz Technology Licensing damages adequate to compensate Katz Technology Licensing for the United Health Defendants' infringement, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest;

128.   Enter an order, pursuant to 35 U.S.C. § 284, and based on the United Health Defendants' willful infringement, trebling all damages awarded to Katz Technology Licensing and against the United Health Defendants;

129.   Enter an order, pursuant to 35 U.S.C. § 285, finding that this is an exceptional case and awarding to Katz Technology Licensing its reasonable attorneys' fees incurred in this action; and

Heller
Ehrman LLP

19
COMPLAINT FOR PATENT INFRINGEMENT

149

130.    Award such other relief as the Court may deem appropriate and just under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims that are triable by jury.

DATED: June 6, 2007                    HELLER EHRMAN LLP


By _Robert T. Haslam_____
Robert T. Haslam
Attorneys for Plaintiff RONALD A. KATZ
TECHNOLOGY LICENSING, L.P.

20

**COMPLAINT FOR PATENT INFRINGEMENT**



**U.S. Postal Service**
**CERTIFIED MAIL... RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

# OFFICIAL USE

| | |
|---|---|
| Postage | $ 1.48 |
| Certified Fee | 2.65 |
| Return Reciept Fee (Endorsement Required) | 2.15 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 6.28 |

7004 1350 0001 7577 4816

Sent To Contract Administration Syntellect, Inc.

Street, Apt. No.; or PO Box No. 16610 N. Black Canyon Hwy., Suite 100

City, State, ZIP+4 Phoenix, AZ 85053

PS Form 3800, June 2002

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Contract Administration
Syntellect, Inc.
16610 N. Black Canyon Hwy.
Suite 100
Phoenix, AZ 85053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)  C. Date of Delivery
Yesenia Verdugo  8/27/07

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)    7004 1350 0001 7577 4816

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**EXHIBIT 4**

151



# WILLENKEN
WILLENKEN WILSON LOH & LIEB LLP

August 21, 2007

<u>VIA FACSIMILE (602) 789-2899</u>
<u>AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>

Contract Administration
Syntellect, Inc.
16610 N. Black Canyon Hwy., Suite 100
Phoenix, AZ 85053

Re:    <u>Indemnity Provision in Hardware/Software System Agreement</u>

Dear Sir or Madam:

This office represents Southern California Gas Company ("SoCalGas"). SoCalGas and Syntellect, Inc. ("Syntellect") are parties to a Hardware/Software System Agreement ("Agreement") dated June 19, 2001. Pursuant to this Agreement, Syntellect designed, developed, manufactured, sold, delivered, installed and warranted a Vista Interactive Voice Response System. <u>See</u> Agreement Article 1.

It is our understanding that, in 2003, SoCalGas informed you of certain patent infringement claims with respect to which Ronald A. Katz Technology Licensing, L.P. ("RAKTL") and SoCalGas were engaged in licensing discussions related to this Interactive Voice Response ("IVR") System.

On June 6, 2007, RAKTL filed a lawsuit in which, <u>inter alia</u>, it has asserted various patent infringement claims against SoCalGas. The complaint filed by RAKTL is attached for your convenience. It is our understanding that RAKTL will also seek leave to file a First Amended Complaint adding another patent.

Pursuant to the Agreement, Syntellect must indemnify, defend and hold SoCalGas harmless for the claims asserted by RAKTL. <u>See, e.g.,</u> Agreement Section 20.2. Syntellect's obligation is not limited in any way by any limitation on the amount or type of damages, compensation or benefits payable. Agreement Section 20.4

Please accept this letter as SoCalGas' notice of the lawsuit filed in connection with the claims described above. Also, please confirm in writing that Syntellect will provide indemnification, as set forth in Article 20. For its part, SoCalGas has retained counsel to represent its interest in the litigation but also intends to cooperate with Syntellect, to the

 WILLENKEN WILS    LOH & LIEB LLP

Syntellect
August 21, 2007
P. -2-

extent necessary to resolve this matter.  Please contact us to discuss this manner and the best method for moving forward.

This letter is not intended to limit SoCalGas' contractual, legal, or equitable rights with respect to Syntellect's indemnity obligations.

I would appreciate it if you would contact me at your earliest convenience so that we may discuss the litigation and how best to coordinate our respective obligations under the Agreement.

Very truly yours,

Jason H. Wilson

Enclosure

 WILLENKEN WILS   LOH & LIEB LLP

Syntellect
August 21, 2007
P. -3-

bcc:   Robert Borthwick, Esq.
        Gary A. Perlmutter, Esq.
        Kimberly McDonnell, Esq.

ROBERT T. HASLAM (Bar No. 71134)
Robert.Haslam@hellerehrman.com
ANDREW C. BYRNES (Bar No. 191516)
Andrew.Byrnes@hellerehrman.com
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA  94025-3506
Telephone: 650.324.7000
Facsimile:  650.324.0638

MICHAEL K. PLIMACK (Bar No. 133869)
Michael.Plimack@hellerehrman.com
DALE A. RICE (Bar No. 146249)
Dale.Rice@hellerehrman.com
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone: 415.772.6000
Facsimile:  415.772.6268

Attorneys for Plaintiff
RONALD A. KATZ TECHNOLOGY LICENSING, L.P.

FILED

2007 JUN -6  PH 3: 44

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RONALD A. KATZ TECHNOLOGY
LICENSING, L.P.,

                              Plaintiff,

        v.

AVON PRODUCTS, INC.; FIRST
PREMIER BANK; PREMIER
BANKCARD, LLC; NAVY FEDERAL
CREDIT UNION; SEMPRA ENERGY;
SAN DIEGO GAS & ELECTRIC
COMPANY; SOUTHERN
CALIFORNIA GAS COMPANY;
UNITEDHEALTH GROUP, INC.;
PACIFICARE HEALTH SYSTEMS,
LLC; PACIFICARE OF
CALIFORNIA; RXSOLUTIONS, INC.
D/B/A PRESCRIPTION SOLUTIONS;
UNITED HEALTHCARE SERVICES,

Case No.  CV 07 3672 CAF

(CTx)

COMPLAINT FOR PATENT
INFRINGEMENT

DEMAND FOR JURY TRIAL

Heller
Ehrman LLP

COMPLAINT FOR PATENT INFRINGEMENT

155

1     INC.; UNITED HEALTHCARE, INC.;   )
2     UNITED HEALTHCARE                 )
      INSURANCE COMPANY,            )
3                                   )
                  Defendants.    )
4                                   )

5       Plaintiff Ronald A. Katz Technology Licensing, L.P. ("Katz Technology

6 Licensing") hereby complains against Avon Products, Inc., First PREMIER Bank,

7 PREMIER Bankcard, LLC, Navy Federal Credit Union, Sempra Energy, San Diego

8 Gas & Electric Company, Southern California Gas Company, UnitedHealth Group,

9 Inc., PacifiCare Health Systems, LLC, PacifiCare of California, RxSolutions, Inc.

10 d/b/a Prescription Solutions, United HealthCare Services, Inc., United HealthCare,

11 Inc., and United HealthCare Insurance Company. This Court has subject matter

12 jurisdiction over this action under 28 U.S.C. sections 1331 and 1338(a).

13                             **THE PARTIES**

14      1.     Plaintiff Katz Technology Licensing is a California limited partnership

15 with its principal place of business at 9220 Sunset Boulevard, Suite 315,

16 Los Angeles, California 90069.

17      2.     On information and belief, Defendant Avon Products, Inc. is a New

18 York corporation with its principal place of business at 1325 Avenue of the

19 Americas, New York, New York 10105.

20      3.     On information and belief, Defendant First PREMIER Bank is a South

21 Dakota corporation with its principal place of business at 601 South Minnesota

22 Avenue, Sioux Falls, South Dakota 57104.

23      4.     On information and belief, Defendant PREMIER Bankcard, LLC is a

24 South Dakota corporation with its principal place of business at 900 West Delaware

25 Street, Sioux Falls, South Dakota 57104.

26

27

28

Heller
Ehrman LLP

5.    On information and belief, Defendant Navy Federal Credit Union is a federal credit union with its principal place of business at 820 Follin Lane, Vienna, Virginia 22180.

6.    On information and belief, Defendant Sempra Energy is a California corporation with its principal place of business at 101 Ash Street, San Diego, California 92101.

7.    On information and belief, Defendant San Diego Gas & Electric Company is (a) a California corporation with its principal place of business at 8326 Century Park Court, San Diego, California 92123, and (b) a subsidiary of Sempra Energy.

8.    On information and belief, Defendant Southern California Gas Company is (a) a California corporation with its principal place of business at 555 West Fifth Street, Los Angeles, California 90013, and (b) a subsidiary of Sempra Energy.

9.    On information and belief, Defendant UnitedHealth Group, Inc. is a Minnesota corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.

10.    On information and belief, Defendant PacifiCare Health Systems, LLC is (a) a Delaware corporation with its principal place of business at 5995 Plaza Drive, Cypress, California 90630, and (b) a subsidiary of UnitedHealth Group, Inc.

11.    On information and belief, Defendant PacifiCare of California is (a) a California corporation with its principal place of business at 5995 Plaza Drive, Cypress, California 90630, and (b) a subsidiary of UnitedHealth Group, Inc.

12.    On information and belief, Defendant RxSolutions, Inc. d/b/a Prescription Solutions is (a) a California corporation with its principal place of business at 3515 Harbor Boulevard, Costa Mesa, California 92626, and (b) a subsidiary of UnitedHealth Group, Inc.

13.    On information and belief, Defendant United HealthCare Services, Inc. is (a) a Minnesota corporation with its principal place of business at 9900 Bren Road

Heller
Ehrman LLP

2

**COMPLAINT FOR PATENT INFRINGEMENT**

East, Minnetonka, Minnesota 55343, and (b) a subsidiary of UnitedHealth Group, Inc.

14.    On information and belief, Defendant United HealthCare, Inc. is (a) a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343, and (b) a subsidiary of UnitedHealth Group, Inc.

15.    On information and belief, Defendant United HealthCare Insurance Company is (a) a Connecticut corporation with its principal place of business at 450 Columbus Boulevard, Hartford, Connecticut 06103, and (b) a subsidiary of UnitedHealth Group, Inc.

## JURISDICTION AND VENUE

16.    This is an action arising under the patent laws of the United States, 35 U.S.C. sections 101 *et seq*. This Court has subject matter jurisdiction over this action under 28 U.S.C. sections 1331 and 1338(a).

17.    Defendant Avon Products, Inc. is subject to this Court's personal jurisdiction because, on information and belief, (1) it does substantial business in this district; (2) it operates infringing automated call processing systems that are available to its customers, including customers in this district; and/or (3) it regularly solicits business from, does business with, and derives revenue from goods and services provided to, customers in this district.

18.    Defendants First PREMIER Bank and PREMIER Bankcard, LLC (collectively, the "First Premier Defendants") are subject to this Court's personal jurisdiction because, on information and belief, (1) they do substantial business in this district; (2) they operate infringing automated call processing systems that are available to their customers, including customers in this district; and/or (3) they regularly solicit business from, do business with, and derive revenue from goods and services provided to, customers in this district.

19.    Defendant Navy Federal Credit Union is subject to this Court's personal jurisdiction because, on information and belief, (1) it does substantial business in this

Heller
Ehrman LLP

3

COMPLAINT FOR PATENT INFRINGEMENT

1    district; (2) it operates infringing automated call processing systems that are available

2    to its customers, including customers in this district; and/or (3) it regularly solicits

3    business from, does business with, and derives revenue from goods and services

4    provided to, customers in this district.

5         20.    Defendants Sempra Energy, San Diego Gas & Electric Company,

6    Southern California Gas Company (collectively, the "Sempra Defendants") are

7    subject to this Court's personal jurisdiction because, on information and belief, (1)

8    they do substantial business in this district; (2) they operate infringing automated call

9    processing systems that are available to their customers, including customers in this

10   district; and/or (3) they regularly solicit business from, do business with, and derive

11   revenue from goods and services provided to, customers in this district.

12        21.    Defendants UnitedHealth Group, Inc., PacifiCare Health Systems, LLC,

13   PacifiCare of California, RxSolutions, Inc. d/b/a Prescription Soutions, United

14   HealthCare Services, Inc., United HealthCare, Inc., and United HealthCare Insurance

15   Company (collectively, the "United Health Defendants") are subject to this Court's

16   personal jurisdiction because, on information and belief, (1) they do substantial

17   business in this district; (2) they operate infringing automated call processing systems

18   that are available to their customers, including customers in this district; and/or (3)

19   they regularly solicit business from, do business with, and derive revenue from goods

20   and services provided to, customers in this district.

21        22.    Venue is proper in this judicial district under 28 U.S.C. sections 1391(c)

22   and 1400(b) because the Defendants are incorporated, reside, have designated a

23   registered agent in, and/or engage in significant business activities in this district as

24   set forth in Paragraphs 17-21 above.

25                              **BACKGROUND**

26        23.    Ronald A. Katz ("Mr. Katz"), founder of Katz Technology Licensing, is

27   the sole inventor of each of the patents-in-suit. Mr. Katz has been widely recognized

28

Heller
Ehrman LLP

**COMPLAINT FOR PATENT INFRINGEMENT**

1    as one of the most prolific and successful inventors of our time, and his inventions

2    over the last forty-plus years have been utilized by literally millions of people.

3        24.    In 1961, Mr. Katz co-founded Telecredit Inc. ("Telecredit"), the first

4    company to provide online, real-time credit authorization, allowing merchants to

5    verify checks over the telephone. Further innovations from Telecredit include the

6    first online, real-time, point-of-sale credit verification terminal, which enabled

7    merchants to verify checks without requiring the assistance of a live operator, and the

8    first device that used and updated magnetically-encoded cards in automated teller

9    machines. Multiple patents issued from these innovations, including patents co-

10   invented by Mr. Katz.

11       25.    Telecredit was eventually acquired by Equifax, and has now been spun

12   off as Certegy, a public company traded on the New York Stock Exchange. Certegy

13   continues to provide services in the credit and check verification field established by

14   Mr. Katz and Telecredit.

15       26.    Mr. Katz's inventions have not been limited to telephonic check

16   verification. Indeed, Mr. Katz is responsible for advancements in many fields of

17   technology. Among his most prominent and well-known innovations are those in the

18   field of interactive call processing. Mr. Katz's inventions in that field are directed to

19   the integration of telephonic systems with computer databases and live operator call

20   centers to provide interactive call processing services.

21       27.    The first of Mr. Katz's interactive call processing patents issued on

22   December 20, 1988. More than fifty U.S. patents have issued to Mr. Katz for his

23   inventions in the interactive call-processing field, including each of the patents-in-

24   suit.

25       28.    In 1988, Mr. Katz partnered with American Express to establish FDR

26   Interactive Technologies, later renamed Call Interactive, to provide interactive call

27   processing services based on Mr. Katz's inventions. The American Express business

28   unit involved in this joint venture later became known as First Data.

Heller
Ehrman LLP

5

**COMPLAINT FOR PATENT INFRINGEMENT**

29.   Early clients of Call Interactive included *The New York Times*, ABC's *Monday Night Football*, KABC Radio, CBS News, and Beatrice Foods (Hunt-Wesson division).

30.   Many of these clients utilized Call Interactive technology for high-profile events.  For example, CBS News hired Call Interactive to operate an interactive, real-time telephone poll to gauge viewer reaction to President George H.W. Bush's 1992 State of the Union address.

31.   Mr. Katz sold his interest in Call Interactive to American Express in 1989 but continued to provide advisory services to Call Interactive until 1992. American Express later spun off the First Data business unit into a separate corporation, and with that new entity went Mr. Katz's interactive call processing patents and the Call Interactive call processing business.  The former Call Interactive, now known as First Data Voice Services, continues to provide call processing solutions today.

32.   In 1994, Mr. Katz formed Katz Technology Licensing, which acquired the rights to the entire interactive call processing patent portfolio, including the rights to each of the patents-in-suit, from First Data, the owner of all of the Katz interactive call processing patents at that time.

33.   The marketplace has clearly recognized the value of Mr. Katz's inventions.  Indeed, over one hundred fifty companies have licensed the patents-in-suit.  Licensees include IBM, Hewlett-Packard, Bank of America, JPMorgan Chase, Wells Fargo, HSBC, Verizon, Sprint, Microsoft, Delta Airlines, Merck, Sears, Citibank, and the Home Shopping Network.  These licensees and others acknowledge the applicability of the patents-in-suit to multiple fields of use, including but not limited to financial services call processing, automated securities transactions, automated credit card authorization services, automated wireless telecommunication services and support, automated health care services, and product and service support.

Heller
Ehrman LLP

6

**COMPLAINT FOR PATENT INFRINGEMENT**

34. Each of the defendants employs the inventions of certain of the patents-in-suit. Katz Technology Licensing, through its licensing arm A2D, L.P., has repeatedly attempted to engage each defendant in licensing negotiations, but to date, none of the defendants has agreed to take a license to any of the patents-in-suit.

## THE ASSERTED PATENTS

35. On December 20, 1988, the United States Patent and Trademark Office duly and legally issued United States Patent No. 4,792,968 (the "'968 Patent") to Ronald A. Katz for an invention entitled "Statistical Analysis System for Use With Public Communication Facility." The '968 Patent expired on December 20, 2005.

36. On May 29, 1990, the United States Patent and Trademark Office duly and legally issued United States Patent No. 4,930,150 (the "'150 Patent") to Ronald A. Katz for an invention entitled "Telephonic Interface Control System." The '150 Patent expired on December 20, 2005.

37. On July 7, 1992, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,128,984 (the "'984 Patent") to Ronald A. Katz for an invention entitled "Telephone Interface Call Processing System With Call Selectivity."

38. On October 5, 1993, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,251,252 (the "'252 Patent") to Ronald A. Katz for an invention entitled "Telephone Interface Call Processing System With Call Selectivity."

39. On October 19, 1993, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,255,309 (the "'309 Patent") to Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis System." The '309 Patent expired on December 20, 2005.

40. On September 27, 1994, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,351,285 (the "'285 Patent") to

Heller
Ehrman LLP

7

162

1  Ronald A. Katz for an invention entitled "Multiple Format Telephonic Interface

2  Control System." The '285 Patent expired on December 20, 2005.

3      41.    On October 1, 1996, the United States Patent and Trademark Office duly

4  and legally issued United States Patent No. 5,561,707 (the "'707 Patent") to Ronald

5  A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis System."

6  The '707 Patent expired on December 20, 2005.

7      42.    On November 4, 1997, the United States Patent and Trademark Office

8  duly and legally issued United States Patent No. 5,684,863 (the "'863 Patent") to

9  Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis

10  System." The '863 Patent expired on December 20, 2005.

11      43.    On July 28, 1998, the United States Patent and Trademark Office duly

12  and legally issued United States Patent No. 5,787,156 (the "'156 Patent") to Ronald

13  A. Katz for an invention entitled "Telephonic-Interface Lottery System." The '156

14  Patent expired on December 20, 2005.

15      44.    On September 29, 1998, the United States Patent and Trademark Office

16  duly and legally issued United States Patent No. 5,815,551 (the "'551 Patent") to

17  Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis

18  System." The '551 Patent expired on December 20, 2005.

19      45.    On October 27, 1998, the United States Patent and Trademark Office

20  duly and legally issued United States Patent No. 5,828,734 (the "'734 Patent") to

21  Ronald A. Katz for an invention entitled "Telephone Interface Call Processing

22  System With Call Selectivity."

23      46.    On November 10, 1998, the United States Patent and Trademark Office

24  duly and legally issued United States Patent No. 5,835,576 (the "'576 Patent") to

25  Ronald A. Katz for an invention entitled "Telephonic-Interface Lottery Device." The

26  '576 Patent expired on July 10, 2005.

27      47.    On April 27, 1999, the United States Patent and Trademark Office duly

28  and legally issued United States Patent No. 5,898,762 (the "'762 Patent") to

eller
irman LLP

8

**COMPLAINT FOR PATENT INFRINGEMENT**

1  Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis

2  System." The '762 Patent expired on December 20, 2005.

3      48.    On June 29, 1999, the United States Patent and Trademark Office duly

4  and legally issued United States Patent No. 5,917,893 (the "'893 Patent") to

5  Ronald A. Katz for an invention entitled "Multiple Format Telephonic Interface

6  Control System." The '893 Patent expired on December 20, 2005.

7      49.    On October 26, 1999, the United States Patent and Trademark Office

8  duly and legally issued United States Patent No. 5,974,120 (the "'120 Patent") to

9  Ronald A. Katz for an invention entitled "Telephone Interface Call Processing

10  System With Call Selectivity."

11      50.    On March 7, 2000, the United States Patent and Trademark Office duly

12  and legally issued United States Patent No. 6,035,021 (the "'021 Patent") to Ronald

13  A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis System."

14  The '021 Patent expired on December 20, 2005.

15      51.    On March 28, 2000, the United States Patent and Trademark Office duly

16  and legally issued United States Patent No. 6,044,135 (the "'135 Patent") to Ronald

17  A. Katz for an invention entitled "Telephone-Interface Lottery System." The '135

18  Patent expired on July 10, 2005.

19      52.    On November 14, 2000, the United States Patent and Trademark Office

20  duly and legally issued United States Patent No. 6,148,065 (the "'065 Patent") to

21  Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis

22  System." The '065 Patent expired on July 10, 2005.

23      53.    On January 1, 2002, the United States Patent and Trademark Office duly

24  and legally issued United States Patent No. 6,335,965 (the "'965 Patent") to

25  Ronald A. Katz for an invention entitled "Voice-Data Telephonic Interface Control

26  System." The '965 Patent expired on December 20, 2005.

27      54.    On February 19, 2002, the United States Patent and Trademark Office

28  duly and legally issued United States Patent No. 6,349,134 (the "'134 Patent") to

Heller
Ehrman LLP

9

**COMPLAINT FOR PATENT INFRINGEMENT**

1 Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis

2 System." The '134 Patent expired on December 20, 2005.

3     55.    On July 23, 2002, the United States Patent and Trademark Office duly

4 and legally issued United States Patent No. 6,424,703 (the "'703 Patent") to Ronald

5 A. Katz for an invention entitled "Telephonic-Interface Lottery System." The '703

6 Patent expired on July 10, 2005.

7     56.    On August 13, 2002, the United States Patent and Trademark Office

8 duly and legally issued United States Patent No. 6,434,223 (the "'223 Patent") to

9 Ronald A. Katz for an invention entitled "Telephone Interface Call Processing

10 System With Call Selectivity." The '223 Patent expired on July 10, 2005.

11     57.    On January 28, 2003, the United States Patent and Trademark Office

12 duly and legally issued United States Patent No. 6,512,415 (the "'415 Patent") to

13 Ronald A. Katz for an invention entitled "Telephonic-Interface Game Control

14 System." The '415 Patent expired on July 10, 2005.

15     58.    On January 13, 2004, the United States Patent and Trademark Office

16 duly and legally issued United States Patent No. 6,678,360 (the "'360 Patent") to

17 Ronald A. Katz for an invention entitled "Telephonic-Interface Statistical Analysis

18 System." The '360 Patent expired on July 10, 2005.

19 <u>**FIRST CLAIM**</u>
**(Patent Infringement by Avon Products, Inc.)**
20

21     59.    Katz Technology Licensing realleges and incorporates by reference

22 Paragraphs 1-58 of this Complaint as if fully set forth herein.

23     60.    Avon Products, Inc. sells cosmetics, jewelry, clothing and gift items

24 throughout the United States.

25     61.    On information and belief, Avon Products, Inc. uses infringing call

26 processing systems to offer automated customer service to its customers. Using an

27 automated system, in some instances in connection with operators, Avon Products,

28

Heller
Ehrman LLP

COMPLAINT FOR PATENT INFRINGEMENT

165

1   Inc. allows its customers to place an order, check account balance, check order status,
2   make a payment, and perform various other functions.
3       62.    Katz Technology Licensing is the sole holder of the entire right, title,
4   and interest in the '065, '120, '150, '223, '252, '285, '360, '551, '734, '762, '863,
5   '893, '965, '968 and '984 Patents.
6       63.    On information and belief, in its automated operations described in
7   Paragraph 61 (the "Accused Avon Services"), Avon Products, Inc. has been and is
8   now infringing, actively inducing the infringement of, or contributing to the
9   infringement of one or more claims of the patents identified in Paragraph 62 of this
10  Complaint by making, using, offering to sell, or selling the Accused Avon Services.
11      64.    On information and belief, Avon Products, Inc. continues to infringe,
12  actively induce the infringement of, and contribute to the infringement of one or
13  more claims of the '120, '252, '734 and '984 Patents by making, using, offering to
14  sell, or selling the Accused Avon Services.
15      65.    Avon Products, Inc.'s infringement of the patents identified in
16  Paragraph 62 of this Complaint has been and is willful.
17      66.    Avon Products, Inc.'s infringement has caused and will continue to
18  cause Katz Technology Licensing irreparable harm unless enjoined by this Court.
19  Katz Technology Licensing has no adequate remedy at law.

20                          **SECOND CLAIM**
21           **(Patent Infringement By The First Premier Defendants)**

22      67.    Katz Technology Licensing realleges and incorporates by reference
23  Paragraphs 1-58 of this Complaint as if fully set forth herein.
24      68.    The First Premier Defendants provide banking and credit card services
25  to customers throughout the United States.
26      69.    On information and belief, the First Premier Defendants use infringing
27  call processing systems to offer automated banking and other financial services to
28  their customers.  Using an automated system, in some instances in connection with

Heller
Ehrman LLP

                                11

1    operators, the First Premier Defendants allow their customers to access information

2    about their accounts, transfer funds between accounts, activate check cards, check the

3    status of a credit card application, report a lost or stolen credit card, and perform

4    various other functions.

5        70.    Katz Technology Licensing is the sole holder of the entire right, title,

6    and interest in the '065, '120, '135, '150, '156, '223, '285, '360, '551, '576, '707,

7    '734, '762, '863, '893, '965, '968 and '984 Patents.

8        71.    On information and belief, in their automated customer service

9    operations described in Paragraph 69 (collectively, the "Accused First Premier

10    Services"), the First Premier Defendants have been and are now infringing, actively

11    inducing the infringement of, or contributing to the infringement of one or more

12    claims of the patents identified in Paragraph 70 of this Complaint by making, using,

13    offering to sell, or selling the Accused First Premier Services.

14        72.    On information and belief, the First Premier Defendants continue to

15    infringe, actively induce the infringement of, and contribute to the infringement of

16    one or more claims of the '120, '734 and '984 Patents by making, using, offering to

17    sell, or selling the Accused First Premier Services.

18        73.    The First Premier Defendants' infringement of the patents identified in

19    Paragraph 70 of this Complaint has been and is willful.

20        74.    The First Premier Defendants' infringement has caused and will

21    continue to cause Katz Technology Licensing irreparable harm unless enjoined by

22    this Court.  Katz Technology Licensing has no adequate remedy at law.

23                  **THIRD CLAIM**

24        **(Patent Infringement By Navy Federal Credit Union)**

25        75.    Katz Technology Licensing realleges and incorporates by reference

26    Paragraphs 1-58 of this Complaint as if fully set forth herein.

27        76.    Navy Federal Credit Union offers banking and other financial services

28    throughout the United States.

77.   On information and belief, Navy Federal Credit Union uses infringing call processing systems to offer automated banking and investment services to its customers.  Using an automated system, in some instances in connection with operators, Navy Federal Credit Union allows its members to access information about their accounts, transfer funds between accounts, issue stop payments on checks, request copies of paid checks, make payments on their credit card accounts, and perform various other functions.

78.   Katz Technology Licensing is the sole holder of the entire right, title, and interest in the '065, '120, '134, '150, '223, '252, '285, '360, '551, '734, '762, '863, '893, '965, '968 and '984 Patents.

79.   On information and belief, in its automated operations described in Paragraph 77 (the "Accused Navy Federal Credit Union Services"), Navy Federal Credit Union has been and is now infringing, actively inducing the infringement of, or contributing to the infringement of one or more claims of the patents identified in Paragraph 78 of this Complaint by making, using, offering to sell, or selling the Accused Navy Federal Credit Union Services.

80.   On information and belief, Navy Federal Credit Union continues to infringe, actively induce the infringement of, and contribute to the infringement of one or more claims of the '120, '252, '734 and '984 Patents by making, using, offering to sell, or selling the Accused Navy Federal Credit Union Services.

81.   Navy Federal Credit Union's infringement of the patents identified in Paragraph 78 of this Complaint has been and is willful.

82.   Navy Federal Credit Union's infringement has caused and will continue to cause Katz Technology Licensing irreparable harm unless enjoined by this Court. Katz Technology Licensing has no adequate remedy at law.

Heller
Ehrman LLP

13

**COMPLAINT FOR PATENT INFRINGEMENT**

168

## FOURTH CLAIM
### (Patent Infringement By The Sempra Defendants)

83.    Katz Technology Licensing realleges and incorporates by reference Paragraphs 1-58 of this Complaint as if fully set forth herein.

84.    The Sempra Defendants, among other things, provide gas and electricity to customers in southern and central California.

85.    On information and belief, the Sempra Defendants use infringing call processing systems to offer automated customer service to their customers.  Using an automated system, in some instances in connection with operators, the Sempra Defendants allow their customers to access account information; sign up for new service; transfer service; make a payment or a payment arrangement; schedule a service request; request a duplicate bill, a twelve-month usage report, or a letter of credit; enter a meter read; report a gas leak, power outage or emergency; and perform various other functions.

86.    Katz Technology Licensing is the sole holder of the entire right, title, and interest in the '065, '120, '134, '135, '150, '156, '223, '252, '285, '309, '360, '415, '551, '703, '707, '734, '863, '893, '965, '968 and '984 Patents.

87.    On information and belief, in their automated customer service operations described in Paragraph 85 (collectively, the "Accused Sempra Services"), the Sempra Defendants have been and are now infringing, actively inducing the infringement of, or contributing to the infringement of one or more claims of the patents identified in Paragraph 86 of this Complaint by making, using, offering to sell, or selling the Accused Sempra Services.

88.    On information and belief, the Sempra Defendants continue to infringe, actively induce the infringement of, and contribute to the infringement of one or more claims of the '120, '252, '734 and '984 Patents by making, using, offering to sell, or selling the Accused Sempra Services.

Heller
Ehrman LLP

14

COMPLAINT FOR PATENT INFRINGEMENT

89.   The Sempra Defendants' infringement of the patents identified in Paragraph 86 of this Complaint has been and is willful.

90.   The Sempra Defendants' infringement has caused and will continue to cause Katz Technology Licensing irreparable harm unless enjoined by this Court. Katz Technology Licensing has no adequate remedy at law.

## FIFTH CLAIM
### (Patent Infringement by the United Health Defendants)

91.   Katz Technology Licensing realleges and incorporates by reference Paragraphs 1-58 of this Complaint as if fully set forth herein.

92.   The United Health Defendants offer health insurance and prescription medication services to customers throughout the United States.

93.   On information and belief, the United Health Defendants use infringing call processing systems to offer automated customer service and pharmacy services to their customers. Using automated systems, in some instances in connection with operators, the United Health Defendants allow their customers to access information about their policies, make credit card payments, order new identification cards, locate healthcare providers, order pharmacy products, and perform various other functions.

94.   Katz Technology Licensing is the sole holder of the entire right, title, and interest in the '021, '065, '120, '134, '135, '150, '156, '223, '252, '285, '309, '360, '551, '703, '707, '734, '762, '863, '893, '965, '968 and '984 Patents.

95.   On information and belief, in their automated customer service operations described in Paragraph 93 (collectively, the "Accused United Health Services"), the United Health Defendants have been and are now infringing, actively inducing the infringement of, or contributing to the infringement of one or more claims of the patents identified in Paragraph 94 of this Complaint by making, using, offering to sell, or selling the Accused United Health Services.

96.   On information and belief, the United Health Defendants continue to infringe, actively induce the infringement of, and contribute to the infringement of

Heller
Ehrman LLP

15

170

1    one or more claims of the '120, '252, '734 and '984 Patents by making, using,

2    offering to sell, or selling the Accused United Health Services.

3        97.    The United Health Defendants' infringement of the patents identified in

4    Paragraph 94 of this Complaint has been and is willful.

5        98.    The United Health Defendants' infringement has caused and will

6    continue to cause Katz Technology Licensing irreparable harm unless enjoined by

7    this Court. Katz Technology Licensing has no adequate remedy at law.

8    <div align="center">**PRAYER FOR RELIEF**</div>

9        WHEREFORE, Ronald A. Katz Technology Licensing, L.P., respectfully

10   requests that this Court enter judgment in its favor and against the defendants and

11   grant the following relief:

12       99.    Adjudge that Avon Products, Inc. has been and is infringing one or more

13   claims of the patents identified in Paragraph 62 of this Complaint by offering the

14   Accused Avon Services;

15       100.   Adjudge that Avon Products, Inc.'s infringement has been and is willful;

16       101.   Enter an order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily,

17   and permanently enjoining Avon Products, Inc., and all persons in active concert or

18   participation with it, from any further acts of infringement, contributory

19   infringement, or inducement of infringement of the '120, '252, '734, and '984

20   Patents;

21       102.   Order an accounting for damages resulting from Avon Products, Inc.'s

22   infringement of the patents identified in Paragraph 62 of this Complaint.

23       103.   Enter an order, pursuant to 35 U.S.C. § 284, awarding to Katz

24   Technology Licensing damages adequate to compensate Katz Technology Licensing

25   for Avon Products, Inc.'s infringement, but in no event less than a reasonable royalty,

26   together with pre-judgment and post-judgment interest;

27

28

Heller
Ehrman LLP

<div align="center">16

**COMPLAINT FOR PATENT INFRINGEMENT**</div>

104.   Enter an order, pursuant to 35 U.S.C. § 284, and based on Avon Products, Inc.'s willful infringement, trebling all damages awarded to Katz Technology Licensing and against Avon Products, Inc.;

105.   Adjudge that the First Premier Defendants have been and are infringing one or more claims of the patents identified in Paragraph 70 of this Complaint by offering the Accused First Premier Services;

106.   Adjudge that the First Premier Defendants' infringement has been and is willful;

107.   Enter an order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily, and permanently enjoining the First Premier Defendants, and all persons in active concert or participation with them, from any further acts of infringement, contributory infringement, or inducement of infringement of the '120, '734, and '984 Patents;

108.   Order an accounting for damages resulting from the First Premier Defendants' infringement of the patents identified in Paragraph 70 of this Complaint;

109.   Enter an order, pursuant to 35 U.S.C. § 284, awarding to Katz Technology Licensing damages adequate to compensate Katz Technology Licensing for the First Premier Defendants' infringement, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest;

110.   Enter an order, pursuant to 35 U.S.C. § 284, and based on the First Premier Defendants' willful infringement, trebling all damages awarded to Katz Technology Licensing and against the First Premier Defendants;

111.   Adjudge that Navy Federal Credit Union has been and is infringing one or more claims of the patents identified in Paragraph 78 of this Complaint by offering the Accused Navy Federal Credit Union Services;

112.   Adjudge that Navy Federal Credit Union's infringement has been and is willful;

Heller
Ehrman LLP

17

**COMPLAINT FOR PATENT INFRINGEMENT**

113.   Enter an order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily, and permanently enjoining Navy Federal Credit Union, and all persons in active concert or participation with it, from any further acts of infringement, contributory infringement, or inducement of infringement of the '120, '252, '734, and '984 Patents;

114.   Order an accounting for damages resulting from Navy Federal Credit Union's infringement of the patents identified in Paragraph 78 of this Complaint.

115.   Enter an order, pursuant to 35 U.S.C. § 284, awarding to Katz Technology Licensing damages adequate to compensate Katz Technology Licensing for Navy Federal Credit Union's infringement, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest;

116.   Enter an order, pursuant to 35 U.S.C. § 284, and based on Navy Federal Credit Union's willful infringement, trebling all damages awarded to Katz Technology Licensing and against Navy Federal Credit Union;

117.   Adjudge that the Sempra Defendants have been and are infringing one or more claims of the patents identified in Paragraph 86 of this Complaint by offering the Accused Sempra Services;

118.   Adjudge that the Sempra Defendants' infringement has been and is willful;

119.   Enter an order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily, and permanently enjoining the Sempra Defendants, and all persons in active concert or participation with them, from any further acts of infringement, contributory infringement, or inducement of infringement of the '120, '252, '734 and '984 Patents;

120.   Order an accounting for damages resulting from the Sempra Defendants' infringement of the patents identified in Paragraph 86 of this Complaint;

121.   Enter an order, pursuant to 35 U.S.C. § 284, awarding to Katz Technology Licensing damages adequate to compensate Katz Technology Licensing

1  for the Sempra Defendants' infringement, but in no event less than a reasonable

2  royalty, together with pre-judgment and post-judgment interest;

3      122.  Enter an order, pursuant to 35 U.S.C. § 284, and based on the Sempra

4  Defendants' willful infringement, trebling all damages awarded to Katz Technology

5  Licensing and against the Sempra Defendants;

6      123.  Adjudge that the United Health Defendants have been and are infringing

7  one or more claims of the patents identified in Paragraph 94 of this Complaint by

8  offering the Accused United Health Services;

9      124.  Adjudge that the United Health Defendants' infringement has been and

10  is willful;

11      125.  Enter an order, pursuant to 35 U.S.C. § 283, temporarily, preliminarily,

12  and permanently enjoining the United Health Defendants, and all persons in active

13  concert or participation with them, from any further acts of infringement,

14  contributory infringement, or inducement of infringement of the '120, '252, '734 and

15  '984 Patents;

16      126.  Order an accounting for damages resulting from the United Health

17  Defendants' infringement of the patents identified in Paragraph 94 of this Complaint;

18      127.  Enter an order, pursuant to 35 U.S.C. § 284, awarding to Katz

19  Technology Licensing damages adequate to compensate Katz Technology Licensing

20  for the United Health Defendants' infringement, but in no event less than a

21  reasonable royalty, together with pre-judgment and post-judgment interest;

22      128.  Enter an order, pursuant to 35 U.S.C. § 284, and based on the United

23  Health Defendants' willful infringement, trebling all damages awarded to Katz

24  Technology Licensing and against the United Health Defendants;

25      129.  Enter an order, pursuant to 35 U.S.C. § 285, finding that this is an

26  exceptional case and awarding to Katz Technology Licensing its reasonable

27  attorneys' fees incurred in this action; and

28

Heller
Ehrman LLP

19

**COMPLAINT FOR PATENT INFRINGEMENT**

1    130.   Award such other relief as the Court may deem appropriate and just

2  under the circumstances.

## JURY DEMAND

4  Plaintiff demands a trial by jury of all claims that are triable by jury.

5

6  DATED: June 6, 2007              HELLER EHRMAN LLP

7

8                                  By _Robert T. Haslam_____

9                                     Robert T. Haslam
                                    Attorneys for Plaintiff RONALD A. KATZ

10                                 TECHNOLOGY LICENSING, L.P.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Heller
rman LLP

COMPLAINT FOR PATENT INFRINGEMENT

175

EXHIBIT 5

# Snell & Wilmer
## L.L.P.
### LAW OFFICES

One Arizona Center
Phoenix, AZ 85004-2202
602.382.6000
602.382.6070 (Fax)
www.swlaw.com

DENVER

LAS VEGAS

ORANGE COUNTY

PHOENIX

SALT LAKE CITY

TUCSON

John Platt
602.382.6367
jhplatt@swlaw.com

October 1, 2007

Jason H. Wilson
Willenken Wilson Loh & Lieb LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017

Re:    Ronald A. Katz Technology Licensing, L.P. v. Southern California Gas Company

Dear Mr. Wilson:

I am responding to your letter of August 21, 2007 in which you informed Syntellect that a complaint has been filed against Southern California Gas Company ("SoCalGas") by Ronald A. Katz Technology Licensing, L.P. ("Katz"). Our firm represents Syntellect.

Your letter states, "Syntellect must indemnify, defend and hold SoCalGas harmless for the claims asserted by RAKTL." But the Katz patents do not cover the products which SoCalGas purchased and/or licensed from Syntellect. Rather, the Katz patents relate to call centers and their operation. Katz's claims against SoCalGas do not arise from actual or alleged infringement by Syntellect of any Katz patent.

Katz' licensing and litigation activities illustrate the "call center" focus of the claims and of Katz' enforcement strategy. Each and every one of the companies Katz has licensed were pursued by Katz because of their call center operations. Significantly, to our knowledge, not a single company has been accused of infringement as a result of telephone hardware or component sales. Additionally, various Katz claims were formally construed by the court in the case of *Ronald A. Katz Technology Licensing, L.P. v. AT&T Corp.*, 63 F.Supp.2d 583 (E.D.Pa. 1999). The Pennsylvania court's construction further confirms the "call center" focus of the Katz patent claims.

In short, the Katz patents do not cover the software which SoCalGas licensed from Syntellect. Therefore, Syntellect has no contractual obligation to indemnify SoCalGas for any alleged infringement by SoCalGas of Katz's patent rights.

**EXHIBIT 5**

Snell & Wilmer is a member of LEX MUNDI, The Leading Association of Independent Law Firms.

176

# Snell & Wilmer
### L.L.P.

Jason H. Wilson
October 1, 2007
Page 2

　　　Syntellect values its relationships with its customers.　However, the present circumstances are not appropriate for indemnification by Syntellect.

Very truly yours,

Snell & Wilmer

John H. Platt

JHP:kb
cc:　Charles F. Hauff (via e-mail)
　　　Jason Meretsky (via e-mail)
　　　Steve Dodenhoff (via e-mail)
　　　Dennis Farar (via e-mail)

2053374.1

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS:   330 West Broadway
MAILING ADDRESS:   330 West Broadway
CITY AND ZIP CODE:  San Diego, CA 92101
BRANCH NAME:  Central
TELEPHONE NUMBER: (619) 685-6150

PLAINTIFF(S) / PETITIONER(S): *Southern California Gas Company*

DEFENDANT(S) / RESPONDENT(S): *Syntellect, Inc*

| NOTICE OF CASE ASSIGNMENT | CASE NUMBER:<br>37-2008-00082356-CU |
|---|---|

Judge:  **WILLIAM R. NEVITT, JR.**      Department: C-64

COMPLAINT/PETITION FILED: APR 2 1 2008

---

### CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

---

SDSC CIV-721 (Rev. 11-06)         **NOTICE OF CASE ASSIGNMENT**        Page: 1

## PROOF OF SERVICE BY ALL OPTIONS

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 600 Anton Boulevard, Suite 1400, Costa Mesa, CA 92626-7689.

On May 28, 2008, I served, in the manner indicated below, the foregoing document described as **NOTICE OF REMOVAL UNDER 28 U.S.C. § 1446** on the interested parties in this action by placing true copies thereof, enclosed in sealed envelopes, at Costa Mesa, addressed as follows:

*Please see attached Service List*

[X]    BY REGULAR MAIL:  I caused such envelopes to be deposited in the United States mail at Costa Mesa, California, with postage thereon fully prepaid.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the United States Postal Service each day and that practice was followed in the ordinary course of business for the service herein attested to  (C.C.P. § 1013(a)).

[ ]    BY FACSIMILE: (C.C.P. § 1013(e)(f)).

[ ]    BY FEDERAL EXPRESS:  I caused such envelopes to be delivered by air courier, with next day service, to the offices of the addressees. (C.C.P. § 1013(c)(d)).

[ ]    BY PERSONAL SERVICE:  I caused such envelopes to be delivered by hand to the offices of the addressees. (C.C.P. § 1011(a)(b)).

\*\*\*\*\*\*\*\*

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on May 28, 2008, at Costa Mesa, California.

Wendy J. Merkle
Wendy J. Merkle

8813513.1

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1

## SERVICE LIST
## SOUTHERN CALIFORNIA GAS COMPANY V. SYNTELLECT, INC.

2

## U.S.D.C. CASE NO. TBA

3

4     Jason H. Wilson                    Attorneys for Plaintiff
      William A. Delgado
5     WILLENKEN WILSON LOH &            Phone:  (213) 955-9240
      LIEB LLP                          FAX:  (213) 955-9250
6     707 Wilshire Blvd., Ste. 3850
      Los Angeles, CA 90017

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

8813513.1

- 2 -

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 151326    — MB**

**May 28. 2008
15:31:04**

**Civ Fil Non-Pris**
USAO #.: 08CV0941
Judge..: ROGER T BENITEZ
Amount.:                    $350.00 CK
Check#.: BC11376

**Total—>   $350.00**

FROM: SO CAL GAS CO
      SYNTELLECT

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers *as required by law, except as provided by local rules of court.* This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SOUTHERN CALIFORNIA GAS COMPANY, a
California corporation

## DEFENDANTS

SYNTELLECT, INC., a Delaware corporation

08 MAY 28 PM 3:34

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                     DEPUTY

**(b)** County of Residence of First Listed Plaintiff  Los Angeles, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Maricopa, AZ
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Snell & Wilmer L.L.P.
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626
714-427-7000

Attorneys (If Known)

'08 CV 0941 BEN NLS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [X] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [X] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [X] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [ ] 445 Amer. w/Disabilities- Employment
- [ ] 446 Amer. w/Disabilities- Other
- [ ] 440 Other Civil Rights

### PERSONAL INJURY
- [ ] 362 Personal Injury - Med. Malpractice
- [ ] 365 Personal Injury - Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### PRISONER PETITIONS
- [ ] 510 Motion to Vacate Sentence
**Habeas Corpus:**
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- [ ] 1 Original Proceeding
- [X] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. 1332

Brief description of cause: Breach of Contract (Indemnity)

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] YES [ ] NO

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE                          DOCKET NUMBER

DATE
May 27, 2008

SIGNATURE OF ATTORNEY OF RECORD
Sean M. Sherlock

FOR OFFICE USE ONLY
RECEIPT #  151526    AMOUNT $250—    APPLYING IFP ___    JUDGE ___    MAG. JUDGE ___
TLS  05/28/08

## PROOF OF SERVICE BY ALL OPTIONS

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 600 Anton Boulevard, Suite 1400, Costa Mesa, CA 92626-7689.

On May 28, 2008, I served, in the manner indicated below, the foregoing document described as **CIVIL COVER SHEET** on the interested parties in this action by placing true copies thereof, enclosed in sealed envelopes, at Costa Mesa, addressed as follows:

*Please see attached Service List*

☒ BY REGULAR MAIL: I caused such envelopes to be deposited in the United States mail at Costa Mesa, California, with postage thereon fully prepaid. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the United States Postal Service each day and that practice was followed in the ordinary course of business for the service herein attested to (C.C.P. § 1013(a)).

☐ BY FACSIMILE: (C.C.P. § 1013(e)(f)).

☐ BY FEDERAL EXPRESS: I caused such envelopes to be delivered by air courier, with next day service, to the offices of the addressees. (C.C.P. § 1013(c)(d)).

☐ BY PERSONAL SERVICE: I caused such envelopes to be delivered by hand to the offices of the addressees. (C.C.P. § 1011(a)(b)).

\*\*\*\*\*\*\*\*

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on May 28, 2008, at Costa Mesa, California.

Wendy J. Merkle

Wendy J. Merkle

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

8813513.1

# SERVICE LIST
## SOUTHERN CALIFORNIA GAS COMPANY V. SYNTELLECT, INC.
### U.S.D.C. CASE NO. TBA

Jason H. Wilson                        Attorneys for Plaintiff
William A. Delgado
WILLENKEN WILSON LOH &                 Phone:  (213) 955-9240
LIEB LLP                               FAX:  (213) 955-9250
707 Wilshire Blvd., Ste. 3850
Los Angeles, CA 90017

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

8813513.1